UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AT&T CORP.,

                                    Plaintiff,          Case No. _____

                    -against-

ATOS IT SOLUTIONS AND SERVICES, INC.,          **JURY TRIAL DEMANDED**

                                    Defendant.

## COMPLAINT

Plaintiff AT&T Corp. ("AT&T"), by and through its attorneys Haynes and Boone, LLP,

for its complaint against Defendant Atos IT Solutions and Services, Inc. ("Atos" or "Defendant")

respectfully alleges as follows on knowledge as to its own acts and on information and belief as

to all other matters except as indicated otherwise:

## NATURE OF THE ACTION

1.      This is a Complaint for breach of contract arising from Defendant's flagrant

breach of a December 24, 2019 Addendum for Network Sourcing Services (the "Addendum")

agreement between AT&T and Atos, by which AT&T agreed to assume responsibility for the

provision of network sourcing services to Atos' customers in exchange for Atos' agreement to,

*inter alia*, make certain guaranteed minimum annual revenue commitments to AT&T.

2.      As detailed herein, in or about the Fall of 2019, Atos approached AT&T to discuss

the terms of a deal by which AT&T would agree to assume control over the provision of network

services and/or functions to certain of Atos' customers.  While an agreement of the sort proposed

by Atos typically requires upwards of six to nine months to finalize—to allow the parties to

engage in sufficient due diligence regarding the scope of services required, develop a plan and

infrastructure to effectuate the transition of management for such services between entities, and

1

negotiate the terms of an agreement—Atos was anxious to get the deal done by year-end and asked AT&T to proceed on an accelerated schedule.

3.      As an accommodation to Atos—which, at the time, was a longtime business partner of AT&T—AT&T agreed to negotiate and execute the Addendum on an expedited basis. AT&T's undertaking in this regard was no small feat. Indeed, AT&T's personnel devoted countless hours to understanding: the variety of telecommunication and network devices used by Atos' customers and the scope of services to be provided to such customers; devising preliminary plans for AT&T's assumption of responsibility for such services; and negotiating the terms of an agreement with Atos.  AT&T also agreed to provide Atos with a $3 million upfront credit as part of the deal which, upon information and belief, Atos required to demonstrate an expense reduction on its books at a time when Atos was experiencing financial difficulties.

4.      In no small part due to AT&T's efforts, the parties were able to consummate a written agreement and signed the Addendum on December 24, 2019.  However, given the accelerated schedule on which the Addendum was negotiated and executed, AT&T specifically bargained for—and expressly obtained—the right to engage in further due diligence regarding the scope of services to be provided to Atos' customers and develop a plan to transition operational responsibility for such services from Atos to AT&T *after* the Addendum's execution.

5.      From the very start, AT&T worked in good faith to prepare for its assumption of control over the provision of network services to Atos' customers. In fact, AT&T invested millions of dollars in resources and manpower in planning for the transition of responsibility outlined by the Addendum. Yet, soon after the parties executed the Addendum, it became evident that Atos was not prepared to furnish the information required by, and was ill-equipped to support the proposed solutions contemplated under, the Addendum. Moreover, it became

increasingly clear that Atos no longer had any desire—or intent—to honor the deal to which it had only weeks earlier agreed.

6.     Upon information and belief, Atos' change in tack was motivated by significant turnover in its management and an associated change in business philosophy as well as the fact that many of Atos' employees charged with facilitating the transition of management to AT&T recognized that AT&T's assumption of control over Atos' network services would likely render them expendable and jeopardize their positions at Atos.

7.     Faced with the fact that the Addendum does not permit Atos to terminate the agreement for convenience, Atos chose a different approach and decided to sabotage AT&T's efforts to comply with its contractual obligations. As a result, Atos engaged in a pattern of dilatory and obstructive conduct that was designed to prevent AT&T from completing its due diligence and interfere with AT&T's ability to formulate a plan for the transfer of control over Atos' network services to AT&T.

8.     Among other things, Atos withheld critical information from a contractually mandated "virtual data room" that AT&T needed to formulate the transition plan required by the Addendum.  What little information Atos provided to AT&T demonstrated there were significant gaps between the scope of services AT&T believed was required under the Addendum and those Atos believed AT&T should be required to provide to Atos' customers.

9.     As of September of 2020, Atos had not only failed to comply with its performance-related obligations under the Addendum, but its financial obligations as well. Specifically, Atos failed to pay AT&T's August 26, 2020 invoice in the amount of $1,027,976.82 (the "Invoice") within thirty (30) days of invoicing in accordance with the terms of the Addendum.

10.     As a result, on October 9, 2020, following months of Atos' failure to comply with its performance obligations and its failure to make any payments toward satisfaction of the amounts due under the Invoice, AT&T advised Atos that it was terminating the Addendum for cause as of November 8, 2020.

11.     Not only did AT&T lose millions of dollars in costs, labor and additional resources used to prepare for its assumption of control over Atos' network services as a result of Atos' breach, but it also lost the guaranteed minimum annual revenue commitments to which Atos willingly agreed as part of the Addendum.  Indeed, Atos committed to a Minimum Annual Revenue Commitment (the "MARC") totaling more than $37 million over the Addendum's term—though the parties anticipated Atos would spend at least double that amount.

12.     Because AT&T's damages in the event of a breach were not readily ascertainable at the time the Addendum was executed—given, among other things, all of the resources AT&T devoted toward negotiating, planning for and effectuating the transition outlined by the Addendum—the parties expressly agreed to a termination charge that they believed was proportionate to AT&T's probable losses in the event of a breach by Atos.

13.     In the event that AT&T terminates the Addendum for cause, as here, the Addendum is clear: Atos is liable to AT&T for 50% of the unsatisfied MARC, in addition to other charges.  Accordingly, AT&T brings this complaint for breach of contract seeking damages of no less than $21,800,000.00.

