UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
                                            :

AT&T CORP.,                            :

                        Plaintiff,       :

            -against-              :

ATOS IT SOLUTIONS AND SERVICES,     :
INC.

                     Defendant.    :

------------------------------------- x               Case No. 1:21-cv-04550-GHW
                                           :

ATOS IT SOLUTIONS AND SERVICES,     :
INC.,

                  Counterclaim Plaintiff, :

            -against-             :

AT& T CORP.                        :
                  Counterclaim Defendant. :

------------------------------------- x

## ANSWER AND COUNTERCLAIMS OF ATOS IT SOLUTIONS AND SERVICES, INC.

Defendant Atos IT Solutions and Services, Inc. ("Atos"), by their undersigned attorneys, hereby answer the complaint filed in this action by plaintiff AT&T Corp. ("AT&T") on May 20, 2021 [ECF No. 1] as follows:

## NATURE OF THE ACTION[1]

    **1.**    **This is a Complaint for breach of contract arising from Defendant's flagrant breach of a December 24, 2019 Addendum for Network Sourcing Services (the "Addendum") agreement between AT&T and Atos, by which AT&T agreed to assume responsibility for the provision of network sourcing services to Atos'**

---

[1] Atos denies any averments in the headings and subheadings of the Complaint, which are repeated in this Answer solely for the convenience of the Court. The text of each numbered paragraph of the complaint is set forth in bold below, with Atos's answer to each paragraph immediately following the corresponding bolded text.

**customers in exchange for Atos' agreement to, *inter alia*, make certain guaranteed minimum annual revenue commitments to AT&T.**

1.        Atos denies the allegations contained in paragraph 1, except admits that Atos and AT&T executed the Addendum on or about December 24, 2019 and respectfully refers the Court to the Addendum for all of its terms and conditions.

**2.        As detailed herein, in or about the Fall of 2019, Atos approached AT&T to discuss the terms of a deal by which AT&T would agree to assume control over the provision of network services and/or functions to certain of Atos' customers. While an agreement of the sort proposed by Atos typically requires upwards of six to nine months to finalize—to allow the parties to engage in sufficient due diligence regarding the scope of services required, develop a plan and infrastructure to effectuate the transition of management for such services between entities, and negotiate the terms of an agreement—Atos was anxious to get the deal done by year-end and asked AT&T to proceed on an accelerated schedule.**

2.        Atos denies the allegations contained in paragraph 2, except denies knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 2 that "an agreement of the sort proposed by Atos typically requires upwards of six to nine months to finalize[.]"

**3.        As an accommodation to Atos—which, at the time, was a longtime business partner of AT&T—AT&T agreed to negotiate and execute the Addendum on an expedited basis. AT&T's undertaking in this regard was no small feat. Indeed, AT&T's personnel devoted countless hours to understanding: the variety of telecommunication and network devices used by Atos' customers and the scope of services to be provided to such customers; devising preliminary plans for AT&T's assumption of responsibility for such services; and negotiating the terms of an agreement with Atos. AT&T also agreed to provide Atos with a $3 million upfront credit as part of the deal which, upon information and belief, Atos required to demonstrate an expense reduction on its books at a time when Atos was experiencing financial difficulties.**

3.        Atos denies the allegations contained in paragraph 3, except: (i) as to the allegations contained in the first sentence of paragraph 3, admits that Atos and AT&T had a pre-existing business relationship prior to execution of the Addendum; (ii) denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of

paragraph 3; and (iii) as to the allegations in the fourth sentence of paragraph 3, admits that AT&T agreed to provide Atos with a $3 million loyalty credit in connection with the execution of the Addendum, in recognition of the substantial business Atos both had done with AT&T in the past and planned to do with AT&T in the future under the Addendum.

> **4.      In no small part due to AT&T's efforts, the parties were able to consummate a written agreement and signed the Addendum on December 24, 2019. However, given the accelerated schedule on which the Addendum was negotiated and executed, AT&T specifically bargained for—and expressly obtained—the right to engage in further due diligence regarding the scope of services to be provided to Atos' customers and develop a plan to transition operational responsibility for such services from Atos to AT&T after the Addendum's execution.**

4.      Atos denies the allegations contained in paragraph 4, except admits that AT&T and Atos executed the Addendum on or about December 24, 2019 and respectfully refers the Court to the Addendum for all of its terms and conditions.

> **5.      From the very start, AT&T worked in good faith to prepare for its assumption of control over the provision of network services to Atos' customers. In fact, AT&T invested millions of dollars in resources and manpower in planning for the transition of responsibility outlined by the Addendum. Yet, soon after the parties executed the Addendum, it became evident that Atos was not prepared to furnish the information required by, and was ill-equipped to support the proposed solutions contemplated under, the Addendum. Moreover, it became increasingly clear that Atos no longer had any desire—or intent—to honor the deal to which it had only weeks earlier agreed.**

5.      Atos denies the allegations contained in paragraph 5, except denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of paragraph 5.

> **6.      Upon information and belief, Atos' change in tack was motivated by significant turnover in its management and an associated change in business philosophy as well as the fact that many of Atos' employees charged with facilitating the transition of management to AT&T recognized that AT&T's assumption of control over Atos' network services would likely render them expendable and jeopardize their positions at Atos.**

6.      Atos denies the allegations contained in paragraph 6.

**7.      Faced with the fact that the Addendum does not permit Atos to terminate the agreement for convenience, Atos chose a different approach and decided to sabotage AT&T's efforts to comply with its contractual obligations. As a result, Atos engaged in a pattern of dilatory and obstructive conduct that was designed to prevent AT&T from completing its due diligence and interfere with AT&T's ability to formulate a plan for the transfer of control over Atos' network services to AT&T.**

7.      Atos denies the allegations contained in paragraph 7.

**8.      Among other things, Atos withheld critical information from a contractually mandated "virtual data room" that AT&T needed to formulate the transition plan required by the Addendum. What little information Atos provided to AT&T demonstrated there were significant gaps between the scope of services AT&T believed was required under the Addendum and those Atos believed AT&T should be required to provide to Atos' customers.**

8.      Atos denies the allegations contained in paragraph 8.

**9.      As of September of 2020, Atos had not only failed to comply with its performance-related obligations under the Addendum, but its financial obligations as well. Specifically, Atos failed to pay AT&T's August 26, 2020 invoice in the amount of $1,027,976.82 (the "Invoice") within thirty (30) days of invoicing in accordance with the terms of the Addendum.**

9.      Atos denies the allegations contained in paragraph 9, except admits that AT&T sent to Atos an invoice dated August 26, 2020 in the amount of $1,027,976.82 for services purportedly rendered under the Addendum, which invoice was improperly sent because no such services were ever rendered.

**10.      As a result, on October 9, 2020, following months of Atos' failure to comply with its performance obligations and its failure to make any payments toward satisfaction of the amounts due under the Invoice, AT&T advised Atos that it was terminating the Addendum for cause as of November 8, 2020.**

10.      Atos denies the allegations contained in paragraph 10, except admits that AT&T sent a notice to Atos on October 9, 2020 purporting to terminate the Addendum for cause as of November 8, 2020.

**11.      Not only did AT&T lose millions of dollars in costs, labor and additional resources used to prepare for its assumption of control over Atos' network services as a result of Atos' breach, but it also lost the guaranteed minimum annual**

**revenue commitments to which Atos willingly agreed as part of the Addendum. Indeed, Atos committed to a Minimum Annual Revenue Commitment (the "MARC") totaling more than $37 million over the Addendum's term—though the parties anticipated Atos would spend at least double that amount.**

11.     Atos denies the allegations contained in paragraph 11.

**12.     Because AT&T's damages in the event of a breach were not readily ascertainable at the time the Addendum was executed—given, among other things, all of the resources AT&T devoted toward negotiating, planning for and effectuating the transition outlined by the Addendum—the parties expressly agreed to a termination charge that they believed was proportionate to AT&T's probable losses in the event of a breach by Atos.**

12.     Atos denies the allegations contained in paragraph 12, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**13.     In the event that AT&T terminates the Addendum for cause, as here, the Addendum is clear: Atos is liable to AT&T for 50% of the unsatisfied MARC, in addition to other charges. Accordingly, AT&T brings this complaint for breach of contract seeking damages of no less than $21,800,000.00.**

13.     Atos denies the allegations contained in paragraph 13, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

## THE PARTIES

**14.     AT&T is a New York corporation with a principal place of business located at One AT&T Way, Bedminster, New Jersey 07921, and additional offices located at, *inter alia*, 30 Hudson Yards, New York, New York 10001.**

14.     Atos denies knowledge or information sufficient to form a belief as to the truth of

the allegations contained in paragraph 14.

**15.     Atos is a Delaware corporation with its principal place of business located at 4851 Regent Blvd, Irving, Texas 75063, and offices located at 2500 Westchester Ave, Purchase, NY 10577. Upon information and belief, Atos is authorized transact business in the State of New York.**

15.     Atos denies the allegations contained in paragraph 15, except admits that it

maintains its principal place of business at 4851 Regent Blvd., Irving, Texas 75063 and is

authorized to transact business in the State of New York.

**JURISDICTION AND VENUE**

**16.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the dispute is between citizens of different states and the amount in controversy exceeds $75,000.00.**

16.     The allegations contained in paragraph 16 state legal conclusions as to which no responsive pleading is required.  To the extent any response is deemed to be required, Atos denies the allegations contained in paragraph 16, except admits that paragraph 16 describes the plaintiff's purported basis for the Court's subject matter jurisdiction over this matter.

**17.     Defendant is also subject to personal jurisdiction in New York pursuant to CPLR § 302 because Atos: (1) regularly transacts or solicits business within the state; (2) committed a tortious act within the state and/or without the state causing injury to AT&T within the state; (3) reasonably expected its acts to have consequences in the state especially given the fact that the agreements at issue are governed by New York law; and (4) derives substantial revenue from interstate or international commerce.**

17.     The allegations contained in paragraph 17 state legal conclusions as to which no responsive pleading is required.  To the extent any response is deemed to be required, Atos denies the allegations contained in paragraph 17.

**18.     Venue is proper in this Court pursuant to, inter alia, 28 U.S.C. §§ 1391(b)(1) and (b)(2) because Defendant resides in this District pursuant to 28 U.S.C. §§ 1391(c)(2) and/or 1391(d), and, upon information and belief, because a substantial part of the events or omissions giving rise to the claim occurred in this District.**

18.     The allegations contained in paragraph 18 state legal conclusions as to which no responsive pleading is required.  To the extent any response is deemed to be required, Atos denies the allegations contained in paragraph 18.

**FACTUAL BACKGROUND**

*A.     The Business of AT&T.*

**19.     AT&T is the world's largest telecommunications company. Although AT&T has expanded its business over the last several decades to provide software-based entertainment and modern media, a pillar of AT&T's business is—and has been—its broadband connectivity services.**

19.    Atos denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19.

**20.    As a broadband connectivity provider, AT&T connects people and businesses across the United States through high-speed fiber and wireless broadband networks.**

20.    Atos denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20.

**21.    As a part of its business, AT&T also offers network sourcing services, which assists companies with management of their IT infrastructure and, in some cases, the provision of network services to end-user customers.**

21.    Atos denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21.

**22.    A leader in this space, AT&T's premier network sourcing services grants customers with access to, *inter alia*, AT&T's managed services expertise and tools proven to improve performance, lower costs and optimize efficiency and efficacy of operations including, but not limited to, tools designed to enhance the network security of AT&T's customers and their end-user customers.**

22.    Atos denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22.

**B.    *The Business of Atos.***

**23.    Upon information and belief, Atos is an IT services company that specializes in providing cybersecurity, digital consulting, artificial intelligence, internet services, customer journey analytics, and cloud management solutions.**

23.    Atos denies the allegations contained in paragraph 23, except admits that, *inter alia*, Atos is an IT services company that provides, among other things, cybersecurity, digital consulting, artificial intelligence, internet services, customer journey analytics, and cloud management solutions.

**24.   Upon information and belief, as a part of its business, Atos also provides network sourcing services to its customers.**

24.   Atos denies the allegations contained in paragraph 24, except admits that network sourcing services are among the suite of services that Atos offers to prospective and existing customers.

*C.   The Master Agreement.*

**25.   AT&T's has had a business relationship with Atos for nearly twenty years.**

25.   Atos denies the allegations contained in paragraph 25, except admits AT&T has had a business relationship with Atos and its predecessor-in-interest since October 2002.

**26.   Effective October 9, 2002, AT&T and Atos Origin, Inc.—the predecessor-in-interest to Atos—entered into Master Agreement, Reference No. 120206 (the "Master Agreement").**

**FN 1:**

**The Addendum expressly identifies Atos as the "successor-in-interest to Atos Origin, Inc., effective December 31, 2011[.]" (See Addendum at 1.)**

26.   Atos denies the allegations contained in paragraph 26, except admits that AT&T and Atos Origin, Inc. entered into the Master Agreement effective October 9, 2002 and respectfully refers the Court to the Master Agreement and the Addendum for all of their terms and conditions.