## THE PARTIES

14.     AT&T is a New York corporation with a principal place of business located at One AT&T Way, Bedminster, New Jersey 07921, and additional offices located at, *inter alia*, 30 Hudson Yards, New York, New York 10001.

15.     Upon information and belief, Atos is a Delaware corporation with its principal place of business located at 4851 Regent Blvd, Irving, Texas 75063, and offices located at 2500 Westchester Ave, Purchase, NY 10577.  Upon information and belief, Atos is authorized to transact business in the State of New York.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the dispute is between citizens of different states and the amount in controversy exceeds $75,000.00.

17.     Defendant is also subject to personal jurisdiction in New York pursuant to CPLR § 302 because Atos: (1) regularly transacts or solicits business within the state; (2) committed a tortious act within the state and/or without the state causing injury to AT&T within the state; (3) reasonably expected its acts to have consequences in the state especially given the fact that the agreements at issue are governed by New York law; and (4) derives substantial revenue from interstate or international commerce.

18.     Venue is proper in this Court pursuant to, *inter alia*, 28 U.S.C. §§ 1391(b)(1) and (b)(2) because Defendant resides in this District pursuant to 28 U.S.C. §§ 1391(c)(2) and/or 1391(d), and, upon information and belief, because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

A.     *The Business of AT&T.*

19.     AT&T is the world's largest telecommunications company.  Although AT&T has expanded its business over the last several decades to provide software-based entertainment and modern media, a pillar of AT&T's business is—and has been—its broadband connectivity

services.

20.     As a broadband connectivity provider, AT&T connects people and businesses across the United States through high-speed fiber and wireless broadband networks.

21.     As a part of its business, AT&T also offers network sourcing services, which assists companies with management of their IT infrastructure and, in some cases, the provision of network services to end-user customers.

22.     A leader in this space, AT&T's premier network sourcing services grants customers with access to, *inter alia*, AT&T's managed services expertise and tools proven to improve performance, lower costs and optimize efficiency and efficacy of operations including, but not limited to, tools designed to enhance the network security of AT&T's customers and their end-user customers.

**B.      The Business of Atos.**

23.     Upon information and belief, Atos is an IT services company that specializes in providing cybersecurity, digital consulting, artificial intelligence, internet services, customer journey analytics, and cloud management solutions.

24.     Upon information and belief, as a part of its business, Atos also provides network sourcing services to its customers.

**C.      The Master Agreement.**

25.     AT&T's has had a business relationship with Atos for nearly twenty years.

26.     Effective October 9, 2002, AT&T and Atos Origin, Inc.—the predecessor-in-interest to Atos—entered into Master Agreement, Reference No. 120206 (the "Master Agreement").[1]

---

[1]     The Addendum expressly identifies Atos as the "successor-in-interest to Atos Origin, Inc., effective December 31, 2011[.]" (*See* Addendum at 1.)

27.     The Master Agreement provides the "General Terms and Conditions" applicable to AT&T's provision of products and services to Atos under the Master Agreement (collectively, the "Services") and all service attachments attached to the Master Agreement or subsequently signed by the parties to the extent they reference the Master Agreement. (Master Agreement, at 1-2.)

28.     The precise Services to be provided by AT&T under the Master Agreement were memorialized in separate service attachments (each, an "Attachment")—some of which were executed contemporaneously with the Master Agreement and some of which were executed at dates that followed the parties' execution of the Master Agreement. (Master Agreement, at 2.)

29.     The Master Agreement provides that, "[i]n the event of a conflict between the General Terms and Conditions and any Attachment, the Attachment shall take precedence." (Master Agreement, at 1.)

30.     The Master Agreement makes clear that its terms "shall continue in effect for as long as any Attachment remains in effect, unless earlier terminated in accordance with the provisions of the Agreement" and that "[t]he term of each Attachment is stated in the Attachment." (Master Agreement, at 1.)

31.     The Master Agreement sets forth the terms governing AT&T's charges and billing and, among other things, provides that Atos:

> [S]hall pay AT&T for [Atos'] and [Atos' customers'] use of the Services at the rates and charges specified in the Attachments, without deduction, setoff or delay for any reason. Charges set forth in the Attachments are exclusive of any applicable taxes.

(Master Agreement, § 2.1.)

32.     Section 10.1 of the Master Agreement sets forth the Master Agreement's termination provision and, *inter alia*, governs the parties' right to terminate an Attachment as follows:

> If a party fails to perform or observe any material term or condition of this Agreement and the failure continues unremedied for thirty (30) days after receipt of written notice, (i) the other party may terminate for cause any Attachment affected by the breach, or (ii) where the failure is a non-payment by [Atos] of any charge when due, AT&T may, at its option, terminate or suspend Service or require a deposit under affected Attachments.

(Master Agreement, § 10.1.)

33.    Further, Section 10.3 of the Master Agreement provides that, in the event an

Attachment is terminated and/or AT&T terminates an Attachment pursuant to Section 10.1 or

10.2[2] of the Master Agreement, Atos shall be responsible for the payment of all charges incurred

as of the effective date of termination, in addition to any termination charges set forth by the

Attachment as follows:

> [Atos] shall be responsible for payment of all charges under a terminated Attachment incurred as of the effective date of termination.  [Atos] shall also be liable to AT&T for Termination Charges, if specified in a terminated Attachment, in the event that AT&T terminates under Section 10.1 or Section 10.2, or [Atos] terminate[s] without cause.

(Master Agreement, § 10.3.)

34.    Section 10.4 of the Master Agreement provides that termination of an Attachment

by either party shall be without prejudice to any other rights or remedies the party might have

under the Master Agreement or any other Attachment as follows:

> Termination by either party of an Attachment does not waive any other rights or remedies it may have under this Agreement.

---

[2]    Section 10.2 of the Master Agreement provides that an Attachment may be terminated immediately upon written notice by: "(i) either party if the other party has violated the other party's Marks, becomes insolvent or involved in a liquidation or termination of its business, files a bankruptcy petition, has an involuntary bankruptcy petition filed against it (if not dismissed within thirty (30) days of filing), becomes adjudicated bankrupt, or becomes involved in an assignment for benefit of its creditors; or (ii) either party due to a material breach of any provision of Article 4 [of the Master Agreement governing the use of proprietary or confidential information]." (Master Agreement, § 10.2.)