**27.   The Master Agreement provides the "General Terms and Conditions" applicable to AT&T's provision of products and services to Atos under the Master Agreement (collectively, the "Services") and all service attachments attached to the Master Agreement or subsequently signed by the parties to the extent they reference the Master Agreement. (Master Agreement, at 1-2.)**

27.   Atos denies the allegations contained in paragraph 27, and respectfully refers the Court to the Master Agreement for all of its terms and conditions.

**28.   The precise Services to be provided by AT&T under the Master Agreement were memorialized in separate service attachments (each, an "Attachment")—some of which were executed contemporaneously with the Master**

Agreement and some of which were executed at dates that followed the parties'
execution of the Master Agreement. (Master Agreement, at 2.)

28.     Atos denies the allegations contained in paragraph 28, and respectfully refers the

Court to the Master Agreement for all of its terms and conditions.

**29.     The Master Agreement provides that, "[i]n the event of a conflict
between the General Terms and Conditions and any Attachment, the
Attachment shall take precedence." (Master Agreement, at 1.)**

29.     Atos denies the allegations contained in paragraph 29, and respectfully refers the

Court to the Master Agreement for all of its terms and conditions.

**30.     The Master Agreement makes clear that its terms "shall continue in
effect for as long as any Attachment remains in effect, unless earlier terminated in
accordance with the provisions of the Agreement" and that "[t]he term of each
Attachment is stated in the Attachment." (Master Agreement, at 1.)**

30.     Atos denies the allegations contained in paragraph 30, and respectfully refers the

Court to the Master Agreement for all of its terms and conditions.

**31.     The Master Agreement sets forth the terms governing AT&T's
charges and billing and, among other things, provides that Atos:**

> **[S]hall pay AT&T for [Atos'] and [Atos' customers'] use
> of the Services at the rates and charges specified in the
> Attachments, without deduction, setoff or delay for any
> reason. Charges set forth in the Attachments are
> exclusive of any applicable taxes.**

**(Master Agreement, § 2.1.)**

31.     Atos denies the allegations contained in paragraph 31, and respectfully refers the

Court to the Master Agreement for all of its terms and conditions.

**32.     Section 10.1 of the Master Agreement sets forth the Master
Agreement's termination provision and, *inter alia*, governs the parties' right to
terminate an Attachment as follows:**

> **If a party fails to perform or observe any material term
> or condition of this Agreement and the failure continues
> unremedied for thirty (30) days after receipt of written
> notice, (i) the other party may terminate for cause any**

> **Attachment affected by the breach, or (ii) where the failure is a non-payment by [Atos] of any charge when due, AT&T may, at its option, terminate or suspend Service or require a deposit under affected Attachments.**

**(Master Agreement, § 10.1.)**

32.   Atos denies the allegations contained in paragraph 32, and respectfully refers the

Court to the Master Agreement for all of its terms and conditions.

**33.   Further, Section 10.3 of the Master Agreement provides that, in the event an Attachment is terminated and/or AT&T terminates an Attachment pursuant to Section 10.1 or 10.2 of the Master Agreement, Atos shall be responsible for the payment of all charges incurred as of the effective date of termination, in addition to any termination charges set forth by the Attachment as follows:**

> **[Atos] shall be responsible for payment of all charges under a terminated Attachment incurred as of the effective date of termination. [Atos] shall also be liable to AT&T for Termination Charges, if specified in a terminated Attachment, in the event that AT&T terminates under Section 10.1 or Section 10.2, or [Atos] terminate[s] without cause.**

**(Master Agreement, § 10.3.)**

**FN 2:**

**Section 10.2 of the Master Agreement provides that an Attachment may be terminated immediately upon written notice by: "(i) either party if the other party has violated the other party's Marks, becomes insolvent or involved in a liquidation or termination of its business, files a bankruptcy petition, has an involuntary bankruptcy petition filed against it (if not dismissed within thirty (30) days of filing), becomes adjudicated bankrupt, or becomes involved in an assignment for benefit of its creditors; or (ii) either party due to a material breach of any provision of Article 4 [of the Master Agreement governing the use of proprietary or confidential information]." (Master Agreement, § 10.2.)**

33.   Atos denies the allegations contained in paragraph 33, and respectfully refers the

Court to the Master Agreement for all of its terms and conditions.

**34.   Section 10.4 of the Master Agreement provides that termination of an Attachment by either party shall be without prejudice to any other rights or remedies**

the party might have under the Master Agreement or any other Attachment as follows:

> Termination by either party of an Attachment does not waive any other rights or remedies it may have under this Agreement. Termination or suspension of an Attachment shall not affect the rights and obligations of the parties under any other Attachment.

**(Master Agreement, § 10.4.)**

34.     Atos denies the allegations contained in paragraph 34, and respectfully refers the

Court to the Master Agreement for all of its terms and conditions.

**35.     The Master Agreement includes a no oral modification clause which requires that any modifications be set forth in a writing signed by both parties as follows:**

> Any supplement, modification or waiver of any provision of this Agreement must be in writing and signed by authorized representatives of both parties. A waiver by either party of any breach of this Agreement shall not operate as a waiver of any other breach of this Agreement.

**(Master Agreement, § 12.1.)**

35.     Atos denies the allegations contained in paragraph 35, and respectfully refers the

Court to the Master Agreement for all of its terms and conditions.

**36.     The Master Agreement requires that any notices required under the Agreement be set forth in writing as follows:**

> All required notices under this Agreement shall be in writing and either mailed by certified or registered mail, postage prepaid return receipt requested, sent by express courier or hand delivered and addressed to each party at the address set forth on the cover page of this Agreement or, if the notice relates to a specific Attachment, the address set forth in such Attachment, or such other address that a party indicates in writing.

**(Master Agreement, § 12.5.)**

36.     Atos denies the allegations contained in paragraph 36, and respectfully refers the

Court to the Master Agreement for all of its terms and conditions.

**37.     The Master Agreement also provides that it—together with any Attachments—constitutes the entire agreement of the parties with respect to AT&T's Services as follows:**

> **THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SERVICES. THIS AGREEMENT SUPERSEDES ALL PRIOR AGREEMENTS, PROPOSALS, REPRESENTATIONS, STATEMENTS OR UNDERSTANDINGS, WHETHER WRITTEN OR ORAL CONCERNING THE SERVICES OR THE RIGHTS AND OBLIGATIONS RELATING TO THE SERVICES. THIS AGREEMENT SHALL NOT BE CONTRADICTED, OR SUPPLEMENTED BY ANY WRITTEN OR ORAL STATEMENTS, PROPOSALS, REPRESENTATIONS, ADVERTISEMENTS, SERVICE DESCRIPTIONS OR YOUR PURCHASE ORDER FORMS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT OR AN ATTACHMENT.**

**(Master Agreement, § 12.9.)**

37.     Atos denies the allegations contained in paragraph 37, and respectfully refers the

Court to the Master Agreement for all of its terms and conditions.

**38.     Finally, the Master Agreement includes a New York choice of law provision which provides:**

> **State law issues concerning construction, interpretation and performance of this Agreement shall be governed by the substantive law of the State of New York excluding its choice of law rules.**

**(Master Agreement, § 12.6.)**

38.     Atos denies the allegations contained in paragraph 38, and respectfully refers the

Court to the Master Agreement for all of its terms and conditions.

***D.     The October 2002 Amendment.***

**39.    On or about October 9, 2002, Atos Origin, Inc. and AT&T executed an Addendum to Master Agreement, which modified and/or supplemented certain of the general terms and conditions of the Master Agreement (the "Amendment").**

39.    Atos denies the allegations contained in paragraph 39, except admits that Atos Origin, Inc. and AT&T executed an Addendum to Master Agreement effective October 9, 2002, and respectfully refers the Court to the Addendum to Master Agreement for all of its terms and conditions.

**40.    Among the modifications is a change to Section 2.3 of the Master Agreement concerning Atos' payment obligations. Specifically, the parties agreed that AT&T's invoices must be paid by Atos when received and will be considered past due if not paid in full within thirty (30) days of the date of the invoice, as follows:**

> **Billing invoices are payable upon receipt by [Atos]. Charges shall be considered past due if not paid in full within thirty (30) days after the date of an invoice.**

**(Amendment, § 2.3.)**

40.    Atos denies the allegations contained in paragraph 40, and respectfully refers the Court to the Master Agreement and Addendum to Master Agreement for all of their terms and conditions.

**41.    The Amendment expressly provides that, "[e]xcept as modified herein, the terms of the Master Agreement remain unchanged and in full force and effect." (Amendment, at 2.)**

41.    Atos denies the allegations contained in paragraph 41, and respectfully refers the Court to the Master Agreement and Addendum to Master Agreement for all of their terms and conditions.

### E.    *The April 2007 Attachment.*

**42.    On or about April 4, 2007, AT&T and Atos Origin, Inc. executed a Comprehensive Service Order Attachment to the Master Agreement (the "Attachment").**

42.     Atos admits the allegations contained in paragraph 42, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

**43.     The Attachment specifically states that it "is a Service Order Attachment to the [Master] Agreement between AT&T and [Atos]" and includes a specific reference to the Master Agreement's Reference Number 120206. (Attachment, at 1.)**

43.     Atos denies the allegations contained in paragraph 43, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

**44.     Under the Attachment, AT&T agreed to provide the Services to Atos "identified in the applicable Pricing Schedules." (Attachment, § 1(A).)**

44.     Atos denies the allegations contained in paragraph 44, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

**45.     The Attachment defines a "Pricing Schedule" as "a pricing schedule to this Attachment, either appended [to the Attachment] or subsequently signed by the parties referencing [the Master Agreement]." (Attachment, § 2.)**

45.     Atos denies the allegations contained in paragraph 45, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

**46.     The Attachment provides that, "[t]he pricing, service descriptions and other provisions relating to the Services will be as set forth in: (i) this Attachment (including, the Pricing Schedules and any Addenda to this Attachment); (ii) the [Master Agreement's] General Terms and Conditions; and (iii) the appropriate section of the Service Guide or the Applicable Tariffs." (Attachment, § 1(B).)**

46.     Atos denies the allegations contained in paragraph 46, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

**47.     The Attachment further provides that it "shall remain in effect until no Service Component provided under this Attachment remains in service." (Attachment, § 1(C).)**

47.     Atos denies the allegations contained in paragraph 47, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

**48.     The Attachment contemplates that a Pricing Schedule may require a "Minimum Annual Revenue Commitment" (or "MARC") that Atos agrees to satisfy during the Pricing Schedule's term. (Attachment, § 2.)**

48.     Atos denies the allegations contained in paragraph 48, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

**49.     The parties agreed that the MARC represents the *minimum* amount that Atos could be required to pay in a certain period.  Indeed, Section 4 provides that if Atos fails to satisfy the MARC for a designated period "[Atos] will be billed a shortfall charge in an amount equal to the difference between the MARC and the total of the applicable MARC-Eligible Charges incurred" during the period. (Attachment, § 4.)**

49.     Atos denies the allegations contained in paragraph 49, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

**50.     The Attachment specifically addresses the parties' termination rights and, among  other things, provides that, "[i]f a Service or a Service Component is terminated, [Atos] must pay  all charges incurred as of the effective date of termination." (Attachment, § 3.1.)**

50.     Atos denies the allegations contained in paragraph 50, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

**51.     The Attachment defines a "Service" as "collectively all of the Service Components [Atos] orders under a Pricing Schedule" and defines a "Service Component" as "the individual components of a Service that [Atos] orders under a Pricing Schedule." (Attachment, § 2.)**

51.     Atos denies the allegations contained in paragraph 51, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

**52.     Section 3.3 of the Attachment provides that if Atos terminates a Service Component other than for material breach, or AT&T terminates a Service or a Service Component for material breach, Atos must pay the following to AT&T:**

**(i) any credits, waived charges or unpaid amortized charges if the Service Component is terminated prior to the end of an applicable minimum retention period (specified in the Pricing Schedule, the Service Guide or the Applicable Tariffs); (ii) the applicable amount of recurring charges for the terminated Service Component**

> **multiplied by the number of months remaining in an applicable minimum payment period (specified in the Pricing Schedule, the Service Guide or the Applicable Tariffs); and (iii) any access facilities cancellation charges and other third-party charges incurred by AT&T due to the termination.**

**(Attachment, § 3.3.)**

52.     Atos denies the allegations contained in paragraph 52, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

> **53.     At the time of the parties' execution of each of the agreements at issue including, but not limited to, the Attachment, the parties agreed that AT&T's damages in the event it terminated a Pricing Schedule for material breach by Atos, or Atos terminated a Pricing Schedule for convenience, were not readily ascertainable. As a result, the parties specifically agreed to include a termination charge provision in the Attachment that provides for AT&T's recovery of liquidated damages in the event AT&T terminates a Pricing Schedule for cause or Atos terminates a Pricing Schedule for convenience.**

53.     Atos denies the allegations contained in paragraph 53, and respectfully refers the

Court to the Attachment for all of its terms and conditions.