> Termination or suspension of an Attachment shall not affect the rights and obligations of the parties under any other Attachment.

(Master Agreement, § 10.4.)

35.     The Master Agreement includes a no oral modification clause which requires that any modifications be set forth in a writing signed by both parties as follows:

> Any supplement, modification or waiver of any provision of this Agreement must be in writing and signed by authorized representatives of both parties. A waiver by either party of any breach of this Agreement shall not operate as a waiver of any other breach of this Agreement.

(Master Agreement, § 12.1.)

36.     The Master Agreement requires that any notices required under the Agreement be set forth in writing as follows:

> All required notices under this Agreement shall be in writing and either mailed by certified or registered mail, postage prepaid return receipt requested, sent by express courier or hand delivered and addressed to each party at the address set forth on the cover page of this Agreement or, if the notice relates to a specific Attachment, the address set forth in such Attachment, or such other address that a party indicates in writing.

(Master Agreement, § 12.5.)

37.     The Master Agreement also provides that it—together with any Attachments—constitutes the entire agreement of the parties with respect to AT&T's Services as follows:

> THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SERVICES. THIS AGREEMENT SUPERSEDES ALL PRIOR AGREEMENTS, PROPOSALS, REPRESENTATIONS, STATEMENTS OR UNDERSTANDINGS, WHETHER WRITTEN OR ORAL CONCERNING THE SERVICES OR THE RIGHTS AND OBLIGATIONS RELATING TO THE SERVICES. THIS AGREEMENT SHALL NOT BE CONTRADICTED, OR SUPPLEMENTED BY ANY WRITTEN OR ORAL STATEMENTS, PROPOSALS, REPRESENTATIONS, ADVERTISEMENTS, SERVICE DESCRIPTIONS OR YOUR

PURCHASE ORDER FORMS NOT EXPRESSLY SET FORTH IN
THIS AGREEMENT OR AN ATTACHMENT.

(Master Agreement, § 12.9.)

38.     Finally, the Master Agreement includes a New York choice of law provision

which provides:

> State law issues concerning construction, interpretation and
> performance of this Agreement shall be governed by the substantive
> law of the State of New York excluding its choice of law rules.

(Master Agreement, § 12.6.)

**D.      The October 2002 Amendment.**

39.     On or about October 9, 2002, Atos Origin, Inc. and AT&T executed an

Addendum to Master Agreement, which modified and/or supplemented certain of the general

terms and conditions of the Master Agreement (the "Amendment").

40.     Among the modifications is a change to Section 2.3 of the Master Agreement

concerning Atos' payment obligations.  Specifically, the parties agreed that AT&T's invoices

must be paid by Atos when received and will be considered past due if not paid in full within

thirty (30) days of the date of the invoice, as follows:

> Billing invoices are payable upon receipt by [Atos].  Charges shall
> be considered past due if not paid in full within thirty (30) days after
> the date of an invoice.

(Amendment, § 2.3.)

41.     The Amendment expressly provides that, "[e]xcept as modified herein, the terms

of the Master Agreement remain unchanged and in full force and effect." (Amendment, at 2.)

**E.      The April 2007 Attachment.**

42.     On or about April 4, 2007, AT&T and Atos Origin, Inc. executed a

Comprehensive Service Order Attachment to the Master Agreement (the "Attachment").

43.     The Attachment specifically states that it "is a Service Order Attachment to the [Master] Agreement between AT&T and [Atos]" and includes a specific reference to the Master Agreement's Reference Number 120206.   (Attachment, at 1.)

44.     Under the Attachment, AT&T agreed to provide the Services to Atos "identified in the applicable Pricing Schedules."  (Attachment, § 1(A).)

45.     The Attachment defines a "Pricing Schedule" as "a pricing schedule to this Attachment, either appended [to the Attachment] or subsequently signed by the parties referencing [the Master Agreement]." (Attachment, § 2.)

46.     The Attachment provides that, "[t]he pricing, service descriptions and other provisions relating to the Services will be as set forth in: (i) this Attachment (including, the Pricing Schedules and any Addenda to this Attachment); (ii) the [Master Agreement's] General Terms and Conditions; and (iii) the appropriate section of the Service Guide or the Applicable Tariffs." (Attachment, § 1(B).)

47.     The Attachment further provides that it "shall remain in effect until no Service Component provided under this Attachment remains in service." (Attachment, § 1(C).)

48.     The Attachment contemplates that a Pricing Schedule may require a "Minimum Annual Revenue Commitment" (or "MARC") that Atos agrees to satisfy during the Pricing Schedule's term.  (Attachment, § 2.)

49.     The parties agreed that the MARC represents the *minimum* amount that Atos could be required to pay in a certain period.  Indeed, Section 4 provides that if Atos fails to satisfy the MARC for a designated period "[Atos] will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred" during the period.  (Attachment, § 4.)

50.     The Attachment specifically addresses the parties' termination rights and, among other things, provides that, "[i]f a Service or a Service Component is terminated, [Atos] must pay all charges incurred as of the effective date of termination." (Attachment, § 3.1.)

51.     The Attachment defines a "Service" as "collectively all of the Service Components [Atos] orders under a Pricing Schedule" and defines a "Service Component" as "the individual components of a Service that [Atos] orders under a Pricing Schedule." (Attachment, § 2.)

52.     Section 3.3 of the Attachment provides that if Atos terminates a Service Component other than for material breach, or AT&T terminates a Service or a Service Component for material breach, Atos must pay the following to AT&T:

> (i) any credits, waived charges or unpaid amortized charges if the Service Component is terminated prior to the end of an applicable minimum retention period (specified in the Pricing Schedule, the Service Guide or the Applicable Tariffs); (ii) the applicable amount of recurring charges for the terminated Service Component multiplied by the number of months remaining in an applicable minimum payment period (specified in the Pricing Schedule, the Service Guide or the Applicable Tariffs); and (iii) any access facilities cancellation charges and other third-party charges incurred by AT&T due to the termination.