> **54.     Specifically, Section 3.4 of the Attachment provides that if Atos terminates a Pricing Schedule other than for material breach, or AT&T terminates a Pricing Schedule for material breach, Atos must pay a termination charge equal to: (1) 50% of the unsatisfied MARC for the year in which the Pricing Schedule is terminated *plus* 50% of the MARC for each remaining year under the Pricing Schedule (the "Termination Charge"); as well as (2) any additional amounts recoverable under Section 3.3 of the Attachment (the "Additional Termination Charges"), as follows:**

>> **In the event of a termination of a Pricing Schedule either by [Atos] other than as set out in Section 3.2 above [for material breach] or by AT&T for material breach, [Atos] must pay: (i) a Termination Charge equal to 50% of the unsatisfied MARC for the year of the Pricing Schedule Term in which the Pricing Schedule is terminated plus 50% of the MARC for each year remaining in the Pricing Schedule Term; and (ii) the amounts set forth in Section 3.3, above.**

**(Attachment, § 3.4.)**

54.     Atos denies the allegations contained in paragraph 54, and respectfully refers the Court to the Attachment for all of its terms and conditions.

**55.     In other words, pursuant to the terms of the Master Agreement as supplemented by the Attachment, if Atos terminates a Pricing Schedule without cause *or* AT&T terminates a Pricing Schedule for material breach Atos is liable for payment of the Termination Charge and the Additional Termination Charges. (Master Agreement, § 10.3; Attachment, § 3.4.)**

55.     Atos denies the allegations contained in paragraph 55, and respectfully refers the Court to the Master Agreement and Attachment for all of their terms and conditions.

**56.     At the time the parties executed the agreements at issue including, but not limited to, the Attachment, the parties agreed that the Termination Charge and Additional Termination Charges set forth by the Attachment were reasonably proportionate to the anticipated amount of AT&T's probable losses in the event AT&T terminated a Pricing Schedule for material breach or Atos terminated a Pricing Schedule for convenience.**

56.     Atos denies the allegations contained in paragraph 55, and respectfully refers the Court to the Master Agreement and Attachment for all of their terms and conditions.

**F.     *The Parties Negotiate the Transition of Atos' Network Sourcing Services to AT&T.***

**57.     In 2018, Atos issued a request for proposals (the "RFP") in connection with its decision to outsource management of its global network services including, but not limited to, the management of its network services in North America.**

57.     Atos denies the allegations contained in paragraph 57, except admits that it issued a request in 2018 to AT&T and several of AT&T's competitors for proposals regarding the potential management of network services Atos provided to its customers on a global basis.

**58.     Although Atos and AT&T both provide network sourcing services to their customers, AT&T offers such services on a larger scale and at a greater efficiency. Accordingly, AT&T submitted a bid in response to the RFP and devoted substantial resources between January and June 2019 to help Atos devise a solution to outsource the management of its network services for customers in the United States and most of the world. In connection with these efforts, AT&T presented its proposed solution to Atos' management in Amsterdam in or about May 2019.**

58.     Atos denies the allegations contained in paragraph 58, except denies knowledge or information sufficient to form a belief as to the truth of the allegation that AT&T purportedly "devoted substantial resources between January and June 2019" to preparing its response to the RFP, and admits that AT&T presented its proposal in response to the RFP in or about May 2019. Atos further avers that it did not select AT&T's proposal.

**59.     However, following AT&T's presentation in May 2019, Atos' efforts to outsource management of its network services in Europe ran into issues including, upon information and belief, challenges posed by certain European labor laws. As a result, Atos focused its efforts on outsourcing the management of its network services in North America. Accordingly, Atos re-approached AT&T in or about September 2019 to inquire as to whether AT&T would be willing to take over Atos' provision of network sourcing services to customers in North America.**

59.     Atos denies the allegations contained in paragraph 59, except admits that, following the submission of proposals in response to the RFP, Atos reconsidered the contemplated global outsourcing of the management of its network services in light of a variety of factors and ultimately elected to focus only on outsourcing of network services for customers based in North America and, in connection with that change in strategy, contacted AT&T and others concerning a potential outsourcing solution focused solely on North America.

**60.     Typically, negotiating an agreement for a transition of services of the sort sought by Atos would take upwards of six to nine months to complete, to allow time for, among other things: (1) AT&T to conduct due diligence regarding the services required and the devices to be supported by the customer; (2) both parties to internally prepare for the transition of services contemplated; and (3) the parties to negotiate the terms of the operative agreement. However, Atos was adamant that it had to close the deal before year-end.**

60.     Atos denies the allegations contained in paragraph 60, except denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 60.

**61.     Upon information and belief, Atos' desire to consummate an agreement with AT&T on an expedited basis was motivated, at least in part, by Atos' desire to**

**secure a credit from AT&T, as part of such an agreement, that Atos could apply to amounts owed to AT&T.**

61.   Atos denies the allegations contained in paragraph 61.

**62.   Upon information and belief, at the time the parties were negotiating for AT&T's assumption of control over the management of Atos' network services, Atos faced considerable financial challenges and hoped to obtain a significant credit from AT&T as part of any deal in order to recognize revenue and/or expense reductions on Atos' books.**

62.   Atos denies the allegations contained in paragraph 62.

**63.   Between September and December 2019, AT&T invested substantial resources in its efforts to craft a solution to Atos' outsourcing needs and negotiate the terms of an agreement between the parties. Although AT&T still required significant information from Atos to formulate a plan for its assumption of management for Atos' network services, AT&T agreed to a compromise that permitted the parties to execute an agreement on Atos' desired schedule—*i.e.*, by the end of 2019—while ensuring that AT&T would still have time to obtain the additional information it required.**

63.   Atos denies the allegations contained in paragraph 63, except denies knowledge or information sufficient to form a belief as to the truth of: (i) the allegations in the first sentence of paragraph 63; or (ii) the allegation in the second sentence of paragraph 63 that AT&T purportedly required unspecified "significant information from Atos to formulate a plan for its assumption of management for Atos' network services[.]"

**64.   Specifically, the parties agreed to execute an addendum to the Master Agreement in the 2019 calendar year that, among other things, provided AT&T with an opportunity to conduct due diligence regarding the scope of services to be provided, prepare a plan for the transition of services and verify the accuracy of Atos' representations regarding the services and devices to be supported by AT&T *following* execution of the addendum. The parties understood—and agreed—that subsequent changes to the addendum might be necessary following AT&T's completion of its due diligence.**

64.   Atos denies the allegations contained in paragraph 64, except admits that AT&T and Atos ultimately executed the Addendum on or about December 24, 2019 and respectfully refers the Court to the Addendum for all of its terms and conditions.

### G.   The Addendum.

**65.   On or about December 24, 2019, AT&T and Atos executed the Addendum as an Attachment to the Master Agreement. The Addendum memorializes the terms and conditions concerning AT&T's assumption of control over the management of certain of Atos' network sourcing services including, but not limited to, the services to be provided to Atos under the Addendum and the Statement of Work ("SOW") included as an Exhibit to the Addendum. (Addendum, §§ 1(a)-(c).)**

65.   Atos denies the allegations contained in paragraph 65, and respectfully refers the Court to the Addendum for all of its terms and conditions.

**66.   The Addendum expressly provides that it "is an Attachment to [the] Master Agreement" and is "subject to the terms" of the Attachment, and that the "Addendum and all Exhibits which are appended to it collectively are considered to be a Pricing Schedule as defined in Section 2 of the [Attachment]." (Addendum, at 1.)**

66.   Atos denies the allegations contained in paragraph 66, and respectfully refers the Court to the Addendum for all of its terms and conditions.

**67.   The Addendum provides for a sixty-six (66) month term beginning on the Term Start Date. The Addendum defines the "Term Start Date" to mean:**

> **[T]he first day of the calendar month after the latter of the completion of due diligence pursuant to section 3.3 of the [Addendum] or the date on which the [Addendum] is revised to include the comprehensive replacements of Exhibit SOW and Exhibit SL, but in no event later than April 1, 2020.**

**(Addendum, § 1(E).)**

**FN 3:**

**The Exhibit SL provides the "Service Levels" governing the Agreement. The Exhibit SOW provides the "Statement of Work" governing the Agreement.**

67.   Atos denies the allegations contained in paragraph 67, and respectfully refers the Court to the Addendum for all of its terms and conditions.

### H.   AT&T's Right to Conduct Due Diligence Under the Addendum.

**68.   Importantly, under the Addendum, AT&T obtained the right to conduct due diligence—which would enable AT&T to obtain a more complete understanding of Atos' service delivery environment and performance levels—and to**

**develop a transition plan, including the right to identify the activities to be performed by Atos in the course of the transition.  (Addendum, §§ 3.3, 3.4.)**

68.     Atos denies the allegations contained in paragraph 68, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**69.     In connection with AT&T's right to conduct due diligence, Atos agreed to cooperate with AT&T's requests for information and provide AT&T with critical information to facilitate its due diligence and the transition required by the Addendum.**

69.     Atos denies the allegations contained in paragraph 69, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**70.     For example, Atos agreed to set up a virtual data room within fifteen days of executing the Addendum, with information concerning, inter alia, an overview of devices and services used by each Atos customer, equipment inventories, the anticipated timeframe to obtain all required consents to the transition from Atos' customers, network diagrams, and a client migration prioritization schedule.**

70.     Atos denies the allegations contained in paragraph 70, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**71.     Specifically, pursuant to Section 3.3(a)(iii) of the Addendum, Atos agreed to provide the following information to AT&T as part of the virtual data room:**

> **(A)     an overview of the Service Levels of Atos customers and the current achievements;**
>
> **(B)     an overview of devices used by Atos customers;**
>
> **(C)     penalty clauses by Atos customers;**
>
> **(D)     a set of flow down terms for AT&T to review in order for Atos to remain in compliance with its contract obligations to specified Atos Customers;**
>
> **(E)     complete and accurate inventories for the following:**
>
> > **1.     equipment inventory to include: manufacture, model number, site ID, IOS and any associated subcomponents plus the unknown in-scope devices;**

21

**2.**  **site list to include: restricted identifier, site ID, address, city, state, country, postal code. Please identify data centers, hubs and remote sites; and**

**3.**  **circuit inventory to include: circuit ID, circuit size and type, provider, site ID, address, city, state, country, postal code;**

**(F)**  **details regarding the restricted environments;**

**(G)**  **data center names and location information where Atos wants AT&T to install network management circuits and routers;**

**(H)**  **existing network diagrams including data center and transport connectivity;**

**(I)**  **a list of Atos' customers;**

**(J)**  **Atos' customers' specific audit requirements and frequency;**

**(K)**  **Atos' anticipated timeframe to obtain all required Atos customer consents;**

**(L)**  **an initial draft of the client migration prioritization schedule;**

**(M)**  **all readily available information (with the rest to be collected during transition) such as the identity by location and by Atos customer where out-of-brand access is unavailable;**

**(N)**  **firewall rule optimization requirements/plans will be addressed post transition;**

**(O)**  **the identity of which firewalls are single availability or high availability and at which locations;**

**(P)**  **virtual firewall details, by customer and by location;**

**(Q)**  **virtual load balancer details by customer and by location;**

**(R)**  **details on the Jump servers including interface requirements, availability of supplier to use, location, available speeds, etc. (all to be addressed during transition planning);**

**(S)**  **confirmation of the name and scope of each of the suppliers to be managed by letter of agency;**

**(T)**  **additional details regarding off hour support;**

**(U)**      **holidays or time periods with an associated network change freeze during the anticipated transition time frame;**

**(V)**      **notification if there [will] be an expedited change [in] management approval process to facilitate network changes needed to perform transition activity;**

**(W)**      **current Tier 1/1.5 help desk procedures (to be addressed during transition planning); and**

**(X)**      **technical and operational details for how the Load Balancers and WANX devices are supported today.**

**(*See* Addendum, § 3.3(a)(iii).)**

71.      Atos denies the allegations contained in paragraph 71, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

> **72.**      **Atos specifically agreed to provide AT&T with a set of flow down terms for AT&T to review to ensure Atos complied with its contractual obligations to customers. The parties expressly agreed that the terms might have an effect on AT&T's proposed solution and pricing. (Addendum, § 3.3(b).)**

72.      Atos denies the allegations contained in paragraph 72, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

> **73.**      **Atos' contractual obligation to comply with AT&T's requests for information during the due diligence period is expressly set forth in the Addendum. Specifically, Section 3.3(a)(ii) of the Addendum provides that Atos will cooperate with and support AT&T's due diligence efforts as follows:**

>> **AT&T will start due diligence upon grant of access to [the] virtual data room and shall use commercially reasonable efforts to complete due diligence within 4 weeks after *all* required information is made available to AT&T. *Customer will cooperate with and support AT&T in connection with those efforts*.**

**(Addendum, § 3(a)(ii) (emphasis added).)**

73.      Atos denies the allegations contained in paragraph 73, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

> **74.**      **Atos further agreed that if the virtual data room was not available to AT&T within fifteen (15) days of the Addendum's Effective Date of December 24,**

**2019—*i.e.*, by January 8, 2020—"the period for conducting due diligence will be extended for an equivalent period of time of lack of accessibility." (Addendum, § 3.3(a)(i).)**

74.     Atos denies the allegations contained in paragraph 74, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**75.     The Addendum expressly provides for the possibility that AT&T's due diligence might uncover information requiring adjustments to AT&T's pricing. (Addendum, § 3.3(c).)**

75.     Atos denies the allegations contained in paragraph 75, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**76.     Pursuant to Section 3.3(d) of the Addendum, the parties agreed to honor all reasonable requests for information during negotiations concerning price adjustments as follows:**

> **During the course of negotiations under [Section 3.3(c)] all reasonable requests made by one party to another for information which is not privileged or proprietary, reasonably related to the dispute, will be honored in order that each of the parties may be fully advised of the other's position.**

**(Addendum, § 3.3(d).)**

76.     Atos denies the allegations contained in paragraph 76, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**I.     *The Transition Services Outlined by the Addendum and the Transition Plan.***

**77.     Pursuant to Section 3.4(a) of the Addendum, AT&T agreed to perform the services required to transition operational responsibility for Atos' services and functions to AT&T in accordance with a Transition Plan to be developed by the parties (the "Transition Services").  (Addendum, § 3.4(a).)**

77.     Atos denies the allegations contained in paragraph 77, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**78.     The Addendum states that the Transition Services would be provided in two phases:**

> **(1)** **Phase 1** – involving the migration of network management support for in-scope devices from Atos to AT&T, and the establishment of ITIL service management support for in-scope devices as described in the SOW; and
>
> **(2)** **Phase 2** – involving the complete migration of all in-scope devices over to AT&T management and operations and establishment of steady state network management for Atos and Atos' customers.