(Attachment, § 3.3.)

53.     At the time of the parties' execution of each of the agreements at issue including, but not limited to, the Attachment, the parties agreed that AT&T's damages in the event it terminated a Pricing Schedule for material breach by Atos, or Atos terminated a Pricing Schedule for convenience, were not readily ascertainable. As a result, the parties specifically agreed to include a termination charge provision in the Attachment that provides for AT&T's recovery of liquidated damages in the event AT&T terminates a Pricing Schedule for cause or Atos terminates a Pricing Schedule for convenience.

54.     Specifically, Section 3.4 of the Attachment provides that if Atos terminates a

Pricing Schedule other than for material breach, or AT&T terminates a Pricing Schedule for

material breach, Atos must pay a termination charge equal to: (1) 50% of the unsatisfied MARC

for the year in which the Pricing Schedule is terminated *plus* 50% of the MARC for each

remaining year under the Pricing Schedule (the "Termination Charge"); as well as (2) any

additional amounts recoverable under Section 3.3 of the Attachment (the "Additional

Termination Charges"), as follows:

> In the event of a termination of a Pricing Schedule either by [Atos]
> other than as set out in Section 3.2 above [for material breach] or by
> AT&T for material breach, [Atos] must pay: (i) a Termination Charge
> equal to 50% of the unsatisfied MARC for the year of the Pricing
> Schedule Term in which the Pricing Schedule is terminated plus 50%
> of the MARC for each year remaining in the Pricing Schedule Term;
> and (ii) the amounts set forth in Section 3.3, above.

 (Attachment, § 3.4.)

55.     In other words, pursuant to the terms of the Master Agreement as supplemented

by the Attachment, if Atos terminates a Pricing Schedule without cause *or* AT&T terminates a

Pricing Schedule for material breach Atos is liable for payment of the Termination Charge and

the Additional Termination Charges. (Master Agreement, § 10.3; Attachment, § 3.4.)

56.     At the time the parties executed the agreements at issue including, but not limited

to, the Attachment, the parties agreed that the Termination Charge and Additional Termination

Charges set forth by the Attachment were reasonably proportionate to the anticipated amount of

AT&T's probable losses in the event AT&T terminated a Pricing Schedule for material breach or

Atos terminated a Pricing Schedule for convenience.

**F.      *The Parties Negotiate the Transition of Atos' Network Sourcing Services to AT&T.***

57.     In 2018, Atos issued a request for proposals (the "RFP") in connection with its

decision to outsource management of its global network services including, but not limited to,

the management of its network services in North America.

58.     Although Atos and AT&T both provide network sourcing services to their customers, AT&T offers such services on a larger scale and at a greater efficiency. Accordingly, AT&T submitted a bid in response to the RFP and devoted substantial resources between January and June 2019 to help Atos devise a solution to outsource the management of its network services for customers in the United States and most of the world. In connection with these efforts, AT&T presented its proposed solution to Atos' management in Amsterdam in or about May 2019.

59.     However, following AT&T's presentation in May 2019, Atos' efforts to outsource management of its network services in Europe ran into issues including, upon information and belief, challenges posed by certain European labor laws.  As a result, Atos focused its efforts on outsourcing the management of its network services in North America.  Accordingly, Atos re-approached AT&T in or about September 2019 to inquire as to whether AT&T would be willing to take over Atos' provision of network sourcing services to customers in North America.

60.     Typically, negotiating an agreement for a transition of services of the sort sought by Atos would take upwards of six to nine months to complete, to allow time for, among other things: (1) AT&T to conduct due diligence regarding the services required and the devices to be supported by the customer; (2) both parties to internally prepare for the transition of services contemplated; and (3) the parties to negotiate the terms of the operative agreement. However, Atos was adamant that it had to close the deal before year-end.

61.     Upon information and belief, Atos' desire to consummate an agreement with AT&T on an expedited basis was motivated, at least in part, by Atos' desire to secure a credit from AT&T, as part of such an agreement, that Atos could apply to amounts owed to AT&T.

62.    Upon information and belief, at the time the parties were negotiating for AT&T's assumption of control over the management of Atos' network services, Atos faced considerable financial challenges and hoped to obtain a significant credit from AT&T as part of any deal in order to recognize revenue and/or expense reductions on Atos' books.

63.    Between September and December 2019, AT&T invested substantial resources in its efforts to craft a solution to Atos' outsourcing needs and negotiate the terms of an agreement between the parties. Although AT&T still required significant information from Atos to formulate a plan for its assumption of management for Atos' network services, AT&T agreed to a compromise that permitted the parties to execute an agreement on Atos' desired schedule—*i.e.*, by the end of 2019—while ensuring that AT&T would still have time to obtain the additional information it required.

64.    Specifically, the parties agreed to execute an addendum to the Master Agreement in the 2019 calendar year that, among other things, provided AT&T with an opportunity to conduct due diligence regarding the scope of services to be provided, prepare a plan for the transition of services and verify the accuracy of Atos' representations regarding the services and devices to be supported by AT&T *following* execution of the addendum. The parties understood—and agreed—that subsequent changes to the addendum might be necessary following AT&T's completion of its due diligence.

**G.    *The Addendum.***

65.    On or about December 24, 2019, AT&T and Atos executed the Addendum as an Attachment to the Master Agreement. The Addendum memorializes the terms and conditions concerning AT&T's assumption of control over the management of certain of Atos' network sourcing services including, but not limited to, the services to be provided to Atos under the

Addendum and the Statement of Work ("SOW") included as an Exhibit to the Addendum. (Addendum, §§ 1(a)-(c).)