**(Addendum, §§ 3.4(a)(i)-(ii).)**

78.      Atos denies the allegations contained in paragraph 78, and respectfully refers the Court to the Addendum for all of its terms and conditions.

> **79.** **AT&T agreed to deliver a draft Transition Plan to Atos by January 7, 2020, and the parties agreed to work together to complete an agreed upon final Transition Plan by January 31, 2020. The parties agreed that the final Transition Plan would include a detailed work plan identifying the specific activities to be performed by each party and the significant components and conditions precedent pertaining to each such activity. (Addendum, § 3.4(c).)**

79.      Atos denies the allegations contained in paragraph 79, and respectfully refers the Court to the Addendum for all of its terms and conditions.

> **80.** **Atos expressly agreed to "perform (or cause to be performed) those tasks and provide (or cause to be provided) those resources designated in the Transition Plan as responsibilities of [Atos] or its agents." (Addendum, § 3.4(b).)**

80.      Atos denies the allegations contained in paragraph 80, and respectfully refers the Court to the Addendum for all of its terms and conditions.

> **81.** **Under the Addendum, AT&T is excused from its obligation to perform the Services required by the Addendum in the event certain circumstances "prevent or delay the performance of the Services by AT&T" including, but not limited to, "any act or omission by [Atos] or any User, End User Customer, agent or contractor of [Atos] (other than AT&T) or any failure or delay by Customer or any User, End User Customer, agent or contractor of [Atos] (other than AT&T) to perform their obligations under [the Addendum.]" (Addendum, § 3.8(a).)**

81.      Atos denies the allegations contained in paragraph 81, and respectfully refers the Court to the Addendum for all of its terms and conditions.

**82.     Furthermore, although Atos could "elect to suspend or delay the performance of the [transition services designated to it,]" Atos could only do so without incurring additional charges if such election "is primarily based on AT&T's failure to plan for or complete necessary activities related to the applicable Transition Services or Transformation Services[.]" (Addendum, § 3.4(f)(i).)**

82.     Atos denies the allegations contained in paragraph 82, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**83.     Thus, even if Atos *properly* elects to suspend or delay its performance, it is not relieved of its payment obligations to AT&T under the Addendum including, but not limited to, the obligation to make payment of charges relating to Atos' suspension or delay in performance of the parties' contractual obligations.**

83.     Atos denies the allegations contained in paragraph 83, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**J.     *Atos' MARC Obligation Under the Addendum.***

**84.     The Addendum establishes a Minimum Annual Revenue Commitment—*i.e.*, a MARC—for Atos during the Addendum's sixty-six-month term. Specifically, under Section 3.1 of the Addendum, Atos agreed to satisfy MARCs for months 1-6 of the Addendum's term and then for each annual period thereafter, represented by months 7-18, 19-30, 31-42, 43-54 and 55-66 of the Addendum's term. Atos' MARC commitments for these periods (each, a "Commitment Period") ranged from a low of $831,752 to a high of $9,165,913. (Addendum, § 3.1.)**

**FN 4:**

**Although Atos required—and AT&T agreed to provide—an upfront loyalty credit of 3 million dollars, the Addendum provides that the credit is only applicable to "mutually agreed accounts and related invoices" and does not "represent a discount on the price of any good or Service under the [Addendum.]" (Addendum, Exhibit P, § 2.5(a).)**

84.     Atos denies the allegations contained in paragraph 84, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**85.     The charges eligible towards the MARCs set forth under Section 3.1 of the Addendum are identified on Exhibit P to the Addendum, and include fixed, monthly charges (such as an enterprise fee and transition fee), as well as variable device management charges, which are calculated based on the type and volume of devices used by Atos' customers. (Addendum, Exhibit P.)**

85. Atos denies the allegations contained in paragraph 85, and respectfully refers the Court to the Addendum for all of its terms and conditions.

**86. The MARC amounts under the Addendum were determined based on information provided to AT&T by Atos in the course of the parties' negotiations of the Addendum. Although the MARC amounts represented the *minimum* revenues AT&T stood to earn under the Addendum in each Commitment Period, the parties fully expected that AT&T would earn far more. Indeed, given the customer base AT&T believed Atos would be delivering, and the equipment and services AT&T believed those customers used and/or required, the MARC represented less than *half* of what AT&T expected to earn in each Commitment Period.**

86. Atos denies the allegations contained in paragraph 86, except denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second and third sentences of paragraph 86 and admits that AT&T unilaterally determined the MARC amounts based on assumptions and information exchanged between the parties in connection with both the initial 2018 RFP and negotiation of the Addendum.

**87. Consistent with the Master Agreement and Attachment, under the Addendum, Atos can *only* avoid its obligation to pay the contractually agreed upon MARC if Atos terminates the Addendum "for cause" or files for bankruptcy. (Addendum, § 3.2.) However, if AT&T terminates the Addendum for cause or if Atos terminates the Addendum for convenience, then Atos is liable for the full Termination Charge. (Addendum, § 3.2; Attachment, § 3.4.)**

87. Atos denies the allegations contained in paragraph 87, and respectfully refers the Court to the Addendum for all of its terms and conditions.

**88. Toward this end, Section 3.2 of the Addendum provides:**

**Customer may terminate this NS Addendum without cause at any time upon thirty (90) days written notice to AT&T.**

**\*              \*              \***

**If Customer terminates this NS Addendum for convenience, Customer will pay 50% of the unsatisfied MARC for the commitment periods remaining in the term of the NS Addendum.**

27

**(Addendum, § 3.2.)**

88.   Atos denies the allegations contained in paragraph 88, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**89.   In other words, consistent with the terms of the Master Agreement and the Attachment, Atos's termination of the Addendum for convenience leads to precisely the same result as AT&T's termination of the Addendum for cause—in both cases Atos becomes responsible for, *inter alia*, a Termination Charge of 50% of the unsatisfied MARC for all Commitment Periods remaining in the Addendum's term.**

89.   Atos denies the allegations contained in paragraph 89, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**90.   The Termination Charge reflects, *inter alia*, the parties' agreement and understanding that the damages flowing from Atos' prospective breach or early termination of the Addendum were not readily ascertainable at the time of contracting.**

90.   Atos denies the allegations contained in paragraph 90.

**91.   Indeed, at the time of contracting, the parties readily understood that AT&T's losses arising from Atos' prospective breach or early termination of the Addendum were likely to fluctuate over time and would depend on, *inter alia*, the services purchased, and devices used by each of Atos' customers, as well as the volume of Atos' customers. Both parties anticipated significant growth in Atos' customer base during the term of the Addendum, but also understood that the rate of that growth would depend on a number of factors.**

91.   Atos denies the allegations contained in paragraph 91.

**92.   Further, because the Termination Charge represented half of the *minimum* annual revenues AT&T stood to earn from Atos during the Addendum's term, and the parties expected that AT&T would earn far more than the MARC amounts set forth under the Addendum, the Termination Charge was not grossly disproportionate to the probable loss the parties anticipated AT&T would suffer in the event AT&T terminated the Addendum for cause (or Atos terminated the Addendum for convenience) when the Attachment and Addendum were executed.**

92.   Atos denies the allegations contained in paragraph 92.

**K.    *AT&T's Performance Under, and Atos' Material Breach of, the Addendum.***

**93.   Following the parties' execution of the Addendum, AT&T immediately got to work. Among other things, AT&T provided Atos with a draft Transition Plan**

on January 7, 2020 and a final Transition Plan on January 31, 2020, in accordance with Section 3.4(c) of the Addendum.

93.     Atos denies the allegations contained in the first sentence of paragraph 93.  Atos denies the allegations contained in the second sentence of paragraph 93, except admits that AT&T submitted a draft Transition Plan on January 7, 2020 and an updated version of the Transition Plan on January 31, 2020 that AT&T acknowledged remained subject to further review and adjustment.

**94.     However, despite Atos' rush to negotiate and sign the Addendum by the end of 2019, almost immediately after the Addendum was executed, Atos' representatives exhibited a complete change in attitude and appeared intent on renegotiating the deal to which Atos agreed.**

94.     Atos denies the allegations contained in paragraph 94.

**95.     At first, Atos' representatives sought to add considerable items to the scope of services to be provided by AT&T under the Addendum. At the same time, Atos sought reductions in price to be charged by AT&T for its work.**

95.     Atos denies the allegations contained in paragraph 95.

**96.     However, as discussions between the parties progressed it became evident that Atos no longer wished to proceed with the deal at all. In fact, rather than working with AT&T to formulate a Transition Plan, Atos appeared to be actively working against it.**

96.     Atos denies the allegations contained in paragraph 96.

**97.     Upon information and belief, Atos' change in attitude was motivated by turnovers in its management and a newfound belief that AT&T's assumption of control over Atos' network services would soon render many of Atos' employees expendable. As a result, the same Atos employees charged with responsibility for facilitating the transition of control to AT&T actively delayed—if not, outright prevented—the provision of information necessary for AT&T to effectuate the transition of responsibility required under the Addendum.**

97.     Atos denies the allegations contained in paragraph 97.

**98.     For example, as noted above, under the Addendum, Atos agreed to set up a "virtual data room" with information critical to AT&T's due diligence and Transition Plan within fifteen days of the parties' execution of the Addendum—*i.e.*, by January 8, 2020.  However, Atos failed to do so.**

98.     Atos denies the allegations contained in paragraph 98, and respectfully refers the

Court to the Addendum for all of its terms and conditions.

**99.     In fact, Atos did not even "*create*" a data room until January 16, 2020. Yet, even then, it lacked *any* content. Indeed, by email dated January 19, 2020 (the "January 19 Email"), AT&T advised Atos that only two files had been uploaded to the data room for AT&T's review: (a) a document identifying the locations for the proposed data centers (the "Data Center Document"); and (b) an inventory document (the "Inventory") that AT&T identified as, "THE most important document we need to address many open issues."**

99.     Atos denies the allegations contained in paragraph 99, and respectfully refers the

Court to the referenced email for its content.

**100.   AT&T informed Atos that: (a) the Data Center Document raised questions regarding the location of the proposed data recovery centers to be used by AT&T during the Addendum's term; and (b) the Inventory was missing critical information needed to assess the scope of services to be provided and AT&T's pricing for its services including, but not limited to, IOS information and site locations of devices subject to the Addendum and the identities of Atos' customers to be serviced by AT&T.**

100.   Atos denies the allegations contained in paragraph 100, and respectfully refers the

Court to the referenced email for its content.

**101.   AT&T's January 19 Email also reminded Atos that the parties specifically agreed to a schedule by which "all information would be provided by 1/16 and it would be complete" in order for AT&T to conduct the due diligence within the timeframes specified in the Addendum.**

101.   Atos denies the allegations contained in paragraph 101, and respectfully refers the

Court to the referenced email for its content.

**102.   Based on Atos' delay in providing the information required for AT&T to complete its due diligence, the January 19 Email advised Atos that AT&T "will need more time to conduct due diligence and we require accurate and complete data." AT&T asked Atos when AT&T could expect to receive the additional information and advised that it has "resources (network engineering, technical architects, billing SMEs, operational and ebonding teams etc.) waiting for this." AT&T's representative stressed the need for AT&T's receipt of the additional information—stating, "I can't emphasize enough the urgency for receipt of a complete and accurate inventory as outlined in our due diligence requirements."**

102.    Atos denies the allegations contained in paragraph 102, and respectfully refers the

Court to the referenced email for its content.