66.     The Addendum expressly provides that it "is an Attachment to [the] Master Agreement" and is "subject to the terms" of the Attachment, and that the "Addendum and all Exhibits which are appended to it collectively are considered to be a Pricing Schedule as defined in Section 2 of the [Attachment]."  (Addendum, at 1.)

67.     The Addendum provides for a sixty-six (66) month term beginning on the Term Start Date.  The Addendum defines the "Term Start Date" to mean:

> [T]he first day of the calendar month after the latter of the completion of due diligence pursuant to section 3.3 of the [Addendum] or the date on which the [Addendum] is revised to include the comprehensive replacements of Exhibit SOW and Exhibit SL, but in no event later than April 1, 2020.[3]

(Addendum, § 1(E).)

## H.     AT&T's Right to Conduct Due Diligence Under the Addendum.

68.     Importantly, under the Addendum, AT&T obtained the right to conduct due diligence—which would enable AT&T to obtain a more complete understanding of Atos' service delivery environment and performance levels—and to develop a transition plan, including the right to identify the activities to be performed by Atos in the course of the transition. (Addendum, §§ 3.3, 3.4.)

69.     In connection with AT&T's right to conduct due diligence, Atos agreed to cooperate with AT&T's requests for information and provide AT&T with critical information to facilitate its due diligence and the transition required by the Addendum.

---

[3]     The Exhibit SL provides the "Service Levels" governing the Agreement. The Exhibit SOW provides the "Statement of Work" governing the Agreement.

70.     For example, Atos agreed to set up a virtual data room within fifteen days of executing the Addendum, with information concerning, *inter alia*, an overview of devices and services used by each Atos customer, equipment inventories, the anticipated timeframe to obtain all required consents to the transition from Atos' customers, network diagrams, and a client migration prioritization schedule.

71.     Specifically, pursuant to Section 3.3(a)(iii) of the Addendum, Atos agreed to provide the following information to AT&T as part of the virtual data room:

(A)     an overview of the Service Levels of Atos customers and the current achievements;

(B)     an overview of devices used by Atos customers;

(C)     penalty clauses by Atos customers;

(D)     a set of flow down terms for AT&T to review in order for Atos to remain in compliance with its contract obligations to specified Atos Customers;

(E)     complete and accurate inventories for the following:

    1.     equipment inventory to include: manufacture, model number, site ID, IOS and any associated subcomponents plus the unknown in-scope devices;

    2.     site list to include: restricted identifier, site ID, address, city, state, country, postal code. Please identify data centers, hubs and remote sites; and

    3.     circuit inventory to include: circuit ID, circuit size and type, provider, site ID, address, city, state, country, postal code;

(F)     details regarding the restricted environments;

(G)     data center names and location information where Atos wants AT&T o install network management circuits and routers;

(H)     existing network diagrams including data center and transport connectivity;

(I)     a list of Atos' customers;

(J)     Atos' customers' specific audit requirements and frequency;

(K)     Atos' anticipated timeframe to obtain all required Atos customer consents;

(L)     an initial draft of the client migration prioritization schedule;

(M)     all readily available information (with the rest to be collected during transition) such as the identity by location and by Atos customer where out-of-brand access is unavailable;

(N)     firewall rule optimization requirements/plans will be addressed post transition;

(O)     the identity of which firewalls are single availability or high availability and at which locations;

(P)     virtual firewall details, by customer and by location;

(Q)     virtual load balancer details by customer and by location;

(R)     details on the Jump servers including interface requirements, availability of supplier to use, location, available speeds, etc. (all to be addressed during transition planning);

(S)     confirmation of the name and scope of each of the suppliers to be managed by letter of agency;

(T)     additional details regarding off hour support;

(U)     holidays or time periods with an associated network change freeze during the anticipated transition time frame;

(V)     notification if there [will] be an expedited change [in] management approval process to facilitate network changes needed to perform transition activity;

(W)     current Tier 1/1.5 help desk procedures (to be addressed during transition planning); and

(X)     technical and operational details for how the Load Balancers and WANX devices are supported today.

(*See* Addendum, § 3.3(a)(iii).)

72.     Atos specifically agreed to provide AT&T with a set of flow down terms for AT&T to review to ensure Atos complied with its contractual obligations to customers.  The parties expressly agreed that the terms might have an effect on AT&T's proposed solution and

pricing. (Addendum, § 3.3(b).)

73.     Atos' contractual obligation to comply with AT&T's requests for information

during the due diligence period is expressly set forth in the Addendum.  Specifically, Section

3.3(a)(ii) of the Addendum provides that Atos will cooperate with and support AT&T's due

diligence efforts as follows:

> AT&T will start due diligence upon grant of access to [the] virtual
> data room and shall use commercially reasonable efforts to complete
> due diligence within 4 weeks after *all* required information is made
> available to AT&T. *Customer will cooperate with and support
> AT&T in connection with those efforts*.

(Addendum, § 3(a)(ii) (emphasis added).)

74.     Atos further agreed that if the virtual data room was not available to AT&T within

fifteen (15) days of the Addendum's Effective Date of December 24, 2019—*i.e.*, by January 8,

2020—"the period for conducting due diligence will be extended for an equivalent period of time

of lack of accessibility." (Addendum, § 3.3(a)(i).)

75.     The Addendum expressly provides for the possibility that AT&T's due diligence

might uncover information requiring adjustments to AT&T's pricing. (Addendum, § 3.3(c).)

76.     Pursuant to Section 3.3(d) of the Addendum, the parties agreed to honor all

reasonable requests for information during negotiations concerning price adjustments as follows:

> During the course of negotiations under [Section 3.3(c)] all
> reasonable requests made by one party to another for information
> which is not privileged or proprietary, reasonably related to the
> dispute, will be honored in order that each of the parties may be fully
> advised of the other's position.

(Addendum, § 3.3(d).)