**103.    Unfortunately, Atos failed to address AT&T's concerns. Indeed, the data room remained largely empty through February 3, 2020. Although Atos advised AT&T that the data room was "complete" as of February 4, 2020, that was also not the case.**

103.    Atos denies the allegations contained in paragraph 103.

**104.    In fact, when Atos finally began to upload files to the data room, most of the files were: (a) empty or blank; (b) incomplete; (c) inaccurate; or (d) missing relevant details. Moreover, what little content Atos provided required multiple reviews and iterations to supplement or correct the information supplied (or lack thereof). Thus, while Atos' arguably created the shell of a "virtual data room" the room itself remained largely "unfurnished."**

104.    Atos denies the allegations contained in paragraph 104.

**105.    Despite numerous requests from AT&T over the course of more than eight months, Atos *never* provided the information that AT&T required.**

105.    Atos denies the allegations contained in paragraph 105.

**106.    Atos' failure to complete provide such information—along with its failure to complete numerous other critical tasks—prevented AT&T from engaging in the due diligence it bargained for, and interfered with AT&T's development of the transition plan required by the Addendum.**

106.    Atos denies the allegations contained in paragraph 106.

**107.    Nevertheless, AT&T fully performed all of its obligations under the Addendum— to the extent possible—and continued to prepare for the transition of control over Atos' network services. Indeed, AT&T devoted more than 50 employees to the transition, some of which spent upwards of 8 months and 100 percent of their time on the project. AT&T also spent significant resources building infrastructure to accommodate Atos' networking sourcing services.**

107.    Atos denies the allegations contained in the first sentence of paragraph 107.  Atos

denies knowledge or information sufficient to form a belief as to the truth of the allegations

contained in the second and third sentences of paragraph 107.

**108.    As a result of its considerable efforts, and in compliance with its obligations under Section 3.4(c) of the Addendum, AT&T provided a transition plan**

**and proposed project schedule to Atos on January 31, 2020. Moreover, AT&T continued to work to satisfy its contractual obligations through the Fall of 2020.**

108.    Atos denies the allegations contained in paragraph 108, except admits that AT&T

provided a transition plan and proposed project schedule to Atos on January 31, 2020.

**109.    For example, AT&T provided Atos with consulting services and work product in a good faith effort to facilitate their working relationship, including, but not limited to: (i) risk assessments to help Atos optimize its current infrastructure and processes; (ii) analyses of operational and software flaws; (iii) operational and software rehabilitation, including introduction to new, more cost-effective operational models; (iv) AT&T's unique, intellectual capital concerning, *inter alia*, its approach to network sourcing; (v) security assessments; and (vi) inventory analysis and recommendations for improvements to Atos' network services.**

109.    Atos denies the allegations contained in paragraph 109.

**110.    Despite AT&T's diligent efforts to comply with its contractual obligations in the face of daily resistance from Atos' representatives, on July 31, 2020—more than seven months after the Agreement was executed—Atos sent AT&T an email by which Atos advised it was exercising its alleged right to suspend transition services under Section 3.4(f)(i) of the Agreement effective July 30, 2020 (the "Notice"). Incredibly, Atos claimed the alleged suspension was warranted because, "due diligence activities have not been completed by AT&T and transition services have not commenced."**

110.    Atos denies the allegations contained in paragraph 110, except admits that Atos

sent a notice to AT&T on July 31, 2020 exercising its right to suspend services under Section

3.4(f)(i) of the Addendum in light of AT&T's failure to complete its due diligence obligations and

properly plan for and commence transition services, and respectfully refers the Court to the Notice

for its content.

**111.    AT&T promptly responded to Atos' Notice by letter dated August 3 (the "Response Letter"), and advised that Atos' purported suspension of services was entirely improper and invalid. In fact, *Atos* had failed to perform *its* obligations to assist AT&T's completion of due diligence activities and formulation of a transition plan.**

111.    Atos denies the allegations contained in paragraph 111, and respectfully refers the

Court to the referenced letter for its content.

**112.     Nevertheless, despite the numerous obstacles posed by Atos, AT&T continued to work toward satisfaction of its obligations under the Addendum and attempted to work with Atos on multiple occasions following its delivery of the Response Letter on August 3, 2020.**

112.     Atos denies the allegations contained in paragraph 112.

**113.     For example, on August 13, 2020, AT&T's representatives participated in a call with Atos' management to address Atos' purported "suspension" of transition activities and explain why it was improper. Although Atos committed to letting AT&T know when it was ready to address the substance of AT&T's position—including AT&T's identification of specific examples demonstrating Atos' interference with AT&T's due diligence—it failed to do so.**

113.     Atos denies the allegations contained in paragraph 113, except admits that representatives of AT&T and Atos participated in a phone call on August 13, 2020 during which they discussed Atos's suspension of services under Section 3.4(f)(i) of the Addendum in light of AT&T's failure to complete its due diligence obligations and properly plan for and commence transition services.

**114.     Instead, AT&T's Vice President, Global Business, Chris Zpevak, followed-up with Atos' Senior Vice President, Head of Operations, Chris Wick, by letter dated August 28, 2020, to advise that AT&T required Atos' reasonable assistance to address more than thirty separate issues that were preventing AT&T from completing an updated Transition Plan.**

114.     Atos denies the allegations contained in paragraph 114, except admits that AT&T sent a letter to Atos dated August 28, 2020 and respectfully refers the Court to that letter for its content.

**115.     One day earlier, on August 27, 2020, AT&T delivered the Invoice in the amount of $1,027,976.82, dated August 26, 2020, to Atos for services rendered under the Addendum between July 1, 2020 and July 31, 2020. Pursuant to the Amendment, Atos was required to pay the Invoice by September 25, 2020—within thirty (30) days of the date of the Invoice.**

115.     Atos denies the allegations contained in paragraph 115, except admits that AT&T sent an invoice to AT&T in the amount of $1,027,976.82 on August 27, 2020 for purported services

rendered under the Addendum in July 2020, and respectfully refers the Court to that invoice for its

content.

**116.    Although Atos did not dispute the Invoice or advise that it was withholding payment at the time, Atos failed to pay the Invoice by the September 25, 2020 deadline.**

116.    Atos denies the allegations contained in paragraph 116, except admits that Atos did

not pay the referenced invoice because AT&T never rendered any services under the Addendum.

**117.    AT&T and Atos' leadership continued to discuss Atos' failures to provide the information required by the Addendum and Atos' general dereliction of its contractual obligations between August and November 2020. However, no progress was made. Atos consistently refused to comply with its contractual obligations or provide AT&T with the information it needed to complete the transition addressed in the Addendum.**

117.    Atos denies the allegations contained in paragraph 117.

*L.     AT&T Exercises Its Right to Terminate the Addendum For Cause.*

**118.    By letter dated October 9, 2020, AT&T provided Atos with a Notice of Termination For Cause of Addendum For Network Sourcing Services to Master Agreement No. 120206 (the "Notice of Termination").**

118.    Atos denies the allegations contained in paragraph 118, except admits that AT&T

sent a letter to Atos dated October 9, 2020 purporting to terminate the Addendum for cause, and

respectfully refers the Court to that letter for its content.

**119.    AT&T's Notice of Termination advised Atos that its failure to make payment of the Invoice constituted a failure to perform or observe a material term and condition of the Addendum and Master Agreement (as modified by the Addendum).**

119.    Atos denies the allegations contained in paragraph 119, except admits that AT&T

sent a letter to Atos dated October 9, 2020 purporting to terminate the Addendum for cause and

respectfully refers the Court to that letter for its content.

**120.    As a result, AT&T advised Atos that the Addendum would automatically terminate for cause—without the need for any further action by**

**AT&T—pursuant to Section 10.1 of the Master Agreement unless Atos provided payment in full of the Invoice within thirty (30) days.**

120.   Atos denies the allegations contained in paragraph 120, except admits that AT&T

sent a letter to Atos dated October 9, 2020 purporting to terminate the Addendum for cause and

respectfully refers the Court to that letter for its content.

**121.   Once again, Atos failed to take any action to cure its material breach. Thus, the Addendum automatically terminated for cause based on Atos' material breach on November 8, 2020—30 days from AT&T's provision of the Notice of Termination.**

121.   Atos denies the allegations contained in paragraph 121.

**122.   Out of an abundance of caution, AT&T confirmed its termination of the Addendum for cause in writing to Atos by letter dated November 11, 2020. As a result, AT&T demanded payment of the Termination Charge of $18,800,000.00 representing 50% of the MARC for the year in which the Addendum was terminated plus 50% of the MARC for each year remaining in the Addendum's term. AT&T also demanded payment of any Additional Termination Charges to which it is entitled.**

122.   Atos denies the allegations contained in paragraph 122, except admits that AT&T

sent a letter to Atos dated November 11, 2020 purporting to confirm AT&T's termination of the

Addendum for cause, and respectfully refers the Court to that letter for its content.

**123.   As a result of Atos' various breaches of the Addendum and AT&T's resulting termination of the Addendum for cause, Atos is liable to A&T for the full amount of the Termination Charge plus the Additional Termination Charges pursuant to Sections 3.3 and 3.4 of the Attachment.**

123.   Atos denies the allegations contained in paragraph 123.

**124.   To date, Atos has failed to make any payments toward satisfaction of the Termination Charge or Additional Termination Charges to which AT&T is entitled.**

124.   Atos denies the allegations contained in paragraph 124, except admits that it has

not made any payments to AT&T because AT&T is entitled to nothing.

## COUNT I
### (Breach of Contract)

**125.    AT&T repeats and realleges the allegations contained in paragraphs 1 through 124 of this Complaint as if fully set forth herein.**

125.    Atos repeats and realleges each and every response set forth in paragraphs 1 through

124 above as if fully set forth herein.

**126.    As described above, the Master Agreement, together with the Amendment, Attachment and Addendum, each and collectively constitute a valid and legally binding contract between AT&T and Atos.**

126.    Atos denies the allegations contained in paragraph 126, and respectfully refers the

Court to the referenced documents for all of their terms and conditions.

**127.    AT&T fully performed its obligations under the Addendum through the date of Atos' breach.**

127.    Atos denies the allegations contained in paragraph 127.

**128.    Despite AT&T's performance, Atos materially breached the Addendum by, among other things, failing to pay the Invoice when due and failing to comply with Atos' obligations to provide certain information to AT&T in connection with AT&T's due diligence formulation of a Transition Plan under the Addendum.**

128.    Atos denies the allegations contained in paragraph 128.

**129.    The effect of Atos' breach was material.**

129.    Atos denies the allegations contained in paragraph 129.

**130.    As a result of Atos' material breach of the Addendum, AT&T has been damaged in an amount to be determined at trial, but believed to be no less than $21.8 million, plus interest from the date of the breach which amount is comprised of the Termination Charge and the Additional Termination Charges to which AT&T is entitled under the terms of the Master Agreement, the Amendment, the Attachment and the Addendum.**

130.    Atos denies the allegations contained in paragraph 130.

## PRAYER FOR RELIEF

**WHEREFORE, AT&T demands that judgment be entered in their favor against Atos as follows:**

**(i)** awarding AT&T damages in an amount to be determined at trial but believed to be no less than $21.8 million, plus interest;

**(ii)** awarding AT&T the costs, fees and expenses incurred in this action, including, without limitation, reasonable attorneys' fees to the extent permitted by the Master Agreement, together with the Amendment, Attachment and Addendum, or by law; and

**(iii)** awarding AT&T such other and further relied as the Court may deem just and proper.

Answering AT&T's prayer for relief, Atos denies that AT&T is entitled to any relief against Atos.

## DEMAND FOR A JURY TRIAL

The Plaintiff's demand for a jury trial requires no response. Atos likewise demands a trial by jury of all issues so triable in this action.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming the burden of proof on any matters where that burden rests on AT&T, Atos asserts the following affirmative and other defenses to the Complaint.

## FIRST DEFENSE

AT&T fails to state a claim against Atos upon which relief can be granted.

## SECOND DEFENSE

This Court lacks personal jurisdiction over Atos under CPLR 302 because none of the alleged acts out of which AT&T's cause of action arises occurred within the State of New York, nor does the complaint allege any tortious act committed by Atos within the State of New York or without the State of New York causing injury in the State. All of the alleged conduct underlying AT&T's claim occurred in either Texas, where Atos is headquartered and where Atos executed

and performed under the relevant agreements, or New Jersey, where AT&T is headquartered and where AT&T executed and performed (or failed to perform, as set forth in Atos's Counterclaims below) under the relevant agreements.

**THIRD DEFENSE**

This Court is not a proper venue for this dispute under 28 U.S.C. § 1391 because Atos does not reside in this judicial district and a substantial part of the alleged events or omissions giving rise to AT&T's claim did not occur in this judicial district.  Atos is headquartered in Texas and, as set forth in Atos's counterclaim below, has not maintained an office in New York since October 2019.  Further, all of the alleged events or omissions giving rise to AT&T's claim occurred in either Texas, where Atos is headquartered and where Atos executed and performed under the relevant agreements, or New Jersey, where AT&T is headquartered and where AT&T executed and performed (or failed to perform, as set forth in Atos's Counterclaims below) under the relevant agreements.

**FOURTH DEFENSE**

AT&T's claim is barred by AT&T's failure to perform under the Addendum as described in Atos's Counterclaims below.

**FIFTH DEFENSE**

AT&T's claim is barred because Atos properly suspended transition services pursuant to the terms of the Addendum, including under Section 3.4(f)(i) of the Addendum on July 31, 2020, in light of AT&T's failure to discharge its obligation to conduct due diligence and adequately plan for and complete necessary activities related to the Transition Services, as set forth more fully in Atos's Counterclaims below.