## I.     *The Transition Services Outlined by the Addendum and the Transition Plan.*

77.     Pursuant to Section 3.4(a) of the Addendum, AT&T agreed to perform the

services required to transition operational responsibility for Atos' services and functions to

AT&T in accordance with a Transition Plan to be developed by the parties (the "Transition Services"). (Addendum, § 3.4(a).)

78.     The Addendum states that the Transition Services would be provided in two phases:

(1)     Phase 1 – involving the migration of network management support for in-scope devices from Atos to AT&T, and the establishment of ITIL service management support for in-scope devices as described in the SOW; and

(2)     Phase 2 – involving the complete migration of all in-scope devices over to AT&T management and operations and establishment of steady state network management for Atos and Atos' customers.

(Addendum, §§ 3.4(a)(i)-(ii).)

79.     AT&T agreed to deliver a draft Transition Plan to Atos by January 7, 2020, and the parties agreed to work together to complete an agreed upon final Transition Plan by January 31, 2020.  The parties agreed that the final Transition Plan would include a detailed work plan identifying the specific activities to be performed by each party and the significant components and conditions precedent pertaining to each such activity. (Addendum, § 3.4(c).)

80.     Atos expressly agreed to "perform (or cause to be performed) those tasks and provide (or cause to be provided) those resources designated in the Transition Plan as responsibilities of [Atos] or its agents." (Addendum, § 3.4(b).)

81.     Under the Addendum, AT&T is excused from its obligation to perform the Services required by the Addendum in the event certain circumstances "prevent or delay the performance of the Services by AT&T" including, but not limited to, "any act or omission by [Atos] or any User, End User Customer, agent or contractor of [Atos] (other than AT&T) or any

failure or delay by Customer or any User, End User Customer, agent or contractor of [Atos] (other than AT&T) to perform their obligations under [the Addendum.]" (Addendum, § 3.8(a).)

82.     Furthermore, although Atos could "elect to suspend or delay the performance of the [transition services designated to it,]" Atos could only do so without incurring additional charges if such election "is primarily based on AT&T's failure to plan for or complete necessary activities related to the applicable Transition Services or Transformation Services[.]" (Addendum, § 3.4(f)(i).)

83.     Thus, even if Atos *properly* elects to suspend or delay its performance, it is not relieved of its payment obligations to AT&T under the Addendum including, but not limited to, the obligation to make payment of charges relating to Atos' suspension or delay in performance of the parties' contractual obligations.

**J.     Atos' MARC Obligation Under the Addendum.**

84.     The Addendum establishes a Minimum Annual Revenue Commitment—*i.e.*, a MARC—for Atos during the Addendum's sixty-six-month term.  Specifically, under Section 3.1 of the Addendum, Atos agreed to satisfy MARCs for months 1-6 of the Addendum's term and then for each annual period thereafter, represented by months 7-18, 19-30, 31-42, 43-54 and 55-66 of the Addendum's term. Atos' MARC commitments for these periods (each, a "Commitment Period") ranged from a low of $831,752 to a high of $9,165,913.[4] (Addendum, § 3.1.)

85.     The charges eligible towards the MARCs set forth under Section 3.1 of the Addendum are identified on Exhibit P to the Addendum, and include fixed, monthly charges

---

[4]     Although Atos required—and AT&T agreed to provide—an upfront loyalty credit of 3 million dollars, the Addendum provides that the credit is only applicable to "mutually agreed accounts and related invoices" and does not "represent a discount on the price of any good or Service under the [Addendum.]"  (Addendum, Exhibit P, § 2.5(a).)

(such as an enterprise fee and transition fee), as well as variable device management charges,

which are calculated based on the type and volume of devices used by Atos' customers.

(Addendum, Exhibit P.)

86.     The MARC amounts under the Addendum were determined based on information

provided to AT&T by Atos in the course of the parties' negotiations of the Addendum.

Although the MARC amounts represented the *minimum* revenues AT&T stood to earn under the

Addendum in each Commitment Period, the parties fully expected that AT&T would earn far

more.  Indeed, given the customer base AT&T believed Atos would be delivering, and the

equipment and services AT&T believed those customers used and/or required, the MARC

represented less than *half* of what AT&T expected to earn in each Commitment Period.

87.     Consistent with the Master Agreement and Attachment, under the Addendum,

Atos can *only* avoid its obligation to pay the contractually agreed upon MARC if Atos terminates

the Addendum "for cause" or files for bankruptcy.  (Addendum, § 3.2.)  However, if AT&T

terminates the Addendum for cause or if Atos terminates the Addendum for convenience, then

Atos is liable for the full Termination Charge.  (Addendum, § 3.2; Attachment, § 3.4.)

88.     Toward this end, Section 3.2 of the Addendum provides:

> Customer may terminate this NS Addendum without cause at any
> time upon thirty (90) days written notice to AT&T.
>
> *                        *                        *
>
> If Customer terminates this NS Addendum for convenience,
> Customer will pay 50% of the unsatisfied MARC for the
> commitment periods remaining in the term of the NS Addendum.

(Addendum, § 3.2.)

89.     In other words, consistent with the terms of the Master Agreement and the

Attachment, Atos's termination of the Addendum for convenience leads to precisely the same

result as AT&T's termination of the Addendum for cause—in both cases Atos becomes responsible for, *inter alia*, a Termination Charge of 50% of the unsatisfied MARC for all Commitment Periods remaining in the Addendum's term.

90.     The Termination Charge reflects, *inter alia*, the parties' agreement and understanding that the damages flowing from Atos' prospective breach or early termination of the Addendum were not readily ascertainable at the time of contracting.

91.     Indeed, at the time of contracting, the parties readily understood that AT&T's losses arising from Atos' prospective breach or early termination of the Addendum were likely to fluctuate over time and would depend on, *inter alia*, the services purchased, and devices used by each of Atos' customers, as well as the volume of Atos' customers.  Both parties anticipated significant growth in Atos' customer base during the term of the Addendum, but also understood that the rate of that growth would depend on a number of factors.