## SIXTH DEFENSE

AT&T's claim is barred because AT&T lacked a valid cause to terminate the Addendum. AT&T's August 27, 2020 invoice was not properly issued because AT&T never performed any "Services," as defined in Section 1 of the Addendum, for which it could have invoiced Atos in accordance with Section 3.7 of the Addendum.  As a result, Atos's alleged failure to pay the August 27, 2020 invoice was not a proper basis on which AT&T could have terminated the Addendum for cause.

## SEVENTH DEFENSE

AT&T's claim is barred by the doctrine of *in pari delicto* because AT&T's own conduct, as set forth in Atos's Counterclaims below, shows that AT&T was equally at fault for the events leading to Atos's exercise of its right to suspend services under Section 3.4(f)(i) of the Addendum.

## EIGHTH DEFENSE

AT&T's claim is barred by virtue of AT&T's bad faith conduct in submitting over $14 million in change orders to the Addendum and improperly seeking to shift costs for which AT&T expressly was responsible, thereby destroying Atos's right to receive the fruits of the Addendum, as set forth more fully in Atos' counterclaims below.

## NINTH DEFENSE

Even if AT&T could establish that Atos materially breached the Addendum and that AT&T terminated the Addendum for a valid cause, AT&T is barred from enforcing the liquidated damages provision set forth at Section 3.4 of the Attachment because it is a penalty.  The $18.8 million penalty that Section 3.4 of the Attachment and Section 3.1 of the Addendum purport to impose is grossly disproportionate to any probable loss AT&T allegedly suffered and was designed solely to coerce Atos's performance under the contract.  Upon information and belief, any profit

AT&T could have expected to earn over the term of the Addendum would have been a fraction of the $18.8 million penalty it seeks to impose here, and thus an award of such a penalty would result in an impermissible windfall to AT&T.

**TENTH DEFENSE**

Even if AT&T could establish that Atos materially breached the Addendum and that AT&T terminated the Addendum, AT&T's damages, if any, are "LIMITED TO PROVEN DIRECT DAMAGES NOT TO EXCEED PER CLAIM (OR IN THE AGGREGATE DURING ANY TWELVE (12) MONTH PERIOD) AN AMOUNT EQUAL TO THE TOTAL NET PAYMENTS MADE BY [ATOS] FOR THE AFFECTED SERVICE DURING THE THREE (3) MONTHS PRECEDING THE MONTH IN WHICH THE DAMAGE OCCURRED." Master Agreement § 9.2(iv) (capitalization in original).

**ELEVENTH DEFENSE**

AT&T's claim is barred, in whole or in part, by its failure to mitigate, minimize, or avoid any damages AT&T may be claiming.

**RESERVATION OF RIGHT TO ASSERT ADDITIONAL DEFENSES**

Atos has not knowingly or intentionally waived any applicable defenses, and reserves the right to assert and rely upon other applicable defenses that may become available or apparent during discovery in this matter. Atos reserves the right to amend or seek to amend its Answer and Affirmative Defenses.

## COUNTERCLAIMS

Counterclaimant Atos asserts counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and a declaratory judgment pursuant to 28 U.S.C. § 2201 against counterclaim defendant AT&T on the basis of the following allegations:

## PRELIMINARY STATEMENT

1.      Atos asserts Counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and a declaratory judgment.  These Counterclaims stem from AT&T's wrongful conduct.  AT&T executed a contract with Atos to provide management of networking services.  It did not intend to meet its obligations under that contract, failed to meet its obligations under that contract, and then wrongfully asserted that Atos failed to meet its obligations under the contract.

2.      AT&T denied its wrongdoing.  It further tried to leverage certain provisions of the contract to threaten Atos into excusing AT&T's wrongdoing. The contract between the parties contained a provision providing for liquidated damages. Endeavoring to excuse its wrongful conduct, AT&T attempted to claim Atos breached its obligations so that AT&T could invoke the liquidated damages provision to create leverage against Atos by claiming damages in excess of $20 million.

3.      AT&T and Atos have a long-standing business relationship.  As part of that relationship, Atos included treatment to AT&T when it put out to bid outsourcing the management of its network services in North America.  AT&T underpriced its bid to win the contract because it knew what Atos needed for its business case.  Once the parties entered into the agreement, AT&T began instituting significant amounts of change orders ultimately amounting to approximately

$14.4 million.  AT&T always knew it would require these changes to provide the services it agreed to provide.  But it omitted them from its bid to get the contract.

4.      The parties' agreements also obligated AT&T to conduct due diligence in a specific timeframe in order to effectuate the transition of network services.  In reliance upon AT&T's contractual promises, Atos informed its customers of the transition.  But AT&T never made a good faith attempt to conduct due diligence.  It did not meet its obligations or complete due diligence benchmarks by the deadlines imposed under the parties' agreements.

5.      Once it became clear to Atos that AT&T could not or would not meet its obligations under the contract, Atos provided notice under the parties' agreements that it would suspend transition services due to AT&T's failure to complete due diligence and other necessary activities.

6.      In response, AT&T made no attempt to correct their failure.  Instead, they chose to blame Atos and attempt to collect a windfall penalty payment.  AT&T claimed Atos failed to provide the information necessary in due diligence despite the fact Atos provided everything the parties' agreements obligated it to provide.  AT&T then demanded a payment of nearly $20 million. This amount represented accelerated minimum payments that would have been due under the contract for services AT&T was supposed to provide.  But AT&T never provided any of those services nor did it attempt to complete the due diligence required to commence the services contemplated.

7.      In essence, AT&T demands compensation that would be due under a long-term contract even though it never even began performing under that contract.

8.       AT&T should not be rewarded for its failure to meet its basic obligations under the parties' contracts.  Rather, Atos deserves compensation for the harm AT&T caused by failing to meet its obligations while Atos endeavored to meet its own contractual obligations in good faith.

## PARTIES

9.      Counterclaim plaintiff Atos is a Delaware corporation with its principal place of business located at 4851 Regent Blvd, Irving, Texas 75063.  Atos is a worldwide provider of information technology consulting services across a variety of industries, including manufacturing, financial services and insurance; public sector and defense; telecommunications, media, and technology; resources and services, and health care and life sciences.  Its parent company, Atos SE, is a French publicly traded multinational corporation with over 100,000 employees worldwide.

10.     Counterclaim defendant AT&T is a New York corporation with a principal place of business located at One AT&T Way, Bedminster, New Jersey 07921.  Upon information and belief, AT&T is a subsidiary of AT&T Inc., a publicly traded multinational company headquartered in Dallas, Texas.  AT&T is a global provider of voice, video, data, and internet telecommunications and professional services.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because Atos and AT&T are citizens of different states and the amount in controversy exceeds $75,000.

12.     Atos denies that venue is proper in this Court under 28 U.S.C. § 1391(b) because neither Atos nor AT&T resides in this judicial district and a substantial part of the events or omissions giving rise to AT&T's claims and Atos's counterclaims did not occur in this judicial district.  Atos asserts these counterclaims because they are compulsory under Fed. R. Civ. P. 13(a), and reserves the right to seek dismissal of this action in its entirety for lack of personal jurisdiction or improper venue at the appropriate time.

## FACTUAL ALLEGATIONS

**A.     Relevant Background of Atos and AT&T's Business Relationship**

13.     The business relationship between Atos and AT&T has its roots in an October 9, 2002 Master Agreement, Reference No. 120206, between AT&T and Atos Origin, Inc., Atos's predecessor-in-interest (the "Master Agreement").  The Master Agreement set out the general terms under which Atos would pay AT&T to provide various telecommunications and professional services.

14.     Under the Master Agreement, "service attachments" would provide additional terms governing AT&T's provisions of specific services, with the terms of the Master Agreement to control to the extent that they were not inconsistent with the terms of the attachments.  Master Agreement at 1.

15.     In April 2007, AT&T and Atos Origin, Inc. executed the "AT&T Comprehensive Service Order Attachment for MA VIII or Earlier" (the "Attachment").  Among other things, the Attachment provided that AT&T would provide services "identified in the applicable Pricing Schedules."  Attachment § 1.A.

16.     The Attachment further defined a "Pricing Schedule" as "a pricing schedule to this Attachment, either appended hereto or subsequently signed by the parties referencing this Agreement."  Attachment § 2.

17.     Subject to the terms of the Master Agreement, therefore, the Attachment and any Pricing Schedules governed the services AT&T provided to Atos beginning in April 2007.

18.     In subsequent years Atos and AT&T maintained a steady business relationship, with AT&T providing a variety of services to Atos as different needs arose.  AT&T derived substantial revenue from its relationship with Atos, receiving millions of dollars annually for the services it provided to Atos.

44

**B.      Atos's November 2018 Request for Proposal**

19.      In November 2018, Atos issued a request for proposal ("RFP") in which it sought proposals to manage Atos's network services in North America.  Given its longstanding business relationship with Atos, AT&T was included as one of the potential bidders on the RFP.  The RFP was also issued to several competitors of AT&T.

20.      By outsourcing its network services to an expert in telecommunications and network infrastructure, Atos anticipated it could save millions of dollars annually and better serve its customers in other critical areas.  Atos did not intend to move forward with that planned outsourcing if AT&T or other bidders could not establish that their respective proposals would result in a net financial benefit to Atos.

21.      From the beginning of the process, Atos made it clear to AT&T that AT&T needed to make the business case in order to win the bid.  To assist AT&T in preparing its final bid, Atos provided AT&T with access to vast amounts of information about Atos's existing network services environment in North America and participated in numerous question-and-answer sessions with AT&T representatives.

22.      AT&T submitted its response to the November 2018 RFP on or about December 12, 2018.  Atos believed AT&T presented the technically superior proposal.  But Atos selected another proposal because AT&T's proposed pricing failed to meet Atos's financial requirements. At the prices proposed by AT&T, Atos would have paid more for network services than if it were to continue to manage those services internally.

23.      AT&T's pricing was too high even when accounting for a $3 million loyalty credit that AT&T offered to provide to Atos in its December 2018 response to the RFP.  In fact, AT&T's pricing implied an additional cost of nearly $10 million in comparison to the status quo, and exceeded the winning bidder's proposed price by approximately $16.5 million.

C.       **Atos Reinstates the RFP Process But Elects Not to Move Forward**

24.      After Atos and the winning bidder failed to reach a definitive agreement on a plan for outsourcing Atos's North America network services, AT&T would have another chance to prepare an improved proposal.  In or about February 2019, Atos initiated a new RFP process, this time seeking to outsource management of its network services both in North America and abroad.

25.      As with the previous RFP process, Atos provided voluminous information to AT&T and other potential bidders about the contemplated project.  Atos also engaged in one-on-one question-and-answer sessions with AT&T and the other bidders to address any questions they might have about the project.

26.      For example, Atos gave AT&T access to inventory documents identifying more than 100,000 devices that AT&T would be responsible for managing after the transition of Atos's network services to AT&T.  Atos also provided AT&T with a list of 301 Atos employees it would require AT&T to retain to support the transition.

27.      On the basis of the information provided by Atos, AT&T made its initial presentation on May 9, 2019.  After Atos reviewed that initial presentation and provided feedback to AT&T, AT&T presented its final proposal in a June 18, 2019 Technical Solution Document spanning 50 pages.  The Technical Solution Document include an attachment detailing a pricing matrix setting forth the expected annual cost of the project over a five-year period.

28.      The Technical Solution Document provided for AT&T and Atos to engage in due diligence before commencing transition services "to ensure the right processes are established along with an agreement on roles and responsibilities to avoid finger pointing as there are shared responsibilities within this network management."  Technical Solution Document at 37.  AT&T anticipated a due diligence period of at least three months before the start of any transition services.

29.     On June 28, 2019, after careful consideration of the options presented to it, Atos determined that it would place the project on hold.  That decision was driven principally by the fact that none of the proposals delivered pricing that would result in meaningful savings for Atos compared to the status quo.  Expected restructuring costs with respect to Atos's European operations presented another barrier that threatened the viability of the project.

30.     Nonetheless, Atos attempted to negotiate a deal with AT&T solely for Atos's North American operations.  But negotiations stalled when the parties failed to agree upon an up-front loyalty credit granted by AT&T to Atos.

**D.      Atos and AT&T Reopen Discussions to Outsource Management of Atos's North American Network Operations**

31.      On October 9, 2019, Atos and AT&T representatives convened a telephone conference to discuss reviving the North American aspect of the two prior RFP processes.

32.     The technical scope of this proposed project was ***identical*** to the scope previously contemplated in both of the prior RFPs, with the exception of minor updates to the scope of the Atos customer base that would be included in transitioning network services to AT&T.  As a result, the parties reused much of the information shared and knowledge gained during the prior two RFP processes.

33.     Atos also told AT&T that it needed to satisfy Atos that the transition result would be net positive for Atos financially.  Atos informed AT&T any deal required an up-front loyalty credit of $3 million to establish a positive business case for the contemplated transition of services.

34.      Thereafter, the parties engaged in negotiations over the next two months endeavoring to execute an agreement by year's end.

35.     Based on the updated inventory and customer information that Atos provided to AT&T, the parties anticipated in mid-December 2019 that Atos would transition a total of 19,323

devices and 75 customers (plus Atos) for network services managed by AT&T.  Those devices included wide area network, local area network, and firewall devices.  AT&T's proposal included a six-month period to complete the transition to an AT&T-managed network environment.