92.     Further, because the Termination Charge represented half of the *minimum* annual revenues AT&T stood to earn from Atos during the Addendum's term, and the parties expected that AT&T would earn far more than the MARC amounts set forth under the Addendum, the Termination Charge was not grossly disproportionate to the probable loss the parties anticipated AT&T would suffer in the event AT&T terminated the Addendum for cause (or Atos terminated the Addendum for convenience) when the Attachment and Addendum were executed.

**K.     AT&T's Performance Under, and Atos' Material Breach of, the Addendum.**

93.     Following the parties' execution of the Addendum, AT&T immediately got to work. Among other things, AT&T provided Atos with a draft Transition Plan on January 7, 2020 and a final Transition Plan on January 31, 2020, in accordance with Section 3.4(c) of the Addendum.

94.     However, despite Atos' rush to negotiate and sign the Addendum by the end of

2019, almost immediately after the Addendum was executed, Atos' representatives exhibited a complete change in attitude and appeared intent on renegotiating the deal to which Atos agreed.

95.     At first, Atos' representatives sought to add considerable items to the scope of services to be provided by AT&T under the Addendum. At the same time, Atos sought reductions in price to be charged by AT&T for its work.

96.     However, as discussions between the parties progressed it became evident that Atos no longer wished to proceed with the deal at all.  In fact, rather than working with AT&T to formulate a Transition Plan, Atos appeared to be actively working against it.

97.     Upon information and belief, Atos' change in attitude was motivated by turnovers in its management and a newfound belief that AT&T's assumption of control over Atos' network services would soon render many of Atos' employees expendable. As a result, the same Atos employees charged with responsibility for facilitating the transition of control to AT&T actively delayed—if not, outright prevented—the provision of information necessary for AT&T to effectuate the transition of responsibility required under the Addendum.

98.     For example, as noted above, under the Addendum, Atos agreed to set up a "virtual data room" with information critical to AT&T's due diligence and Transition Plan within fifteen days of the parties' execution of the Addendum—*i.e.*, by January 8, 2020. However, Atos failed to do so.

99.     In fact, Atos did not even "*create*" a data room until January 16, 2020. Yet, even then, it lacked *any* content.  Indeed, by email dated January 19, 2020 (the "January 19 Email"), AT&T advised Atos that only two files had been uploaded to the data room for AT&T's review: (a) a document identifying the locations for the proposed data centers (the "Data Center Document"); and (b) an inventory document (the "Inventory") that AT&T identified as, "THE

most important document we need to address many open issues."

100.    AT&T informed Atos that: (a) the Data Center Document raised questions regarding the location of the proposed data recovery centers to be used by AT&T during the Addendum's term; and (b) the Inventory was missing critical information needed to assess the scope of services to be provided and AT&T's pricing for its services including, but not limited to, IOS information and site locations of devices subject to the Addendum and the identities of Atos' customers to be serviced by AT&T.

101.    AT&T's January 19 Email also reminded Atos that the parties specifically agreed to a schedule by which "all information would be provided by 1/16 and it would be complete" in order for AT&T to conduct the due diligence within the timeframes specified in the Addendum.

102.    Based on Atos' delay in providing the information required for AT&T to complete its due diligence, the January 19 Email advised Atos that AT&T "will need more time to conduct due diligence and we require accurate and complete data."  AT&T asked Atos when AT&T could expect to receive the additional information and advised that it has "resources (network engineering, technical architects, billing SMEs, operational and ebonding teams etc.) waiting for this." AT&T's representative stressed the need for AT&T's receipt of the additional information—stating, "I can't emphasize enough the urgency for receipt of a complete and accurate inventory as outlined in our due diligence requirements."

103.    Unfortunately, Atos failed to address AT&T's concerns. Indeed, the data room remained largely empty through February 3, 2020. Although Atos advised AT&T that the data room was "complete" as of February 4, 2020, that was also not the case.

104.    In fact, when Atos finally began to upload files to the data room, most of the files were: (a) empty or blank; (b) incomplete; (c) inaccurate; or (d) missing relevant details.

Moreover, what little content Atos provided required multiple reviews and iterations to supplement or correct the information supplied (or lack thereof). Thus, while Atos' arguably created the shell of a "virtual data room" the room itself remained largely "unfurnished."

105.    Despite numerous requests from AT&T over the course of more than eight months, Atos *never* provided the information that AT&T required.

106.    Atos' failure to complete provide such information—along with its failure to complete numerous other critical tasks—prevented AT&T from engaging in the due diligence it bargained for, and interfered with AT&T's development of the transition plan required by the Addendum.

107.    Nevertheless, AT&T fully performed all of its obligations under the Addendum— to the extent possible—and continued to prepare for the transition of control over Atos' network services.  Indeed, AT&T devoted more than 50 employees to the transition, some of which spent upwards of 8 months and 100 percent of their time on the project.  AT&T also spent significant resources building infrastructure to accommodate Atos' networking sourcing services.

108.    As a result of its considerable efforts, and in compliance with its obligations under Section 3.4(c) of the Addendum, AT&T provided a transition plan and proposed project schedule to Atos on January 31, 2020.  Moreover, AT&T continued to work to satisfy its contractual obligations through the Fall of 2020.

109.    For example, AT&T provided Atos with consulting services and work product in a good faith effort to facilitate their working relationship, including, but not limited to: (i) risk assessments to help Atos optimize its current infrastructure and processes; (ii) analyses of operational and software flaws; (iii) operational and software rehabilitation, including introduction to new, more cost-effective operational models; (iv) AT&T's unique, intellectual

capital concerning, *inter alia*, its approach to network sourcing; (v) security assessments; and (vi) inventory analysis and recommendations for improvements to Atos' network services.

110.   Despite AT&T's diligent efforts to comply with its contractual obligations in the face of daily resistance from Atos' representatives, on July 31, 2020—more than seven months after the Agreement was executed—Atos sent AT&T an email by which Atos advised it was exercising its alleged right to suspend transition services under Section 3.4(f)(i) of the Agreement effective July 30, 2020 (the "Notice").   Incredibly, Atos claimed the alleged suspension was warranted because, "due diligence activities have not been completed by AT&T and transition services have not commenced."