36.     Like AT&T's previous proposal, its December 2019 proposal contemplated a due diligence period, but of shorter duration given the voluminous information Atos already provided to AT&T.  Rather than the three-month period previously contemplated, the parties anticipated a due diligence period spanning approximately one month.

37.     In addition, based on the detailed pricing developed and presented by AT&T, Atos projected it would save approximately $8 million over the agreement's initial five-year term.  The agreed to loyalty credit accounted for $3 million of those savings.

38.     Atos was satisfied that AT&T had presented a sufficiently positive business case to warrant moving forward with the transition of services.

39.     Accordingly, on December 24, 2019, the parties executed an Addendum for Network Sourcing Services to Master Agreement (the "NS Addendum").

**E.     The Relevant Terms of the NS Addendum**

40.     The NS Addendum provides that it "is an Attachment to" the Master Agreement and that the "NS Addendum and all of its Exhibits which are appended to it collectively are considered to be a Pricing Schedule as defined in Section 2 of the" Attachment.  NS Addendum at 1.  As a result, the NS Addendum was made subject to the terms of the Master Agreement and the Attachment, with the NS Addendum's terms controlling in the event of a conflict.

41.     Consistent with the parties' expectations as set out in AT&T's prior proposals, Section 3.3 of the NS Addendum anticipated that AT&T would perform due diligence "to obtain a more complete understanding of [Atos's] current service delivery environment and performance levels."  NS Addendum § 3.3(a).

42.     Under Section 3.3(a)(i), Atos agreed to "build a virtual data room and grant access to AT&T by fifteen (15) business days after" execution of the NS Addendum on December 24, 2019, or by January 16, 2020.  The parties further agreed "that if the data room is not accessible by that date, the period for conducting due diligence will be extended for an equivalent period of time . . . ."  *Id.*

43.     Also consistent with AT&T's December 2019 proposal, AT&T agreed that due diligence would start "upon grant of access to virtual data room and shall use commercially reasonable efforts to complete due diligence within 4 weeks after all required information is made available to AT&T."  NS Addendum § 3.3(a)(ii).

44.     Atos agreed to provide the following 24 categories of information to AT&T in the virtual data room:

(A)     an overview of the Service Levels of Atos customers and the current achievements;

(B)     an overview of devices used by Atos customers;

(C)     penalty clauses by Atos customers;

(D)     a set of flow down terms for AT&T to review in order for Atos to remain in compliance with its contract obligations to specified Atos Customers;

(E)     complete and accurate inventories for the following:

1.      equipment inventory to include: manufacture, model number, site ID, IOS and any associated subcomponents plus the unknown in-scope devices;

2.      site list to include: restricted identifier, site ID, address, city, state, country, postal code. Please identify data centers, hubs and remote sites; and

3.      circuit inventory to include: circuit ID, circuit size and type, provider, site ID, address, city, state, country, postal code;

(F)     details regarding the restricted environments;

(G)    data center names and location information where Atos wants AT&T to install network management circuits and routers;

(H)    existing network diagrams including data center and transport connectivity;

(I)    a list of Atos' customers;

(J)    Atos' customers' specific audit requirements and frequency;

(K)    Atos' anticipated timeframe to obtain all required Atos customer consents;

(L)    an initial draft of the client migration prioritization schedule;

(M)    all readily available information (with the rest to be collected during transition) such as the identity by location and by Atos customer where out-of-band access is unavailable;

(N)    firewall rule optimization requirements/plans will be addressed post transition;

(O)    the identity of which firewalls are single availability or high availability and at which locations;

(P)    virtual firewall details, by customer and by location;

(Q)    virtual load balancer details by customer and by location;

(R)    details on the Jump servers including interface requirements, availability of supplier to use, location, available speeds, etc. (all to be addressed during transition planning);

(S)    confirmation of the name and scope of each of the suppliers to be managed by letter of agency;

(T)    additional details regarding off hour support;

(U)    holidays or time periods with an associated network change freeze during the anticipated transition time frame;

(V)    notification if there [will] be an expedited change [in] management approval process to facilitate network changes needed to perform transition activity;

(W)    current Tier 1/1.5 help desk procedures (to be addressed during transition planning); and

(X)   technical and operational details for how the Load Balancers
and WANX devices are supported today.

NS Addendum § 3.3(a)(iii).

45.     As set forth in Section 3.3(a)(iii)(M) above, the parties specifically contemplated that Atos would provide "all readily available information," but that any other information would be "collect[ed] during the transition . . . ."

46.     Atos also agreed to "provide to AT&T a set of flow down terms for AT&T to review in order for [Atos] to remain in compliance with its contract obligations to specified Atos Customers."  NS Addendum § 3.3(b).

47.     Upon AT&T's completion of due diligence, AT&T was required to provide Atos "with a verification report detailing the impact of due diligence on the pricing provided in Exhibit P (Pricing)."  NS Addendum § 3.3(c).

48.     The NS Addendum carried a 66-month term starting on the latter of : (i) the date of completion of due diligence; or (ii) the date of revision of the NS Addendum "to include the comprehensive replacements of Exhibit SOW and Exhibit SL,", but in no event later than April 1, 2020.  NS Addendum at 2.  Exhibits SOW and SL set out the statement of work to be performed and the service levels at which AT&T would be required to perform that work.  *See* NS Addendum Exhs. SOW & SL.

49.     Under Section 3.4, the NS Addendum required AT&T to provide "Transition Services" in two phases pursuant to a "Transition Plan" developed by AT&T. The NS addendum required AT&T to deliver a draft of the Transition Plan by January 7, 2020.  AT&T also agreed to work with Atos "to complete a jointly agreed final Transition Plan by January 31, 2020."  NS Addendum § 3.4(c).

50.    The NS Addendum required the final Transition Plan to "identify[] the specific activities to be performed by each party and the significant components and conditions precedent associated with each activity[.]"  *Id.*  Those activities, components, and conditions precedent included "all deliverables to be completed by AT&T," as well as "the expected completion date for each activity or deliverable."  *See id.* §§ 3.4(c)(i)-(v).

51.    Further, the NS Addendum authorized AT&T to submit invoices only "for Services," defined as "the Services described in this NS Addendum, including Exhibit SOW."  NS Addendum §§ 1(a), 3.7.  The NS Addendum set forth the Transition Services to be provided by AT&T after submission of the final Transition Plan, while Exhibit SOW set forth the managed network operation services to be provided by AT&T following completion of the transition.  *Id.* § 3.4, Exh. SOW.

52.    Also attached to the NS Addendum was a pricing schedule identified as Exhibit P. Section 2.5(a) of Exhibit P set forth the $3 million loyalty credit, which AT&T and Atos agreed "will first apply to unpaid, undisputed invoice balances."

**F.    Atos Timely Provides Access to and Begins to Populate the Data Room, and AT&T Prepares the Transition Plan**

53.    In the weeks immediately following execution of the NS Addendum, the parties' preliminary duties with respect to due diligence and the development of the Transition Plan seemed to be on course.

54.    Consistent with Section 3.4(c) of the NS Addendum, AT&T delivered a draft Transition Plan to Atos on January 7, 2020.  Following AT&T's submission of the draft, AT&T and Atos reviewed the draft together and, in the words of an AT&T representative, engaged in "continual joint review of the program" with the goal of driving towards development of the final Transition Plan by January 31, 2020.

55.      Also following submission of the draft Transition Plan, Atos timely created and provided AT&T with access to the virtual data room on January 16, 2020, exactly 15 business days after the December 24, 2019 effective date of the NS Addendum as required under Section 3.3(a)(i).

56.      Upon creation of the data room, Atos first uploaded two key documents: (i) a document providing the names and locations of Atos's data center; and (ii) a detailed Excel workbook setting forth an inventory of over 20,000 devices tat Atos anticipated would be transitioned to AT&T under the program.  In a January 19, 2020 email acknowledging creation of the data room and uploading of the two documents, an AT&T representative described the inventory document as "THE most important document we need to address many open issues."

57.      In other words, Atos provided to AT&T the most critical document as due diligence commenced.  And within just a week of creation of the data room, Atos had already uploaded hundreds of files concerning dozens of its customers whose network services would be transitioned to AT&T for management.

58.      Atos also prepared a Site Inventory Template Form, or "SIT Form," that would be given to customers to complete.  The SIT Form requested detailed identification information regarding any devices that would be transitioned to AT&T, as well as contact information for the customer.

59.      Atos immediately began contacting its customers to request their consent to the AT&T transition and ask that they complete the SIT Form.  By January 24, 2020, Atos had provided the SIT Form to approximately 85%, had received initial information from nearly 75% , and had inventoried devices for 100% of its customers.

60.     On January 31, 2020, AT&T submitted its final draft of the Transition Plan, which was accompanied by a Transition Project Schedule that set out a detailed list of tasks to be completed in order to complete the transition.

61.     The Transition Project Schedule tentatively contemplated that due diligence would be completed by March 2, 2020, and that Atos would obtain any necessary customer consents to the transition after completion of due diligence, by April 23, 2020.

62.     The schedule further contemplated that AT&T would undertake numerous tasks in parallel with due diligence in order to prepare for the anticipated transition.  The vast majority of those tasks were not dependent upon completion of due diligence.

63.     The Transition Project Schedule ultimately anticipated that the transition would be complete by August 21, 2020.

64.     The final Transition Plan, a comprehensive 42-page document, first noted that it was based "on information obtained from the agreement, information obtained from team members who participated in the agreements development and any/all information *available through the due diligence process*."  Transition Plan at 1 (emphasis added).

65.     The Transition Plan further noted the parties' expectation that Atos would use the SIT Form "to obtain the customer inventory information," which AT&T previously had emphasized was the most important information for implementation of the Transition Plan.  Transition Plan at 4.

66.     The Transition Plan also stated that, in the event that all customer consents were not obtained before AT&T "gains network access and begins network discovery[,]" AT&T would start with "consenting customer networks first[,]" with previously non-consenting customers added as their consents were obtained.  Transition Plan at 4.

67.     AT&T thus was aware from the beginning that it was possible some of Atos's customers might not provide timely consent or might refuse to consent at all.  Obtaining consents from all in-scope customers, however, was not a condition precedent to AT&T's provision of transition services or the other work it was required to do under the Transition Plan.

### G.     Atos Carries Out Its Obligations in Due Diligence

68.     After AT&T submitted the final Transition Plan, Atos continued to populate the virtual data room with the categories of information set forth in Section 3.3(a)(iii) of the NS Addendum.  Devoting more than 20 internal resources to various due diligence activities, Atos provided AT&T with 100% of the all-important device inventory information and obtained completed SIT Forms from nearly 90% of the in-scope customers by March 2020.  *See also* NS Addendum §§ 3.3(a)(iii)(B), (E), (I).  For their part, the 52 in-scope customers devoted more than 70 of their own resources to facilitate completion of the SIT Forms.

69.     By or before March 2020, Atos had substantially completed the material due diligence items set forth in Section 3.3(a)(iii) of the NS Addendum.  For example, Atos shared with AT&T: (a) customer-specific service level agreements and audit requirements, as required under Sections 3.3(a)(iii)(A) and (J); (b) a detailed list of the "flow down terms" contemplated in Section 3.3(a)(iii)(D); (c) details regarding "restricted environments," in accordance with Section 3.3(a)(iii)(F); (d) the names and locations of relevant data centers, as required under Section 3.3(a)(iii)(G); (e) existing network diagrams, in accordance with Section 3.3(a)(iii)(H); (f) an initial draft client migration prioritization schedule per Section 3.3(a)(iii)(L); (g) all "readily available information" about each Atos customer, including information about out-of-band access unavailability and details regarding customer firewalls, load balancers, and jump servers, *see id.* §§ 3.3(a)(iii)(M)-(U); and (h) information on existing help desk procedures and technical and

operational details related to support of load balancers and WANX devices, *see id.* §§ 3.3(a)(iii)(W)-(X).

70.     In total, Atos uploaded nearly 1,000 documents to the virtual data room into well organized and easily identified folders.  Beyond uploading documents to the data room, Atos participated in regular touchpoint meetings with AT&T personnel regarding due diligence, conducted joint sessions to identify any gaps in due diligence, and shared voluminous additional information with AT&T via email.  Thus, Atos satisfied its obligation to provide all "readily available information" to AT&T in due diligence.

71.     Moreover, although Atos was not required to obtain customer consents as part of due diligence—Atos only had to provide "an anticipated timeframe" for when it expected to obtain those consents, as it already had done, NS Addendum § 3.3(a)(iii)(K)—Atos obtained consents from 75% of its customers by mid-March 2020, well ahead of the April 23, 2020 date set forth in the Transition Project Schedule.  The remaining 25% of customers were waiting to provide their consent until they had an opportunity to review AT&T's final operational model.

**H.     AT&T's Failures to Complete Due Diligence or Plan For the Transition**

72.      AT&T never provided the final operational model to enable Atos's remaining customers to consider whether to provide their consent.  Instead, AT&T engaged in a pattern of delay and obstruction during the due diligence process, and lack of knowledge, coordination, and leadership plagued its due diligence during the process.

73.     For example, AT&T repeatedly requested information that already had been provided.  In some instances, AT&T did not bother to review the documents uploaded to the data room, which addressed the relevant due diligence item.  In other instances, AT&T unreasonably demanded Atos provide the information in different formats or it required that Atos revise and re-upload documents to correct immaterial typographical errors.