111.   AT&T promptly responded to Atos' Notice by letter dated August 3 (the "Response Letter"), and advised that Atos' purported suspension of services was entirely improper and invalid. In fact, *Atos* had failed to perform *its* obligations to assist AT&T's completion of due diligence activities and formulation of a transition plan.

112.   Nevertheless, despite the numerous obstacles posed by Atos, AT&T continued to work toward satisfaction of its obligations under the Addendum and attempted to work with Atos on multiple occasions following its delivery of the Response Letter on August 3, 2020.

113.   For example, on August 13, 2020, AT&T's representatives participated in a call with Atos' management to address Atos' purported "suspension" of transition activities and explain why it was improper.  Although Atos committed to letting AT&T know when it was ready to address the substance of AT&T's position—including AT&T's identification of specific examples demonstrating Atos' interference with AT&T's due diligence—it failed to do so.

114.   Instead, AT&T's Vice President, Global Business, Chris Zpevak, followed-up with Atos' Senior Vice President, Head of Operations, Chris Wick, by letter dated August 28,

2020, to advise that AT&T required Atos' reasonable assistance to address more than thirty

separate issues that were preventing AT&T from completing an updated Transition Plan.

115.    One day earlier, on August 27, 2020, AT&T delivered the Invoice in the amount

of $1,027,976.82, dated August 26, 2020, to Atos for services rendered under the Addendum

between July 1, 2020 and July 31, 2020.  Pursuant to the Amendment, Atos was required to pay

the Invoice by September 25, 2020—within thirty (30) days of the date of the Invoice.

116.    Although Atos did not dispute the Invoice or advise that it was withholding

payment at the time, Atos failed to pay the Invoice by the September 25, 2020 deadline.

117.    AT&T and Atos' leadership continued to discuss Atos' failures to provide the

information required by the Addendum and Atos' general dereliction of its contractual

obligations between August and November 2020. However, no progress was made. Atos

consistently refused to comply with its contractual obligations or provide AT&T with the

information it needed to complete the transition addressed in the Addendum.

**L.      AT&T Exercises Its Right to Terminate the Addendum For Cause.**

118.    By letter dated October 9, 2020, AT&T provided Atos with a Notice of

Termination For Cause of Addendum For Network Sourcing Services to Master Agreement No.

120206 (the "Notice of Termination").

119.    AT&T's Notice of Termination advised Atos that its failure to make payment of

the Invoice constituted a failure to perform or observe a material term and condition of the

Addendum and Master Agreement (as modified by the Addendum).

120.    As a result, AT&T advised Atos that the Addendum would automatically

terminate for cause—without the need for any further action by AT&T—pursuant to Section

10.1 of the Master Agreement unless Atos provided payment in full of the Invoice within thirty

(30) days.

121.    Once again, Atos failed to take any action to cure its material breach.  Thus, the Addendum automatically terminated for cause based on Atos' material breach on November 8, 2020—30 days from AT&T's provision of the Notice of Termination.

122.    Out of an abundance of caution, AT&T confirmed its termination of the Addendum for cause in writing to Atos by letter dated November 11, 2020. As a result, AT&T demanded payment of the Termination Charge of $18,800,000.00 representing 50% of the MARC for the year in which the Addendum was terminated plus 50% of the MARC for each year remaining in the Addendum's term. AT&T also demanded payment of any Additional Termination Charges to which it is entitled.

123.    As a result of Atos' various breaches of the Addendum and AT&T's resulting termination of the Addendum for cause, Atos is liable to A&T for the full amount of the Termination Charge plus the Additional Termination Charges pursuant to Sections 3.3 and 3.4 of the Attachment.

124.    To date, Atos has failed to make any payments toward satisfaction of the Termination Charge or Additional Termination Charges to which AT&T is entitled.

## COUNT I
### (Breach of Contract)

125.    AT&T repeats and realleges the allegations contained in paragraphs 1 through 124 of this Complaint as if fully set forth herein.

126.    As described above, the Master Agreement, together with the Amendment, Attachment and Addendum, each and collectively constitute a valid and legally binding contract between AT&T and Atos.

127.    AT&T fully performed its obligations under the Addendum through the date of Atos' breach.

128.    Despite AT&T's performance, Atos materially breached the Addendum by, among other things, failing to pay the Invoice when due and failing to comply with Atos' obligations to provide certain information to AT&T in connection with AT&T's due diligence formulation of a Transition Plan under the Addendum.

129.    The effect of Atos' breach was material.

130.    As a result of Atos' material breach of the Addendum, AT&T has been damaged in an amount to be determined at trial, but believed to be no less than $21.8 million, plus interest from the date of the breach which amount is comprised of the Termination Charge and the Additional Termination Charges to which AT&T is entitled under the terms of the Master Agreement, the Amendment, the Attachment and the Addendum.

## PRAYER FOR RELIEF

**WHEREFORE**, AT&T demands that judgment be entered in their favor against Atos as follows:

(i)     awarding AT&T damages in an amount to be determined at trial but believed to be no less than $21.8 million, plus interest;

(ii)    awarding AT&T the costs, fees and expenses incurred in this action, including, without limitation, reasonable attorneys' fees to the extent permitted the Master Agreement, together with the Amendment, Attachment and Addendum, or by law; and

(iii)   awarding AT&T such other and further relied as the Court may deem just and proper.

Dated:  New York, New York
       May 20, 2021

Respectfully submitted,

HAYNES AND BOONE, LLP

By: /s/ Jonathan D. Pressment
    Jonathan D. Pressment
    Abbey Gauger
    30 Rockefeller Plaza, 26th Floor
    New York, New York  10112
    (t): (212) 659-7300
    (f): (212) 884-9561
    Jonathan.Pressment@haynesboone.com
    Abbey.Gauger@haynesboone.com