74.     Then, in April of 2020, AT&T submitted change orders worth approximately $14.4 million and revised the timeline for the transition to 12 months, rather than the approximately seven-month period outlined in the final Transition Plan and Transition Project Schedule.

75.     Upon information and belief, AT&T knew at the time the parties executed the NS Addendum in December 2019 that it would be required to perform the vast majority of the services identified in the April 2020 change orders, but omitted those items from the original proposal and pricing schedule in order to satisfy Atos that AT&T's proposal met Atos's required business case.

76.     For instance, AT&T based the most significant proposed change order, totaling $11.7 million in additional costs to Atos, on a vague assertion that AT&T purportedly would be required to provide "customized care" for certain Atos customers.  Even while acknowledging that the NS Addendum covered the topic, AT&T falsely claimed that it was not made aware prior to execution of the NS Addendum that AT&T would be required to answer to Atos's customers and satisfy their specific requests.  AT&T was informed at all times that the needs of Atos's customers were not uniform.

77.     Atos pressed AT&T for details to support that $11.7 million figure, but AT&T failed to provide any support and instead rested on its unilateral assumptions regarding what would be required to deliver the necessary services under the NS Addendum.

78.     AT&T failed to complete due diligence by April 1, 2020, the outside date for the start of the 66-month term under the NS Addendum and initiation of the transition.  AT&T therefore never commenced Transition Services or provided any other Services set forth in the NS Addendum.

79.     In May 2020, Atos impressed upon AT&T the need to complete due diligence and provide final cost estimates.  Throughout this period, Atos continued to provide documents in response to AT&T's follow-up due diligence requests.

80.     AT&T presented an incomplete due diligence report in May 2020 and, on June 5, 2020, submitted incomplete pricing and delayed submission of its due diligence findings an additional four weeks.

81.     Atos requested that AT&T provide details regarding pricing by no later than June 9, 2020, but AT&T failed to do so.

82.     On July 15, 2020, AT&T again delayed completion of due diligence by another five-and-a-half weeks and submitted only partial pricing that left several key issues outstanding. During a conference call that occurred around the same time, AT&T admitted that its delays in completing due diligence were the result of issues internal to AT&T, not any purported failure on the part of Atos to provide information.

83.     On July 27, 2020, Atos provided an analysis of the outstanding gaps to AT&T and requested to confer with AT&T regarding the steps required to initiate the transition, but AT&T never responded to that outreach.

I.     **Atos Exercises Its Right to Suspend Transition Services, and AT&T Improperly Issues an Invoice for Services It Never Provided**

84.     On July 31, 2020, Atos notified AT&T that it was exercising its right under Section 3.4(f)(i) of the NS Addendum to suspend Transition Services in light of AT&T's failure to complete due diligence and other necessary activities required to support the Transition Services, as set forth in detail above.

85.     AT&T responded by letter dated August 3, 2020, denying that it had failed to carry out its obligations and refusing to recognize Atos's suspension of transition services.  AT&T also

questioned the basis for Atos's suspension of services, notwithstanding AT&T's manifold, self-evident failures to complete due diligence or commence Transition Services.

86.     AT&T next demanded a call on August 13, 2020, in which it sought to question Atos about its suspension of services. Atos reiterated its statement in its July 31, 2020 notice that AT&T failed to take the actions necessary to complete due diligence and begin the transition.

87.     Two weeks later, on August 27th, AT&T issued an invoice to Atos for services it purportedly rendered under the NS Addendum totaling more than $1 million. But AT&T had never provided any "Services" as defined under the NS Addendum. Thus, Atos deemed the August 27th invoice null and void.

88.     Upon information and belief, AT&T issued the invoice as a pretext to terminate the NS Addendum for cause, as it knew that Atos would never pay $1 million for services AT&T never provided. AT&T created this pretext to terminate to trigger the penalty provision in the Attachment requiring payment of half of the Minimum Annual Revenue Commitment ("MARC") for each year of the 66-month term of the NS Addendum, or $18.8 million, upon a termination of an Attachment or Pricing Schedule for cause.

89.     In fact, the day after it sent the improper invoice, AT&T sent a letter to Atos dated August 28, 2020. It falsely asserted that Atos needed to pay the MARC regardless of the suspension of Transition Services and regardless of AT&T's repeated failures to perform under the NS Addendum. Upon information and belief, AT&T sent that letter to threaten and intimidate Atos into withdrawing its suspension of services and accepting AT&T's deficient performance under the NS Addendum.

90.     AT&T's August 28th letter also included a list of due diligence items that purportedly remained outstanding. The information on that list was and remains inaccurate.

59

Virtually all of the due diligence items on the list were completed except less than five items the parties understood they would address during the transition.

91.     The parties thereafter continued to discuss Atos's position that Atos met all its requirements in due diligence.  Voluminous materials provided not just in the data room, but during telephone conferences and in emails reflected this reality.  But AT&T refused to recognize any fault on its part.

92.     By letter dated October 9, 2020, AT&T advised Atos that it purportedly was terminating the NS Addendum for cause based on Atos's refusal to pay the improperly issued August 27th invoice within 30 days of its issuance.  The letter cited the penalty provisions at Section 3.4 of the Attachment.  AT&T intended to coerce Atos's acceptance of AT&T's defective performance under the NS Addendum with the threat that AT&T would seek to enforce a penalty of nearly $20 million.

93.     AT&T sent a further letter on November 11, 2020, purporting to confirm its termination of the NS Addendum for cause and demanding "payment of $18,800,000 representing a Termination Charge equal to 50% of the unsatisfied MARC for the year of the Pricing Schedule Term in which the Pricing Schedule is terminated plus 50% of the MARC for each year remaining the Pricing Schedule Term (*see* Attachment, § 3.4(i))."  AT&T demanded Atos make the payment by December 10, 2020.

94.     In light of AT&T's failure to perform under the NS Addendum, Atos declined AT&T's demand for an $18.8 million penalty payment.

## COUNT ONE

### Breach of Contract

95.     Atos repeats and realleges each and every allegation above as if fully set forth in this count.

96.     The NS Addendum, which incorporates by reference the terms of the Attachment and the Master Agreement, constitutes a valid and enforceable contract between AT&T and Atos.

97.     Atos fully performed under the terms of the NS Addendum, including by providing timely access to the data room and providing AT&T access to all information available to Atos as necessary for AT&T to complete its due diligence under Section 3.3 of the Addendum.

98.     AT&T materially breached the NS Addendum by failing to "use commercially reasonable efforts to complete due diligence within 4 weeks after all required information is made available to AT&T."  NS Addendum § 3.2(a)(ii).  As alleged above, all required information was provided to AT&T by March 2020, yet AT&T continually sought extensions of its time to complete due diligence, which AT&T never completed.

99.     AT&T also materially breached the NS Addendum by failing to provide the required "verification report detailing the impact of due diligence on the pricing provided in Exhibit P (Pricing)."  NS Addendum § 3.3(c).  AT&T provided incomplete pricing reports in June and July 2020 but never delivered the final verification report because it never completed due diligence.

100.     Finally, AT&T materially breached Section 3.7 of the NS Addendum in issuing an invoice for services it never rendered under the NS Addendum.  Section 3.7 authorizes invoicing only for "Services," which the NS Addendum defines to mean Transition Services and the Services set forth in Exhibit SOW.  Because AT&T never commenced the transition, it never rendered any

Transition Services.  AT&T issued its August 27, 2020 in violation of Section 3.7 of the NS Addendum.

101.    Under Section 3.2 of the Attachment, AT&T's material breaches of the NS Addendum entitle Atos to terminate the NS Addendum without incurring any liability for "Termination Charges" under Section 3.4 of the Attachment.

102.    As a direct and proximate result of AT&T's multiple breaches of the NS Addendum, Atos has suffered damages including, without limitation: (a) the loss of the financial benefit Atos expected to receive from outsourcing its North American network services, which Atos projected to amount to at least $8 million over the term of the contract; (b) out-of-pocket losses related to the costs of conducting due diligence and other transition-related activities and costs from investing in additional tools to continue managing its network services internally; and (c) harm to reputation and goodwill.

## COUNT TWO

### Breach of the Implied Covenant of Good Faith and Fair Dealing

103.    Atos repeats and realleges each and every allegation above as if fully set forth in this count.

104.    The covenant of good faith and fair dealing is inherent in every contract, and prohibits either party from taking any action that will have the effect of destroying or injuring the other party's right to receive the fruits of the contract.

105.    AT&T breached the implied covenant of good faith and fair dealing by proposing change orders totaling nearly $15 million that it planned to propose prior to execution of the NS Addendum, but chose not to include in its original pricing under the contract so as to give the appearance that its proposal met Atos's business and financial needs.  As alleged above, AT&T

was made explicitly aware of Atos's financial requirements for the consummation of any agreement.

106.   In proposing these change orders, AT&T abused its right under Section 3.3(c) of the NS Addendum to propose revised pricing terms based on findings during due diligence, as the change orders did not result from due diligence findings, but rather issues AT&T was aware of prior to executing the contract.

107.   By proposing these change orders and improperly sending the August 27, 2020 invoice as a pretext to terminate the NS Addendum, AT&T effectively destroyed Atos's right to receive the fruits of the NS Addendum in breach of the implied covenant of good faith and fair dealing.

108.   As a direct and proximate result of AT&T's bad-faith conduct designed to destroy Atos's right to receive the fruits of the NS Addendum, AT&T caused harm to Atos' reputation and goodwill and damaged it in an amount to be determined at trial.

## **COUNT THREE**

### **Declaratory Judgment Pursuant to 28 U.S.C. § 2201**

109.   Atos repeats and realleges each and every allegation above as if fully set forth in this count.

110.   Under Section 3.4(f)(i) of the NS Addendum, Atos was entitled to "elect to suspend or delay the performance of the Transition Services[]" without incurring "any additional Charges in connection with the election[]" where such selection was "based on AT&T's failure to plan for or complete necessary activities related to the applicable Transition Services[.]"

111.   As alleged above, AT&T failed to plan for or complete numerous activities directly related to the Transition Services, including but not limited to its obligations to timely complete

due diligence and to submit final proposed pricing changes based on due diligence findings. Despite Atos's requests to address these failures, AT&T refused to do so.

112.   As a result, Atos properly notified AT&T that it was electing to suspend performance of Transition Services on July 31, 2020.

113.   AT&T disputed the validity of Atos's July 31, 2020 notification and sought to force Atos to pay additional charges for which it was not responsible (and for services never provided) in its August 27, 2020 invoice.

114.   Atos maintains it is not obligated to pay any further charges to AT&T under the Addendum and the August 27, 2020 invoice is invalid.

115.   Accordingly, a controversy of a justiciable nature exists between Atos and AT&T regarding the validity of Atos's July 31, 2020 notification and AT&T's August 27, 2020 invoice. Entry of a declaratory judgment pursuant to 28 U.S.C. § 2201 thus is necessary and proper to resolve this controversy.

116.   Based upon the foregoing, Atos is entitled to a judgment declaring that it properly asserted its right to suspend Transition Services under Section 3.4(f)(i) of the NS Addendum in its July 31, 2020 notification and that AT&T's August 27, 2020 invoice is null and void and of no legal force or effect.

## **PRAYER FOR RELIEF**

WHEREFORE, Atos respectfully requests the following relief:

A.   Judgment in the amount of actual damages or other relief proven at trial, including all direct or consequential damages and punitive damages under state law, plus all applicable interest, attorneys' fees, and costs of suit as allowable under applicable law and the Master Agreement;

B.     A declaratory judgment that Atos properly suspended Transition Services under

Section 3.4(f)(i) of the NS Addendum on July 31, 2020 and that AT&T's August

27, 2020 invoice is null and void and of no legal force or effect; and

C.     Such other and further relief as this Court deems just and proper.

Dated: New York, New York                    Respectfully submitted,
       August 13, 2021
                                             DLA PIPER LLP (US)


                                             By:   /s/ Leon Medzhibovsky
                                                   Leon Medzhibovsky
                                                   leon.medzhibovsky@us.dlapiper.com
                                                   Andrew J. Peck
                                                   andrew.peck@us.dlapiper.com
                                                   Steven M. Rosato
                                                   steven.rosato@us.dlapiper.com

                                             1251 Avenue of the Americas, 27th Floor
                                             New York, NY  10020-1104
                                             Tel.: 212.335.4500
                                             Fax: 212.335.4501

                                             Cameron A. Fine (*pro hac vice forthcoming*)
                                             cameron.fine@us.dlapiper.com
                                             2525 East Camelback Road, Suite 100
                                             Phoenix, AZ 85016-4232
                                             Tel.: 480.606.5132
                                             Fax: 480.606.5533

                                             *Attorneys for Defendant and Counterclaimant*
                                             *Atos IT Solutions and Services, Inc.*

## **CERTIFICATE OF SERVICE**

     I certify that on August 13, 2021, I caused a copy of the foregoing to be filed with the Court's ECF system, which will cause notice of its filing to be served electronically upon all counsel who have appeared in this action.

                                 /s/ Leon Medzhibovsky
                                 Leon Medzhibovsky