USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  12/11/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
AT&T CORP.,                                                 :
                                                            :
                              Plaintiff,                    :
                                                            :
              - against -                                   :
                                                            :
                                                            :
ATOS IT SOLUTIONS AND SERVICES, INC.,                       :
                                                            :
                              Defendant.                    :
                                                            :
------------------------------------------------------------X

21-CV-4550 (VSB) (RWL)


**DECISION AND ORDER:
MOTION TO AMEND**


**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

On May 20, 2021, Plaintiff AT&T Corp. ("AT&T") brought this breach of contract action against Defendant and Counterclaimant Atos IT Solutions and Services, Inc. ("Atos").  (Dkt. 1.)  Atos answered on August 13, 2021, and asserted counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and a declaratory judgment.  (Dkt. 13.)  Atos now seeks leave to amend to assert seven additional counterclaims: (i) fraudulent inducement, (ii) fraudulent concealment, (iii) aiding and abetting breach of fiduciary duty, (iv) violation of the Defend Trade Secrets Act, (v) unfair competition, (vi) tortious interference with contract, and (vii) civil conspiracy.  (Dkts. 63-65.)  For the following reasons, the motion is GRANTED in part and DENIED in part.  Atos may amend to include claims for fraudulent concealment (on only the theory that AT&T concealed its use of a "mole" to manipulate the parties' business relationship), aiding and abetting breach of fiduciary duty, violation of the Defend Trade Secrets Act,

unfair competition, and tortious interference with contract.[1]  The motion is denied with respect to Atos's claims for fraudulent inducement, fraudulent concealment (on only the theory that AT&T concealed its understanding of the contract's scope and pricing requirements), and civil conspiracy.

## FACTS

AT&T is a global telecommunications provider.  (PAC at 47 ¶ 23.[2])  Atos is a global information technology services company that provides, among other things, digital consulting, internet services, and cloud management.  (*Id.*)  Until the events that gave rise to this dispute, AT&T and Atos had a longstanding business relationship spanning

---

[1] There is some debate in this Circuit whether a motion to amend is considered dispositive or non-dispositive for purposes of whether a Magistrate Judge's ruling should issue as a Report and Recommendation, subject to de novo review, or as a Decision and Order, subject to review for clear error.  "The Second Circuit has referred to a motion to amend a complaint as a non-dispositive matter but has not explicitly decided so." *Wilson-Abrams v. Magezi*, No. 20-CV-1717, 2022 WL 4545254, at *3 n.6 (W.D.N.Y. Sept. 29, 2022) (citing *Fielding v. Tollaksen*, 510 F.3d 175, 175 (2d Cir. 2007) and *Kilcullen v. New York State Department of Transportation*, 55 F. App'x 583, 584-85 (2d Cir. 2003)); *see also Marsh v. Sheriff of Cayuga County*, 36 F. App'x 10, 11 (2d Cir. 2002) (summary order) ("the magistrate judge acted within his authority in denying this motion to amend the complaint").  "Courts in this circuit generally treat motions to amend as non-dispositive pre-trial motions," *Prosper v. Thomson Reuters Inc.*, No. 18-CV-2890, 2021 WL 535728, at *1 n.1 (S.D.N.Y. Feb. 11, 2021) (collecting cases), although some courts have suggested that a magistrate judge's denial of a motion to amend a complaint should be treated as dispositive, while a grant of the same motion should be treated as non-dispositive.  *See Ashford Locke Builders v. GM Contractors Plus Corp.*, No. 17-CV-3439, 2020 WL 6200169, at *1 (E.D.N.Y. Oct. 22, 2020) ("unless the magistrate judge's decision effectively dismisses or precludes a claim, thereby rendering the motion to amend dispositive, motions for leave to amend are subject to review under the 'clearly erroneous or contrary to law' standard of Rule 72(a).").  In this instance, the Court issues its decision as a decision and order.

[2] "PAC" refers to Atos's Proposed Answer and Amended Counterclaim filed April 10, 2023 (Dkt. 65-1.)  Atos's Answer is found on pages 1-40, while Atos's Proposed Amended Counterclaims are found on pages 41-97.  Because the paragraphs are renumbered beginning at page 41, citations to the PAC include a page number preceding the relevant paragraph number for ease of reference.

two decades.  (*Id*. at 48 ¶ 27.)  That relationship is rooted in an October 9, 2002 master agreement (the "Master Agreement"[3]) under which Atos agreed to pay AT&T to provide Atos and its customers various telecommunications and professional services.  (*Id*.)  The precise services to be provided by AT&T have been memorialized in separate service attachments executed over the years.  (*Id*. at 48 ¶ 28.)  One such attachment is the December 24, 2019 Addendum for Network Sourcing Services ((the "Addendum"), Dkt.93-1), which is the contract at issue in this case.  (*Id*. at 41 ¶ 2; 59 ¶ 79.)

Under the Addendum, the parties agreed that AT&T would assume control over the provision of network services to some of Atos's customers.  (PAC at 41 ¶ 2.)  The Addendum also provided that after it was signed, AT&T would conduct additional due diligence "to obtain a more complete understanding of [Atos's] current service delivery environment and performance levels," which could lead to revisions of the pricing agreed to in the Addendum.  (PAC at 59 ¶ 80; Addendum § 3.3(a).[4])  The Addendum also specified the categories of information AT&T required from Atos to complete its diligence and laid out a timeline for Atos to provide AT&T with that information.  (Addendum § 3.3(a).)

As framed in the operative pleadings, the parties' dispute centers primarily on who failed to comply with the due diligence provisions.  AT&T alleges that Atos "engaged in a pattern of dilatory and obstructive conduct that was designed to prevent AT&T from

---

[3] The Master Agreement was filed as Exhibit C to the November 2, 2021 Declaration of Jonathan D. Pressment ("11/2/2021 Pressment Decl.") (Dkt. 34-3).

[4] The Addendum was filed under seal as Exhibit B to the May 12, 2023 Declaration of Jonathan D. Pressment ("5/12/2023 Pressment Decl.") (Dkt. 93-1).

completing its due diligence," including withholding critical information AT&T needed to formulate the transition plan required by the Addendum.  (Complaint ("Compl."), Dkt. 1, at ¶¶ 7-8.)  Atos alleges AT&T never intended to meet its obligations under the Addendum and is wrongly asserting Atos failed in due diligence as a pretext to demand Atos pay penalties for failing to comply with the parties' agreement.  (*See* PAC at 46 ¶¶ 17-21; 81 ¶ 157.)  Atos further alleges that AT&T knew before execution of the Addendum that AT&T would need to increase the pricing the parties initially agreed upon to achieve Atos's goals, but deliberately hid that knowledge from Atos in order to secure the contract.  (*Id.* at 41 ¶ 2.)

On July 31, 2020, Atos notified AT&T that it was asserting its right to suspend the transition of services under the Addendum.  (*Id.* at 32 ¶¶ 110-12.)  On August 27, 2020, AT&T delivered an invoice for services rendered under the Addendum in the amount of $1,027,976.82, which Atos refused to pay.  (Compl. ¶¶ 115-16; PAC at 80 ¶ 156.)  On October 9, 2020, AT&T notified Atos that it was terminating the Addendum for cause. (PAC at 82 ¶¶ 161-63.)  The instant litigation followed.

### PROCEDURAL BACKGROUND

On May 20, 2021, Atos filed its Complaint for breach of contract.  (Dkt. 1.)  Atos answered on August 13, 2021, and asserted counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment.  (Dkt. 13.)  On October 26, 2021, the Court entered a Case Management Plan and Scheduling Order (the "Scheduling Order") setting the deadline to amend to November 25, 2021 (being 30 days from the date of the Scheduling Order), with fact discovery to be completed

by July 29, 2022.[5]  (Dkt. 30 at ¶¶ 4, 7(a).)  Pursuant to joint requests from the parties, the Scheduling Order was amended twice prior to the filing of Atos's instant Motion for Leave to Amend, but no party requested that the deadline to amend pleadings be extended. (*See* Dkts. 44, 45, 51, 53.)

On November 2, 2021, AT&T filed a Motion to Dismiss Atos's Counterclaims.  (Dkt. 33.)  Discovery was not stayed pending determination of the motion, which was eventually denied.  (Dkt. 47.)  The parties exchanged their initial sets of document requests in October 2021 and began rolling document productions in February 2022.  (Rosato Decl. ¶¶ 7,8, 13.[6])  The parties have each produced approximately 25,000 documents.  (*Id.*) Fact discovery is scheduled to close 180 days from the latest of the issuance of an order on the motion currently before the Court or the filing of a responsive pleading should the Court grant Atos's motion.  (Dkt. 82 at ¶ 7(d).)

On March 17, 2023, the parties filed a letter with the Court requesting a conference to address outstanding discovery issues.  (Dkt. 61.)  The letter mentioned for the first time that Atos "intend[ed] to file a motion for leave to amend its counterclaims shortly."  (*Id.*) Atos filed its Motion to Amend on April 10, 2023.  (Dkts. 63-65.)  With its motion, Atos also filed the PAC, which includes seven proposed additional counterclaims.  According to Atos, all the new counterclaims are based on emails produced during pretrial discovery indicating that (1) AT&T had deliberately concealed its knowledge of the true cost of its

---

[5] Atos says the Scheduling Order set the deadline to amend as November 26, 2021, while AT&T asserts the Scheduling Order set the deadline as November 25, 2021.  (*Compare* Dkt. 64 at 13 with Dkt. 91 at 13.)  The Court takes judicial notice that 30 days from October 26, 2021 is November 25, 2021.

[6] "Rosato Decl." refers to the April 10, 2023 Declaration of Steven M. Rosato (Dkt. 65).

services to induce Atos to sign the Addendum; and (2) AT&T was manipulating a "mole" inside Atos to feed AT&T confidential information about the parties' dispute over the Addendum.  (Def. Mem. at 14.[7])  On May 12, 2023, AT&T filed its opposition, arguing that Atos long knew, or should have known, of the "new" information Atos discovered in AT&T's document productions long before filing its motion; that the new counterclaims would be futile; that the motion was brought in bad faith; and that amendment would prejudice AT&T.  (Dkt. 91.)  Atos filed a reply on June 2, 2023 (Dkt. 95), at which time the motion was fully briefed.[8]   On November 9, 2023, the Court heard oral argument on whether Atos should be permitted to amend.

## LEGAL STANDARDS

Two Federal Rules of Civil Procedure may be implicated by a motion to amend. Generally, Rule 15(a) applies to amendments made prior to a scheduling order's deadline to amend, while Rule 16(b) comes into play when amendments are sought to be made after a deadline to amend has expired. The distinction is important because under Rule 16(b), leave to amend requires "good cause" following expiration of the deadline, whereas the standards under Rule 15(a) are considered more flexible.  "Where ... the Court sets a deadline for amendments to the complaint and a party moves to amend once the deadline

---

[7] "Def. Mem" refers to Atos's Memorandum Of Law In Support Of Motion For Leave To Amend Counterclaims (Dkt. 64).

[8] On September 1, 2023, Atos filed a letter motion requesting that the Court permit it to either file a revised proposed amended complaint or submit further briefing to the Court concerning new material facts learned since briefing on the Motion to Amend was completed.  (Dkt. 99.)  The Court denied Atos's request, as the documents referred to in the motion did not form the basis of new claims or cure any deficiency identified by AT&T in its opposition to the Motion to Amend.  (Dkt. 106.)

has passed, the Court must balance the more liberal standard of Rule 15(a) against the requirements of Federal Rule of Civil Procedure 16(b)." *Mohegan Lake Motors, Inc. v. Maoli*, No. 16-CV-6717, 2018 WL 4278352, at *5 (S.D.N.Y. June 8, 2018), at * 5 (quoting *Volunteer Fire Association of Tappan, Inc. v. County of Rockland*, No. 09-CV-4622, 2010 WL 4968247, at *3 (S.D.N.Y. Nov. 24, 2010)).

Under Rule 15(a)(2), "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2*); see Aetna Casualty & Surety Co. v. Aniero Concrete Co*., 404 F.3d 566, 603 (2d Cir. 2005).   A district court, however, "has discretion to deny leave for good reason."   *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). The Second Circuit has held that a Rule 15(a) motion "should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party."   *Aetna Casualty*, 403 F.2d at 603-04 (quoting *Richardson Greenshields Securities, Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987)).   Delay alone, however, is an insufficient justification for the denial of a motion to amend under Rule 15(a).   *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993)).

"Prejudice to the nonmoving party may arise when the proposed amendment causes the nonmoving party to 'expend significant additional resources to conduct discovery and prepare for trial,' or when the proposed amendment causes significant delay to the disposition of the original claim or claims."   *Maoli*, 2018 WL 4278352, at *5 (S.D.N.Y. June 8, 2018) (quoting *Block*, 988 F.2d at 350).   "The degree of potential prejudice a motion to amend may cause is evaluated against the overall progress of the litigation:   the closer to the end of discovery or the closer to trial a motion to amend is

filed, the more likely that it will cause prejudice and delay to the nonmoving party." *Maoli*, 2018 WL 4278352, at *5 (citing *GEM Global Yield Fund, Ltd. v. Surgilight, Inc.*, 2006 WL 2389345, at *11 (S.D.N.Y. Aug. 17, 2006)).

The standards under Rule 16(b) are stricter. "Under Rule 16(b), a party moving to amend after the applicable deadline must demonstrate good cause.  Whether good cause exists depends on the diligence of the moving party.  In other words, the movant must show that the deadlines could not have been reasonably met despite its diligence." *Tappan*, 2010 WL 4968247, at *3 (internal quotation marks, citations, and brackets omitted).  "A party is not considered to have acted diligently where the proposed amendment is based on information that the party knew, or should have known, in advance of the motion deadline." *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 174-75 (S.D.N.Y. 2014) (internal quotation marks omitted).  The burden of showing diligence is borne by the moving party.  *Id.* at 175.

Although "the primary consideration is whether the moving party can demonstrate diligence," it is "not ... the only consideration." *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).  "[W]here a party's motion to amend would require altering a court's scheduling order, the party must satisfy **both** Federal Rules of Civil Procedure 15 and 16 to be permitted to amend." *International Technologies Marketing, Inc. v. Verint Systems, Ltd.*, 850 F. App'x 38, 43 (2d Cir. 2021) (internal quotation marks omitted) (emphasis in original).

While "the district court, in the exercise of its discretion under Rule 16(b), also may consider other relevant factors including … prejudice," *Kassner*, 496 F.3d at 244, the Second Circuit has held that "a lack of diligence is … reason alone to deny leave to

amend."  *International Technologies Marketing, Inc., Ltd.*, 850 F. App'x at 43; *see also Sokol Holdings, Inc. v. BMB Munai, Inc.*, No. 05-CV-3749, 2009 WL 3467756, at *5 (S.D.N.Y. Oct. 28, 2009) ("the standards of Rule 16(b) must be met first and cannot be short-circuited by an appeal to those of Rule 15") (internal quotation marks and emphasis omitted).  "Ultimately, 'the decision as to whether to let Rule 16(b) stand as a bar to amendment lies within the court's discretion.'"  *Anzovino v. Wingate of Dutchess, Inc.*, No. 21-CV-7625, 2022 WL 17076750, at *2 (S.D.N.Y. Nov. 18, 2022) (quoting *Qanouni v. D&H Ladies Apparel LLC*, No. 18-CV-2763, 2021 WL 9036182, at *8 (S.D.N.Y. March 23, 2021)).

Here, the Court's scheduling order required that any motion to amend the pleadings be made by November 25, 2021.  (*See* Dkt. 30 at ¶ 4 (setting deadline to file amended pleadings as 30 days from entry of the Scheduling Order entered on October 26, 2021).)  Atos did not move to amend until April 10, 2023.  Accordingly, the "good cause" standard of diligence applies, together with considerations of futility, bad faith, and prejudice.

## DISCUSSION

Atos's seven proposed additional counterclaims fall into two broad categories:  (1) allegations concerning AT&T's misrepresentation of the pricing and scope of the services to be provided under the Addendum prior to its execution; and (2) allegations concerning AT&T's misappropriation and use of Atos's confidential information, through the manipulation of a "mole" at Atos.[9]  (PAC at 50 ¶¶ 41-59; 56 ¶¶ 66-74; 68 ¶ 112-45.)  Atos

---

[9] Atos's claims arising out of AT&T's involvement with the mole primarily involve the parties' post-contract discussions about their dispute rather than the negotiations that led to formation of the contract.

concedes, however, that all the proposed new counterclaims "are based on Atos's review of AT&T's document production in this matter," which began in mid-February 2022 with AT&T's first rolling production.  (Def. Mem. at 14.)  Atos thus had notice of the new facts – even if not all the relevant communications – on which it bases its new counterclaims since AT&T's production 14 months before Atos filed its Motion to Amend.  Under these circumstances, the Court concludes that Atos was not diligent.

"[I]n appropriate circumstances," however, "a district court has discretion to grant a motion to amend even where the moving party has not shown diligence in complying with a deadline for amendments in a Rule 16 scheduling order."  *Fresh Del Monte*, 304 F.R.D. at 176; *see also Kassner,* 496 F.3d at 244 ("The district court, in the exercise of its discretion under Rule 16(b), also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants")*; Grochowski v. Phoenix Construction*, 318 F.3d 80, 86 (2d Cir. 2003) ("Where a scheduling order has been entered, the lenient standard under Rule 15(a), which provides leave to amend 'shall be freely given,' must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause'").  Here, despite finding that Atos did not act diligently, the Court exercises its discretion to also consider the Rule 15(a) factors of futility, bad faith, and prejudice.[10]  Ultimately, the Court concludes that Atos should not be granted leave to amend its claims for fraudulent inducement, fraudulent concealment (on the theory AT&T concealed its understanding of pricing and scope), and civil conspiracy

---

[10] "Undue delay" is also a factor under Rule 15 but is covered by the Court's diligence analysis below.

because they are futile.  However, Atos should be granted leave to add the remaining proposed amended counterclaims, as they are neither futile nor brought in bad faith, and their inclusion would not unduly prejudice AT&T.

## I.   The New Facts In Atos's Proposed Amended Counterclaim

Atos asserts that its review of AT&T's rolling document productions, beginning in February 2022, uncovered "significant evidence of wrongdoing on the part of AT&T of which Atos was not and could not have been previously aware."  (Def. Mem. at 6.)  The evidence in AT&T's productions included (1) internal AT&T communications and documents, which, according to Atos, suggest AT&T deliberately underpriced its services; (2) emails in AT&T's possession appearing to be exchanged only between Atos personnel, suggesting AT&T had been blind copied on confidential Atos communications; (3) internal Atos emails forwarded to AT&T employees; (4) internal AT&T emails in which an AT&T executive admitted she had "a mole" inside Atos feeding her confidential information; and (5) communications between the mole and AT&T sharing details of internal Atos discussions regarding the Addendum after the parties had agreed to it.  (Def. Mem at 7-8; Rosato Decl. ¶ 23.)

Atos argues that these documents show that AT&T deliberately underpriced its services with the intention of adding additional costs after Atos signed the Addendum, thus supporting its proposed counterclaims for fraudulent inducement.  Atos also argues that these documents show that AT&T misappropriated Atos's confidential information through communication with and manipulation of the mole, thus supporting Atos's proposed counterclaims for fraudulent concealment; aiding and abetting breach of

fiduciary duty; violation of the Defend Trade Secrets Act; unfair competition; tortious interference with contract; and civil conspiracy.  (Def. Mem. at 14.)

## II.  Rule 16(b):  Lack Of Diligence

Atos filed its Motion to Amend on April 10, 2023 (Dkt. 64), 17 months after the court-imposed deadline to amend the pleadings (*see* Dkt. 30 at ¶ 4), and 14 months after Atos received much of the documentary discovery on which it bases its proposed amended counterclaims (*See* Def. Mem. at 15).  Atos nonetheless argues that it was diligent and did not learn of "key" facts underlying its proposed amended counterclaims until December 2022.  (*Id.*)  According to Atos, it "first became aware that AT&T had been cultivating and manipulating a 'mole' at Atos" ten months after the parties' productions when it identified an internal AT&T email in which an AT&T employee stated she had been relying on a mole at Atos to provide her with information.  (*Id.*)  As a result of this discovery, Atos conducted an investigation into the mole, which was completed in February 2023.[11]  (Def. Mem. at 16.)  Accordingly, Atos asserts that it acted with diligence because it filed its Motion to Amend in April 2023, "within weeks of completing its initial investigation."  (*Id.*)

AT&T counters that Atos could have asserted each of its proposed amended counterclaims at the time it filed its original counterclaims, or, at the very least, failed to act diligently in reviewing documents.  More particularly, AT&T argues that the facts

---

[11] At oral argument, Atos represented that its investigation led Atos to retrieve text messages from the mole's phone, which it produced on March 30, 2023.  (*See* Transcript of Oral Argument held on November 9, 2023, Dkt. 109, ("Hrg. Tr.") at 4.)  However, Atos conceded that the parties had previously agreed that there would be no collection of custodians' text messages as part of discovery.  (*Id.* at 9.)

underlying the proposed fraud claims are the same facts that underlie Atos's original counterclaim for breach of the covenant of good faith and fair dealing. (Pl. Mem. at 9-10.[12]) Second, AT&T argues that Atos possessed the information it needed to assert the remaining mole-related counterclaims even before this action began because all but one of the emails Atos relies on are Atos documents, having originated from Atos email accounts. (Pl. Mem. at 11.) Third, AT&T argues that even setting aside that all but one of the emails that form the basis of its proposed amended counterclaims originated with Atos, AT&T provided Atos its copies of the Atos emails and the internal AT&T email in February 2022 – 14 months before AT&T filed its Motion to Amend. (*Id.* at 12.) Finally, AT&T argues that Atos should have been aware of AT&T's communications with the mole because the mole sent an email to Atos senior leadership in January 2020 informing them he was "hearing from" AT&T. (*Id.*)

The Court agrees with Atos that it need not have combed through its files before the start of discovery in search of a mole or other evidence of misconduct it had no reason to suspect. In addition, the January 2020 email from the mole to Atos leadership does not establish that Atos had reason to be concerned with the mole's conversations with AT&T as the Atos employee had been involved in negotiating the Addendum. The Court also recognizes that at least a few of the communications quoted in the proposed new counterclaims provide specificity beyond what was available to Atos before the deadline to amend had expired. But even assuming that Atos could not have added its

---

[12] "Pl. Mem." refers to Plaintiff AT&T's Memorandum Of Law In Opposition To Defendants' Motion For Leave To Amend Its Counterclaims filed May 12, 2023 (Dkt.91).

counterclaims before the deadline to amend expired in November 2021,[13] Atos must show it acted diligently once it had notice of the facts underlying its proposed counterclaims. *See Tardif v. City of New York,* No. 13-CV-4056, 2016 WL 2343861, at *5 (S.D.N.Y. May 3, 2016) ("Even if Plaintiff could not reasonably have met the original deadline laid out in the scheduling order, she is not excused from exercising reasonable diligence thereafter"). Atos has not done so.

Fourteen months passed between Atos's receipt of AT&T's production of the relevant documents and the filing of Atos's Motion to Amend. AT&T correctly asserts that "[c]ourts regularly deny leave for far shorter delays." (Pl. Mem. at 12 (citing, *inter alia*, *Gullo v. City of New York*, 540 F. App'x 45, 47 (2d Cir. 2013) (four-month delay from receipt of relevant information to filing of motion); *Tardif*, 2016 WL 2343861, at *5 (five-month delay from receipt of relevant information to filing of motion)).[14]

---

[13] Atos argues that until it reviewed AT&T's emails, it "lacked direct evidence that AT&T had acted with fraudulent intent" (Def. Mem. at 14), and therefore its decision to "delay asserting [a fraud claim] until it had the evidence to properly plead it [was] not dilatory, but prudent." (Atos's Reply Memorandum of Law In Support Of Its Motion For Leave To Amend Counterclaims ("Def. Reply"), Dkt. 95 at 3 (internal quotation marks omitted).) Atos admits, however, that when it filed its original counterclaim, it had "circumstantial evidence suggest[ing] that AT&T intentionally understated its pricing prior to execution of the [ ] Addendum." (Def. Mem. at 6-7.) And, many of the facts supporting Atos's fraud allegations are based on AT&T's June 2019 letter of intent and December 2019 pricing proposal, which Atos has had since 2019. (*See, e.g.*, PAC ¶¶ 67-77.) Accordingly, Atos could have asserted its fraud claims with its original counterclaim, given that circumstantial evidence can be sufficient to plead fraud. *See S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.,* 84 F.3d 629, 634 (2d Cir. 1996) (plaintiff can plead intent element of fraud by "(1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness"). The Court does not rest its decision on this basis, however, given Atos's failure to act diligently following AT&T's production of documents.

[14] "Where the deadline for asserting additional claims or defenses set forth in the scheduling order has passed, courts commonly find that a party acts diligently if it seeks

Still, Atos insists it did not "s[i]t on its hands once it received AT&T's productions." (Def. Reply. at 4.)  Atos says it was busy reviewing both its own documents and AT&T's productions, as the parties each exchanged over 25,000 documents in the case.[15] (Def. Reply at 4.)  Atos points to *Ambac Assurance Corp. v. EMC Mortgage Corp.*, where the court allowed a party to amend 19 months after the expiration of a scheduling order's deadline, despite the party's delay of "almost a year in some cases, and in no case less than six months, ***after*** it obtained the relevant discovery."   No. 08-CV-9464, 2010 WL

---

leave to amend within approximately two months of acquiring information of a new claim or defense." *Martell Strategic Funding LLC v. American Hospitality Academy*, No. 12-CV-627, 2017 WL 2937649, at *2 (S.D.N.Y. July 10, 2017) (collecting cases). *Compare, e.g., Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*, No. 15-CV-1259, 2016 WL 5372843, at *5-6 (S.D.N.Y. Sept. 26, 2016) (granting leave to amend where plaintiff demonstrated diligence and sought leave within two months of learning of the facts underlying the claim); *Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11-CV-3489, 2013 WL 1830416, at *4 (S.D.N.Y. May 1, 2013) (finding party acted diligently where it sought leave to amend approximately one month after learning of the facts upon which the new claims rely); *Knoll, Inc. v. Moderno, Inc.*, No. 11-CV-488, 2012 WL 3613896, at *2, *7 (S.D.N.Y. Aug. 22, 2012) (finding parties acted with diligence where each sought leave to amend pleading within two months of learning facts underlying additional claim or defense), *with Tardif*, 2016 WL 2343861, at *5 (finding "lengthy delay" of five months fell "far short of the diligence necessary to show good cause"); *iMedicor, Inc v. Access Pharmaceuticals, Inc.*, 290 F.R.D. 50, 53 (S.D.N.Y. 2013) (finding no good cause for delay where new counsel waited eight months to file motion to amend); *Jackson v. Roslyn Board of Education.*, 596 F. Supp.2d 581, 586 (E.D.N.Y. 2009) (finding plaintiff's delay of nearly five months evinced "a lack of diligence"); *Rambarran v. Mount Sinai Hospital*, No. 06-CV-5109, 2008 WL 850478, at *3 (S.D.N.Y. March 28, 2008) (denying motion to amend where plaintiff sought to amend complaint three and a half months after deadline).

[15] Atos also says it could not have discovered the mole before thoroughly reviewing AT&T's production because the mole removed his incriminating emails to an external hard drive outside of Atos's control.  (Def. Reply at 4.)  AT&T counters that "[h]ad Atos taken any care to review its production it would have discovered (as AT&T did) that Atos produced only 27 documents from that employee's file – ***by far***, the fewest amount of documents produced from any Atos custodian."   (Pl. Mem. at 11-12 (emphasis in original).)  Regardless, Atos's argument is beside the point because Atos had ***AT&T's copies*** of the mole's emails in its possession for ten months (from February 2022 to December 2022) before Atos claims it discovered the mole.

11595698 (S.D.N.Y. Dec. 16, 2010) (emphasis in original), *R. & R. adopted in relevant part*, 2011 WL 566776 (S.D.N.Y. Feb. 8, 2011).  In *Ambac*, however, the relevant pretrial discovery was "enormous" and included "[*m*]*illions* of electronic documents … , fifteen party witnesses, [and] over thirty non-party witnesses."  *Id.* at *4 (emphasis added).  Here, Atos did not have anything close to millions of electronic documents to review, but rather only approximately 25,000 documents.  Atos took roughly the same amount of time to review those 25,000 documents that the defendant in *Ambac* took to review millions of documents.  It simply is not reasonable that Atos, represented by a large, multinational firm, needed ten months – from February to December 2022 – to review AT&T's productions and discover the relevant facts, particularly when many of the documents at issue were already in Atos's custody and possession.

Atos suggests that the relevant date is not when Atos received AT&T's productions, or even when Atos learned of the existence of a mole, but rather when Atos "completed the initial phase of its investigation" into the mole.  (*See* Def. Mem. at 16.)  Because Atos "moved for leave to amend within weeks of completing its initial investigation," it acted with diligence, Atos says.  (*Id.*)  The Court agrees that litigants must conduct sufficient investigation to make good faith claims.  But Atos still did not act with diligence in reviewing the records that it had; had it done so, it would have conducted and completed its investigation far sooner.[16]

---

[16] The other cases on which Atos relies to argue it acted diligently are also distinguishable.  In *Soroof Trading Development Co. v. GE Microgen, Inc.*, the plaintiff filed its first motion to amend one month after learning of new facts in deposition testimony and filed the second motion less than two months after the initial motion was held in abeyance.  283 F.R.D. 142, 149 (S.D.N.Y. 2012).  In *Olaf Soot Design, LLC v. Daktronics, Inc.,* the plaintiff moved for leave to amend three months after learning of the relevant facts and after the defendant's "misleading" disclosures delayed productions.  299 F. Supp.3d 395, 398

Moreover, once Atos discovered the email – that had been produced months earlier – indicating the existence of the mole (*see* Def. Reply at 4), Atos failed to promptly alert the Court it was contemplating filing a motion, unlike the plaintiff in *Cardwell*, a case Atos cites to suggest it acted diligently. *See Cardwell v. Davis Polk & Wardwell LLP*, No. 19-CV-10256, 2021 WL 4434935, at *40 (S.D.N.Y. Sept. 23, 2021) (plaintiff "acted quickly" after learning facts forming the basis of his proposed amendments by notifying the court he intended to seek leave based on a partial review of Defendants' productions one month after Defendants began productions).  Here, even after Atos says it discovered relevant facts about a mole in December 2022 – again, ten months after it received AT&T's production – Atos waited another three months to alert the court that it was considering filing a motion for leave to amend.  (Dkt. 61.)

In sum, Atos filed its motion 17 months after the deadline expired, 14 months after receiving AT&T's copies of the documents containing sufficient facts to amend, and four months after Atos says it became aware of the mole.   Accordingly, the Court cannot conclude that Atos acted with diligence in seeking to amend its counterclaims.

### III.    Rule 15(a) Factors:  Futility, Bad Faith, and Prejudice

Despite the absence of diligence, the Court exercises its discretion to address the other Rule 15(a) factors of futility, bad faith, and prejudice.   *See Covet & Mane, LLC v. Invisible Bead Extensions, LLC*, No. 21-CV-7740, 2023 WL 2919554, at *13-14 (S.D.N.Y.

---

(S.D.N.Y. 2017).  In *Sandler v. Montefiore Health Systems, Inc.*, the defendants filed their motion for leave "a mere three weeks" after discovering facts underlying the proposed amendment.  No. 16-CV-2258, 2017 WL 2226599, at *3 (S.D.N.Y. May 22, 2017).  And in *Sjunde AP-Fonden v. General Electric Company*, the court granted leave to amend based on documents **produced** less than five months prior to the motion (not based on facts **discovered** five months prior).  *See* 341 F.R.D. 542, 551 (S.D.N.Y. 2022).

March 23, 2023) (granting leave to amend, despite finding lack of diligence sufficient to support good cause under Rule 16(b)), *R. & R. adopted*, 2023 WL 6066168 (S.D.N.Y. Sept. 18, 2023); *Anzovino*, 2022 WL 17076750, at *2 ("'the decision as to whether to let Rule 16(b) stand as a bar to amendment lies within the court's discretion'") (quoting *Qanouni v. D&H Ladies Apparel LLC*, No. 18-CV-2763, 2021 WL 9036182, at *8 (S.D.N.Y. March 23, 2021)); *see also Shi Ming Chen v. Hunan Manor Enterprise, Inc.*, 437 F. Supp.3d 361, 365 (S.D.N.Y. 2020) ("we recognize that we have discretion to apply the more liberal standard that applies to motions to amend under Fed. R. Civ. P. 15 rather than the more exacting standard that applies to extending a deadline set under Fed. R. Civ. P. 16"); *Fresh Del Monte Produce*, 304 F.R.D. at 176 (granting leave to amend, despite finding lack of diligence sufficient to support good cause under Rule 16(b)).

Ultimately, the Court concludes that Atos should be denied leave to amend to add claims for fraudulent inducement, fraudulent concealment (on only the theory AT&T concealed its understanding of the scope and pricing of the contract), and civil conspiracy because those claims are futile. However, Atos should be granted leave to amend to add the proposed counterclaims for fraudulent concealment (on only the theory AT&T concealed its use of the mole), aiding and abetting breach of fiduciary duty, violation of the Defend Trade Secrets Act, unfair competition, and tortious interference with contract because (1) the claims are not futile; (2) the motion was not brought in bad faith, and (3) granting the motion at this stage would not prejudice AT&T.

## A.    Futility

"[T]he standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." *IBEW Local Union No. 58 Pension Trust Fund*

*& Annuity Fund v. Royal Bank of Scotland Group., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).

Therefore, leave to amend will be denied as futile only if the proposed new claims cannot

withstand a 12(b)(6) motion to dismiss for failure to state a claim. *Milanese v. Rust-Oleum*

*Corp.*, 244 F.3d 104, 110 (2d Cir. 2001).   To survive a Rule 12(b)(6) motion, a plaintiff

must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   A claim is facially plausible "when

the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (citing *Twombly*, 550 U.S. at 556).   The Court considers each of Atos's

proposed additional claims in turn under this standard.

### 1.    Fraud Claims

Atos seeks to add counterclaims for fraudulent inducement and fraudulent

concealment.   The fraudulent inducement theory posits that AT&T deliberately

underpriced and misrepresented the scope of its service before executing the Addendum

in order to induce Atos to enter into the Addendum.   Atos's fraudulent concealment claim

has two branches:   (1) that after execution of the Addendum, AT&T deliberately

concealed its understanding that AT&T would need to provide individual services to Atos

customers, which would require millions of dollars in additional costs, and (2) that AT&T

concealed its use of a mole at Atos to gain insight into Atos's stance on the parties' dispute

and to promote AT&T's interests within Atos.   AT&T argues that Atos's fraud claims are

futile for multiple reasons, including that they are not plead with particularity, they are

duplicative of Atos's contract claims, and they are precluded by the Addendum and

Master Agreement's merger provisions.   The Court finds the fraud claims plead with

sufficient particularity but concludes that two of Atos's three fraud theories are futile due to the other reasons provided by AT&T.

### a. Particularity

To plead fraudulent inducement, a party must assert facts showing: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wild Bunch, SA v. Vendian Entertainment, LLC,* No. 17-CV-1383, 2018 WL 1365690, at *3 n.1 (S.D.N.Y. Feb. 26, 2018) (internal quotation marks omitted).  The elements of a fraudulent concealment claim are the same as any fraud claim, except that the "plaintiff must also allege that a defendant had a duty to disclose omitted information." *Niedernhofer v. Wittels*, 17-CV-4451, 2018 WL 3650137, at *5 (S.D.N.Y. July 31, 2018).

As an initial matter, AT&T argues that the PAC fails to state plausible claims for fraudulent inducement and fraudulent concealment because Atos cannot satisfy the heightened pleading requirements of Rule 9(b), which require that fraud claims be plead with particularity.  (*See* Pl. Mem. at 13.)  The Court disagrees.  With respect to the fraudulent inducement claim, AT&T asserts that Atos does not specify the prices and services it contends AT&T misrepresented in order to induce Atos to enter into the Addendum.  (*Id.*)  Not so.  The PAC specifies AT&T's alleged misrepresentations and omissions:  It alleges that in its December 2019 proposal, AT&T represented that it could provide network services to Atos for a specific price over a 66-month term.  (PAC at 57 ¶ 70.)  The PAC also alleges that in the December proposal, AT&T omitted the scope limitation that AT&T would only be serving a single customer – Atos – and not the Atos customers whose network services were to be transitioned to AT&T.  (*Id.* at 58 ¶ 71.)

Finally, the PAC contends that AT&T knew these misrepresentations and omissions were false, as evidenced, inter alia, by AT&T internal emails recognizing that AT&T was struggling to provide pricing that would allow individualized services and meet Atos's needs (*Id.* at 54 ¶ 57) and by emails in which AT&T employees stated that for "19,000 Devices and 76 different end clients as we understand the scope today[,]" there was "very little likelihood that this transition can ever get done" in the time contemplated in the Addendum.  (*Id.* at 58 ¶ 73 (internal quotation marks omitted).)

Similarly, with respect to Atos's claim that AT&T concealed its reliance on a mole at Atos to secretly obtain confidential information, the PAC states that an AT&T employee cultivated a mole at Atos (*Id.* ¶ 113) and communicated with the mole without Atos's knowledge after the Addendum was signed in order to gain confidential information about Atos's position regarding the parties' contractual dispute and to push AT&T's positions internally at Atos (*Id.* ¶ 112).  In short, Atos's proposed fraud claims sufficiently specify the misrepresentations and omissions, those who made them, when and where they were made, and why they were fraudulent.  Along with the PAC's allegations about Atos's reliance and resulting injury (*see* PAC at 82 ¶¶ 166-75), Atos has plead fraud with the requisite particularity.  But that does not rescue them from futility.

### b.  Fraudulent Inducement

Atos's fraudulent inducement claim is futile because it is duplicative of Atos's breach of contract and breach of the implied covenant of good faith claims and also because the Master Agreement contains merger provisions that expressly disclaim reliance on any prior representations outside of the contract.  The Second Circuit has held that a plaintiff bringing a breach of contract action may not also allege fraud simply by asserting that the defendant intended to breach the contract, unless the plaintiff can:  "(i)

demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (internal citations omitted).  Atos cannot demonstrate any of the requirements set forth in *Bridgestone/Firestone*.

Atos alleges that AT&T deliberately understated its pricing for services to be performed under the Addendum and concealed its understanding of the scope and cost of those services.  (*See* PAC at 82 ¶¶ 165-72.)  However, the pricing and scope of the services were the subject of negotiations and are expressly addressed in the Addendum itself.  (*See* Addendum at Exhibits P (Pricing) (laying out detailed unit pricing and monthly charges), SOW (Statement of Work) (providing for "standard [service level agreements] with 16 client dashboards"), and SL (Service Levels) ("Service levels will be measured in aggregate for Atos and the Atos Customers up to sixteen (16) different Atos Customers who each have 174 devices or more").)  They are not separate from the duty to perform under the contract.  Indeed, the Addendum includes nearly thirty pages addressing unit pricing, monthly charges, and the scope of the various services to be provided. (Addendum at Exhibits SL, SOW, P at 1-14.)  To be sure, the Addendum does not state an aggregate final price.  Instead, the Addendum expressly provides that the parties "will negotiate in good faith revised pricing" if the information learned during due diligence would affect "the pricing provided in Exhibit P" by more than a change of 1% in either direction.  (*See* Addendum § 3.3 (c).)  The 1% change refers to the pricing listed in Exhibit P, not any pricing that may have been included in pre-contract proposals.  The Addendum

thus not only set forth terms of price and scope, but also included provisions for adjustments.

AT&T's alleged misrepresentations regarding pricing and scope are not collateral to the contract because they concern promissory statements regarding what AT&T would perform under the contract.  Under New York law, "a promissory statement of what will be done in the future ... gives rise only to a breach of contract cause of action and a misrepresentation of a present fact ... gives rise to a separate cause of action for fraudulent inducement."  *Merrill Lynch & Co. v. Allegheny Energy, Inc*., 500 F.3d 171, 184 (2d Cir. 2007).   Atos alleges that when the parties negotiated the Addendum, AT&T misrepresented present facts by omitting "that its pricing proposal rested on improper and undisclosed scope limitations" when it negotiated the Addendum.  (Def. Reply at 6.)  In the PAC, however, Atos alleges that AT&T misrepresented promissory statements; specifically, that "AT&T **would be providing** standardized networking services to a single customer, Atos, and not individualized services to the Atos customers whose networking services **were to be transitioned** from Atos management to AT&T management" in the future.  (PAC at 82 ¶ 166.)  Atos's fraudulent inducement claim is predicated on a false promissory statement of future performance, not a misrepresentation of present facts.  As such, the claim cannot stand.

At bottom, Atos's fraudulent inducement claim amounts to no more than a claim that Atos never intended to perform the contract according to its terms and therefore does not establish claims for fraudulent inducement or concealment.  *See EQT Infrastructure Ltd. v. Smith*, 861 F. Supp.2d 220, 234 (S.D.N.Y. 2012) ("When a plaintiff's fraud claim arises out of the same facts as the breach of contract claim, with the addition only of an

allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is duplicative and cannot stand") (internal quotation marks and brackets omitted); *Telecom International America, Ltd. v. AT&T Corp.,* 280 F.3d 175, 196 (2d Cir. 2001) ("simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim") (internal quotation marks omitted).

Citing *Xcellence v. Arkin Kaplan Rice LLP,* Atos insists that a fraudulent inducement claim can be sustained where pricing presented before contract signing differed from what the party actually intended to charge.[17]  (*See* Def. Reply at 5 (citing *Xcellence, Inc. v. Arkin Kaplan Rice LLP*, No. 10-CV-3304, 2011 WL 1002419 (S.D.N.Y. March 15, 2011)).  In *Xcellence*, the plaintiff, an e-discovery vendor, sued the defendant law firm for breach of contract, quantum meruit, and unjust enrichment based on the law firm's failure to pay for services rendered.  In response, the law firm asserted various defenses – including the absence of any valid contract – and four counterclaims, including for fraudulent inducement on the basis that the plaintiff misrepresented the pricing it

---

[17]  Other cases cited by Atos as actionable examples of misrepresentations of present fact are inapt.  For example, in *GoSmile,* the defendant represented that he was not currently in breach of provisions of a 2003 noncompete agreement in order to induce the plaintiff to enter into a settlement agreement and a consulting agreement in 2008. *Gosmile, Inc. v. Levine,* 81 A.D.3d 77, 915 N.Y.S.2d 521 (2010).  The alleged misrepresentation was not part of the 2008 agreements at issue, and the court properly concluded that the fraudulent inducement claim was separate from the contract claim. (*Id.* at 82.)  And in *Wyle Inc. v. ITT Corp.*, 130 A.D.3d 438, 13 N.Y.S.3d 375 (1st Dep't 2015), the defendant intentionally failed to disclose an ongoing audit during contract negotiations in order to induce the plaintiff to enter into a contract for the sale of the defendant's corporation.  The existence of the audit at the time the contract was executed was a misrepresentation of present fact, not a representation of the defendant's intention to perform.

actually charged.  *Id.* at *2-4.  The plaintiff moved to strike the law firm's fraudulent inducement claim.

As a threshold issue, the court considered "whether in an action for breach of contract a defendant may bring a counterclaim for fraudulent inducement or fraud by asserting that the plaintiff intended to breach the contract for which it seeks to hold the defendant liable."  *Id.* at *3.  The Court held that the defendant could assert such a counterclaim.  However, in doing so, the Court expressly distinguished the case from others like *Bridgestone/Firestone*, where, as here, the party asserting a claim for breach of contract also claimed fraudulent inducement.  *Id.* at *3-4.  Unlike Atos, the defendant in *Xcellence* denied that a contract ever existed and did not assert both tort and contract claims.  *Id.* at *3-4.  Here, Atos asserts alternative tort and contract claims on the same theory – that AT&T misrepresented the scope and costs of its services – both of which were addressed in the contract at issue.  Unlike in *Xcellence*, Atos's fraud counterclaims grounded in price and scope are futile because they are not sufficiently distinct from Atos's breach of contract and implied covenants claims.

Atos's pricing and scope-related fraud claims are also futile for a second reason: the Master Agreement includes an express merger provision.  (*See* Master Agreement § 12.9.)  AT&T argues that even if AT&T's alleged misrepresentations were collateral to the contract, Atos's claims are still futile because the merger provision expressly disclaims reliance on proposals.  (Pl. Mem. at 16.)  Atos counters that the merger provision is not enforceable because "'a general merger clause does not preclude a claim for fraudulent inducement, unless it contains a disclaimer with respect to the specific representation, or a waiver of any challenges to the validity of the contract itself.'"  (Def. Reply at 7 (citing

*Four Finger Art Factory, Inc. v. Dinicola*, 99-CV-1259, 2001 WL 21248, at *4 (S.D.N.Y. Jan. 9, 2001).)

The Master Agreement's merger provision bars reliance on "all prior agreements, ***proposals***, representations, statements or understandings, whether written or oral concerning the services, or the rights [and] obligations relating to the services."  (Master Agreement § 12.9 (emphasis added).)  It also provides that the Master Agreement "shall not be contradicted, or supplemented by any written or oral statements, proposals, representations, advertisements, service descriptions or your purchase order forms not expressly set forth in this agreement or an attachment."[18]  (*Id.*)

The term "proposals" is somewhat general.  But even so, courts have recognized that where, as here, a merger clause and its surrounding contract were the product of arm's-length negotiations between sophisticated parties, "the specificity requirement may be relaxed (or even altogether disregarded)."  *PetEdge, Inc. v. Garg*, 234 F. Supp.3d 477, 488 (S.D.N.Y. 2017); *see also Transnational Management Systems II, LLC v. Carcione*, No. 14-CV-2151, 2016 WL 7077040, at *7 n.8 (S.D.N.Y. Dec. 5, 2016) ("The specificity requirement is further relaxed when the contracting parties are 'sophisticated business people,' and the disclaimer clause is the result of negotiations between them") (internal quotation marks omitted)); *Primedia Enthusiast Publication Inc. v. Ashton International Media, Inc.*, No. 02-CV-9997, 2003 WL 22220375, at *6 (S.D.N.Y. Sept. 25, 2003) ("Notwithstanding the lack of an explicit disclaimer of representations that form the basis

---

[18] The Master Agreement "consists of … all service attachments ('Attachments') attached hereto or subsequently signed by the parties."  (Master Agreement at 1), and the Addendum provides that it is "an Attachment to the Master Agreement."  (Addendum at 1.)

of a fraud-in-the[-]inducement claim, courts may disregard a fraudulent inducement claim and give effect to a contract when the parties have negotiated at arms lengths and they are sufficiently sophisticated that they could have easily protected themselves either through obtaining readily available information or alternatively including a protective clause in the agreement"); *Emergent Capital Investment Management., LLC v. Stonepath Group., Inc.,* 165 F. Supp.2d 615, 622 (S.D.N.Y. 2001) ("Even if an integration clause is general, a fraud claim will not stand where the clause was included in a multi-million dollar transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals in the contract"). Accordingly, Atos's fraudulent inducement claim is also futile because the merger clause precludes Atos's reliance on AT&T's pre-Addendum proposals.

### c. Fraudulent Concealment

The PAC advances two theories of fraudulent concealment.  First, Atos alleges that "after contract execution, … AT&T intentionally concealed that it was aware" it would have to provide individualized services to Atos's customers.  (Def. Mem. at 20; *see also* PAC at 84 ¶¶ 171-72 ("Following execution of the [ ] Addendum, … AT&T failed to disclose … that it understood … that Atos would not agree to a 'one-size-fits-all' arrangement and provided proposed pricing at that time based on that understanding").)  Second, Atos alleges that "AT&T also failed to disclose that it was relying on a 'mole' at Atos to secretly obtain confidential information from Atos."  (PAC at 84 ¶ 173.)  The former is merely a restyling of the fraudulent inducement claim discussed above and is therefore futile.[19]

---

[19] Atos alleges in its proposed counterclaim for fraudulent concealment that AT&T failed to disclose "that it understood as early as June 2019 that Atos would not agree to a 'one-size-fits-all' arrangement and provided proposed pricing at that time based on that understanding."  PAC at 84 ¶ 172.  Thus, as in its fraudulent inducement claim, Atos

The latter theory, however, is not futile because the allegation that AT&T concealed its use of the mole to manipulate the parties' business relationship is an omission collateral to the contract. The claim is therefore sufficiently distinct from the breach of contract and implied covenant claims to be viable.

Under New York law, fraudulent concealment requires proof of: (1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 152 (2d Cir. 1993).

AT&T first argues that it could not have concealed its reliance on a mole from Atos because the mole is an employee, and therefore an agent, of Atos. (Pl. Mem. at 18.) As a result, AT&T argues, the communications could not have been concealed from Atos because they were with Atos. (*Id.*) Not so. Because, as Atos alleges, the mole acted in a manner directly adverse to Atos's interests, the mole's actions cannot be imputed to Atos. *See Kirschner v. KPMG LLP,* 15 N.Y.3d 446, 467 (N.Y. 2010) ("the presumption that an agent will communicate all material information to the principal operates except in the narrow circumstance where the corporation is actually the victim of a scheme undertaken by the agent to benefit himself or a third party personally").

AT&T next argues that the fraudulent concealment claim fails because parties bringing fraudulent concealment claims arising from contractual relationships must demonstrate that the defendant had a duty to disclose the concealed information, and no

---

alleges that AT&T concealed that it did not intend to perform under the contract, which is not actionable as fraudulent concealment. *See TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 90 (2d Cir. 2005) ("under New York law, the failure to disclose an intention to breach is not actionable as a fraudulent concealment").

duty exists between two sophisticated parties to an arms-length contract.[20]  (Pl. Mem. at

19).  Atos, however, relies on the "special facts doctrine" to argue that a duty to disclose

exists even between two sophisticated parties where a "'material fact was information

peculiarly within the knowledge of one party and that the information was not such that

could have been discovered by the other party through the exercise of ordinary

intelligence.'"  (Def. Mem. at 20 (citing *Greenman-Pedersen, Inc. v Berryman & Henigar,

Inc.*, 130 A.D.3d 514, 516 (1st Dep't 2015)).)  AT&T counters that (1) the existence of the

mole was not peculiarly within the knowledge of AT&T because the mole "openly advised

others at Atos he was speaking directly with AT&T" and (2) Atos could have found the

mole's emails to AT&T because they originated from an Atos employee.  (Pl. Mem. at 18-

19.)

AT&T's attempts to avoid application of the "special facts doctrine" fail.  As

discussed above, the fact that the mole told Atos personnel he was in communication

with AT&T did not alert Atos to the substance of his communications.  And, to expect Atos

---

[20] Apart from arguing whether it had a duty to disclose, AT&T states in a footnote that the fraudulent concealment claim "also lacks allegations sufficient to demonstrate reasonable reliance, proximate causation and damages" and asserts that Atos's effort to satisfy these elements consists of conclusory allegations in two paragraphs of the PAC.  (Pl. Mem. at 19 n.10.)  The Court need not consider arguments only cursorily raised in a footnote. *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review"); *United States v. Mendlowitz*, No. 17-CR-248, 2019 WL 1017533, at *7 (S.D.N.Y. March 2, 2019) ("arguments raised in footnotes need not be addressed").  In any event, the Court finds that the PAC plausibly alleges reliance (Atos would have acted differently had it known of AT&T's use of the mole), proximate causation (concealment of the mole caused Atos to continue due diligence), and damages (expenditure of time and resources on continuing due diligence).  It is certainly possible that Atos will not be able to prove that it would have discontinued due diligence and other activity had it known of the mole, and it is also possible that Atos will not be able to prove any actual damages.  But these possibilities do not render the claim implausible or futile.

to comb through its emails in search of a mole it had no reason to believe existed would go beyond the exercise of "ordinary intelligence."  Nor is Atos's fraudulent concealment claim subsumed by its contract claim.  AT&T's alleged secret exploitation of the mole is collateral to the contract.  Unlike Atos's scope and pricing-based fraud claims – which concern AT&T's misrepresentations of its intent to perform under the contract – Atos's mole-based fraudulent concealment claim concerns AT&T's undisclosed use of the mole to help promote AT&T interests within Atos and gain an edge in negotiations to resolve the parties' contractual dispute.  While the Addendum addresses scope and pricing, it makes no mention of any contractual component resembling AT&T's alleged exploitation of the mole.

Courts have found fraudulent concealment claims insufficiently distinct from breach of contract claims where the alleged misrepresentations directly concern a party's performance under the agreement.  *See, e.g., Apotex Corp. v. Hospira Healthcare India Private Ltd.*, No. 18-CV-4903, 2019 WL 3066328, at *4 (S.D.N.Y. July 12, 2019) (dismissing a claim for fraudulent concealment as duplicative of a contract claim where "the alleged harm remains grounded in [the defendant's] dishonesty about its supply, a matter covered by the Agreement); *TVT Records*, 412 F.3d at 91 (dismissing a claim of fraudulent concealment where the "non-disclosure of collateral aims … were not distinct fraudulent misrepresentations but, rather, were allegations about defendants' states of minds used to support the contention that they intended to breach the contract (i.e. the motives for the breach)").  Unlike those cases, AT&T's alleged concealment of the mole to gain inside information from the mole ***after*** the contract was signed goes beyond the

allegation that AT&T never intended to perform its obligations under the agreement.  The mole-related fraudulent concealment claim therefore is not futile.

In sum, Atos's fraudulent inducement claim and its first fraudulent concealment theory are futile.  Only the mole-related fraudulent concealment claim is plausible.  The court turns next to the remaining claims, all of which are based on the alleged misappropriation of Atos's confidential information.

### 2.    Aiding and Abetting Breach Of Fiduciary Duty

In its proposed counterclaim for aiding and abetting breach of fiduciary duty, Atos alleges (1) that the mole breached his duty of good faith and loyalty to Atos by feeding Atos's confidential information to AT&T and promoting AT&T's interests within Atos after the Addendum was signed; (2) that AT&T encouraged the mole's behavior by continuing to communicate with him without alerting Atos of their communications and raising the possibility of a job for the mole at AT&T; and (3) that Atos suffered damages because it would have terminated the contract earlier had it known of the mole's "collusion" with AT&T.  (Def. Mem. at 21-22; PAC at 68 ¶ 113.)

To state a claim for aiding and abetting a breach of fiduciary duty, the plaintiff must show:  "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach."  *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp.2d 372, 442 (S.D.N.Y. 2010).  Atos plausibly pleads the required elements.

AT&T does not dispute that Atos sufficiently alleges the mole breached a duty of loyalty to Atos.  Instead, AT&T argues that Atos's aiding and abetting claim fails "because it requires the defendant knowingly induced or participated in the alleged breach."  (Pl.

Mem. at 22 (citing *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp.2d 300, 313 (S.D.N.Y. 2009)).)  AT&T contends it did not encourage or incentivize the mole's breach, pointing out that the mole repeatedly initiated contact with AT&T and noting that the AT&T employee who communicated with the mole insisted she did not ask the employee "to write [to Atos] nor did [I] coach him."  (See Pl. Mem. at 22 (quoting 5/12/2023 Pressment Decl. ¶ 21.).  AT&T also argues that mere inaction of an alleged aider or abettor is not actionable unless the defendant owes a fiduciary duty directly to the plaintiff, which AT&T does not owe.  (*See* Pl. Mem. at 22.)

Based on the communications cited in the PAC, AT&T's involvement with the mole was not as passive as AT&T suggests.  For instance, an AT&T employee initiated contact with the mole on at least seven occasions (PAC at 68 ¶¶ 113, 114; 70 ¶ 116; 71 ¶¶ 120-22; 77 ¶ 140), shared the mole's communications with other AT&T employees (*Id.* at 73 ¶ 129; 76 ¶ 138); and told the mole she would try to get him a job at AT&T (*Id.* at 68 ¶ 113) and give him "credit" for his work (*Id.* at 76 ¶ 139).  These actions demonstrate far more of an active role than those of the defendants in the cases AT&T cites to argue that its actions did not constitute the substantial assistance required to sustain an aiding and abetting claim.  *See Kaufman v. Cohen*, 307 A.D.2d 113, 126, 760 N.Y.S.2d 157 (1st Dep't 2003) ("assisting [the breaching party] in reacquiring an interest in [real estate], not an unusual activity for those in the business of commercial real estate development, hardly constitutes assisting in a breach of fiduciary duty by itself"); *Cromer Finance Ltd. v. Berger,* 137 F. Supp.2d 452, 470 (S.D.N.Y. 2001) ("A clearing broker does not provide 'substantial assistance' to or 'participate' in a fraud when it merely clears trades").

AT&T argues, with some merit, that the contact between AT&T and the mole was "expected" because the mole "'was directly involved in the negotiations leading up to the execution of the [c]ontract … and involved in gathering detailed information concerning the customer devices to be transitioned to AT&T and engaged directly on that topic and others with AT&T personnel including the AT&T employee.'" (Pl. Mem. at 22-23 (citing PAC at 69 ¶114) (internal brackets omitted).) From AT&T's perspective, the post-execution communications between the AT&T employee and the mole were merely benign expressions of commiseration between employees of the opposing parties who were invested in seeing a tough deal through to the end. AT&T may well be able to prove as much at summary judgment or at trial. But drawing that conclusion now requires making inferences in AT&T's favor, which the Court cannot do. Atos's aiding and abetting claim is not futile.

### 3. Defend Trade Secrets Act

Atos's proposed claim for violation of the Defend Trade Secrets Act ("DTSA") under 18 U.S.C. § 1836 (PAC at 86 ¶¶ 184-92) alleges that through its communication with the mole, AT&T "knowingly acquired Atos's confidential internal communications reflecting Atos's confidential and secret business information and strategies directly relevant to the [ ] Addendum and negotiations with AT&T concerning the contract." (*Id.* at 86 ¶ 187.) At this early juncture, the court cannot conclude the DTSA claim is futile.

Under the DTSA, "a party must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Kraus USA,*

*Inc. v. Magarik*, No. 17-CV-6541, 2020 WL 2415670, at *4 (S.D.N.Y. May 12, 2020); *accord Zirvi v. Flatley*, 433 F. Supp.3d 448, 464 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582 (2d Cir. 2020) (reciting elements); *Medidata Solutions, Inc., v. Veeva Systems Inc.*, No. 17-CV-589, 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018) (same).

A "trade secret" is defined as "'all forms and types of financial, business, scientific, technical, economic, or engineering information, including ... methods, techniques, processes, procedures, [and] programs,'" but only if "'(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Kairam v. West Side GI, LLC*, 793 F. App'x 23, 27-28 (2d Cir. 2019) (quoting 18 U.S.C. § 1839(3)).  To determine if information is a trade secret, courts generally consider six factors:

> "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*Universal Processing LLC v. Weile Zhuang*, No. 17-CV-10210, 2018 WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018) (quoting *In re Document Technologies Litigation*, 275 F. Supp.3d 454, 462 (S.D.N.Y. 2017)).

While determination of whether particular information is a trade secret is typically a fact-intensive inquiry not amenable to resolution on a motion to dismiss, "courts dismiss

34

claims involving trade secrets where they are not actually secret or there is no discernible economic value from them not being generally known." *Kraus USA*, 2020 WL 2415670, at *5 (collecting cases).   Here, AT&T argues that the internal communications and "business strategies" the mole shared with AT&T are not "trade secrets" because (1) none of the information the mole shared with Atos was confidential, and (2) Atos cannot derive independent economic value from it.  (*See* Pl. Mem. at 23; *see also id.* at 20 ("none of the communications (which are quoted at length in the PAC) contain **any** confidential or proprietary information – no prices, designs, methods, calculations or anything of the sort. In fact, the [allegations] primarily pertain to information **AT&T provided** to Atos") (emphasis in original).)   AT&T also points out that the cases Atos cites to argue that "business strategies" constitute protectable trade secrets do not simply include "business strategies" alone, but instead require more specific, commonly protected trade secrets such as client lists, advertising data, pricing structures, and vendor relationships.  (*See* Pl. Mem. at 23 n.13 (citing *Helio Logistics, Inc. v. Mehta*, No. 22-CV-10047, 2023 WL 1517687 (S.D.N.Y. Feb. 3, 2023)).)

Atos counters that AT&T takes "too narrow a view" of what constitutes a trade secret.  (Def. Reply at 9.)  Atos argues that the information the mole shared with AT&T included Atos's confidential business strategies in responding to AT&T's counterpoints for the particular deal at issue.  (*Id.*)  Despite the fact the information is no longer confidential or helpful to others, the information the mole shared with AT&T, Atos asserts, had independent economic value at the time the mole shared it because the mole provided insight into Atos's internal negotiating positions – information to which AT&T would not otherwise have had access.  (*Id.*)  Atos argues AT&T's knowledge of its

"business strategies" and internal communications with respect to the dispute over the Addendum gave AT&T an unfair advantage when attempting to resolve the dispute.  (*Id.*) Atos also asserts the information was protected and not intended to be shared with third parties, as the Atos employees with whom this information was shared all were subject to non-disclosure agreements.  (Def. Mem. at 22-23; *see also* PAC at 88 ¶ 198.)

At oral argument, Atos could not identify any cases addressing whether post-execution internal communications about an ongoing contract dispute with a counterparty are protectable as trade secrets, and the Court is not aware of any.  (Hrg. Tr. at 18-20.) But AT&T has not cited any cases to the contrary.  While the substance of Atos's alleged trade secrets does not include the more typical subject matter such as proprietary methods, customer lists, and pricing structures, Atos has plausibly plead both (1) that it took measures to keep secret the information shared by the mole, and (2) that it derived economic value from keeping the information from being known to AT&T at the time.  This is sufficient to assert a plausible claim; the Court cannot conclude "beyond doubt that [Atos] can prove no set of facts in support" of its proposed DTSA counterclaim.  *See Pangburn v. Culbertson*, 200 F.3d 65, 71 (2d Cir. 1999).  Accordingly, the DTSA claim is not futile.

### 4.    Unfair Competition

Atos also seeks to add a claim for unfair competition under New York common law on the theory that AT&T misappropriated Atos's information to gain a competitive advantage in the parties' dispute over the Addendum after it was signed.  (PAC at 88 ¶¶ 194-95.)  Under New York law, "an unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property."  *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 478

(N.Y. 2007) (internal quotation marks and brackets omitted).  AT&T argues that Atos's allegations are futile because they do not involve the taking of another's "property" to compete against that party's own use of that property.  (Pl. Mem. at 23.)   Unfair competition is not, however, so narrow as AT&T would have it.

As the New York Court of Appeals has recognized, "property" has been used interchangeably with "commercial advantage" when evaluating unfair competition claims. *ITC Ltd*, 9 N.Y.3d at 478.  There are "incalculable variety of illegal practices falling within the unfair competition rubric," and New York courts have called it a "broad and flexible doctrine that depends more upon the facts set forth ... than in most causes of action." *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc.,* 672 F.2d 1095, 1105 (2d Cir. 1982) (internal citations and quotation marks omitted). The tort is "adaptable and capacious," and New York courts have broadly described it as encompassing "any form of commercial immorality," or "misappropriati(ng) for the commercial advantage of one person ... a benefit or 'property' right belonging to another," or simply as "endeavoring to reap where (one) has not sown." *Id.*  (internal quotation marks omitted).  Atos's proposed claim thus falls comfortably within the ambit of conduct recognized to be unfair competition.

AT&T also argues that Atos's allegations fail to show the bad faith or dishonest purpose required to establish an unfair competition claim.  (Pl. Mem. at 23-24.)  AT&T is correct that proof of bad faith is required.  *See Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.,* 1 F. Supp.3d 224, 275 (S.D.N.Y. 2014) ("Bad faith is an essential element of an unfair competition claim"), *aff'd sub nom. Big Vision Private Ltd. v. E.I. du Pont de Nemours & Co.,* 610 F. App'x 69 (2d Cir. 2015).  For pleading purposes, Atos has satisfied

that requirement.  One can reasonably infer bad faith from allegations that AT&T secretly exploited a mole within Atos to gain a commercial advantage in the parties' business relationship under the Addendum.  Atos's proposed unfair competition claim is not futile.

### 5. Tortious Interference with Contract

Atos's proposed claim for tortious interference with contract alleges that AT&T was aware of or had reason to be aware of the mole's contractual obligation not to disclose Atos's confidential information (pursuant to a nondisclosure agreement ("NDA")), yet actively encouraged, solicited, and facilitated the mole's breaches.  (PAC at 88 ¶¶ 198-200.)  This claim too is not futile.

A tortious interference claim requires: (i) "the existence of a valid contract between the plaintiff and a third party"; (ii) "defendant's knowledge of that contract"; (iii) "defendant's intentional procurement of the third-party's breach of the contract without justification"; (iv) "actual breach of the contract"; and (v) "damages resulting therefrom." *Rich v. Fox News Network, LLC,* 939 F.3d 112, 126-27 (2d Cir. 2019) (internal quotations omitted).  AT&T argues that Atos's proposed claim is futile for multiple reasons, none of which stands up to scrutiny.  First, AT&T argues that it lacked knowledge of an alleged NDA between Atos and the mole.  (Pl. Mem. at 23.)  To the contrary, a reasonable inference can be drawn that as a sophisticated business partner and competitor of Atos, AT&T knew that Atos's employees had agreements requiring them not to disclose confidential information.  No doubt AT&T had similar agreements with its own employees.

AT&T also argues that the PAC lacks any allegations demonstrating when the NDA was signed, whether it was even valid, and what specific provision was breached.  (Pl. Mem. at 24.)  Again, it is reasonable to infer from the allegations that the NDA was a valid contract that was in effect prior to the mole's disclosure of Atos's confidential information

and that the provision breached prohibited disclosure of Atos's confidential information. (*See* PAC at 88 ¶¶ 198-99.)  Whether all of that proves to be true is a matter for a later juncture.

AT&T next argues that the alleged interference must be "unjustified" and that a party is justified as long as they are acting in their own economic interest.  (Pl. Mem. at 24.)  The economic interest defense to tortious interference claims is available where (1) the defendant sought to protect an economic interest in the breaching party's business, and (2) plaintiff makes no showing that defendant acted maliciously, fraudulently, or illegally.  *See Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp.3d 16, 29-30 (S.D.N.Y. 2017).  As to the former, whether AT&T, in procuring the mole's violation of his nondisclosure obligations, sought to protect the mole's economic interest is a question of fact.  As to the latter element, the PAC alleges fraudulent and illegal conduct by Atos.  The Court cannot conclude in the absence of an evidentiary record that AT&T's defense would prevail.  Atos's proposed tortious interference claim thus is not futile.

### 6.    Civil Conspiracy

Finally, Atos seeks to add a claim of civil conspiracy, alleging that AT&T and the mole conspired to commit the above torts in order to further AT&T's business position and "ultimately to manufacture an illegitimate basis to terminate the [ ] Addendum for cause and seek a windfall penalty payment."  (PAC at 90 ¶ 205.)  "To state a claim for civil conspiracy, a plaintiff must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury."  *Ritchie Capital Mgmt., L.L.C. v. General Electric Capital Corp.*, 121 F. Supp.3d 321, 339 (S.D.N.Y. 2015), *aff'd*, 821 F.3d 349 (2d

Cir. 2016) (internal quotation marks omitted).  Since civil conspiracy must be derivative of an underlying tort, a civil conspiracy claim "should be dismissed if the underlying tort claim either is not adequately pleaded or has been dismissed."  *Hua Xue v. Jensen*, No. 19-CV-1761, 2020 WL 6825676, at *12 (S.D.N.Y. Nov. 19, 2020).

Atos argues that because Atos's underlying tort claims survive, so too does Atos's claim for civil conspiracy.  (*See* Def. Reply at 10 n.7.)  However, "where the acts underlying a claim of conspiracy are the same as those underlying other claims alleged in the complaint, the conspiracy claim is dismissed as duplicative." *Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, No. 99-CV-9623, 2007 WL 1040809, at *26 (S.D.N.Y. April 4, 2007) ("Here, Plaintiffs' alleged overt acts in support of the conspiracy claim are essentially the same alleged acts that form the basis of the aiding and abetting claim. Therefore, the FAC's First Cause of Action (conspiracy) is duplicative of the Second Cause of Action (aiding and abetting)"), *aff'd sub nom. Briarpatch Ltd. LP v. Phoenix Pictures, Inc.*, 312 F. App'x 433 (2d Cir. 2009).  "[A] cause of action for civil conspiracy that offers no new allegations beyond those alleged in support of other tort claims alleged elsewhere must be dismissed as duplicative." *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, No. 12-CV-3723, 2016 WL 5719749, at *7 (S.D.N.Y. Sept. 29, 2016) (internal quotation marks omitted).

Atos offers no new allegations beyond those alleged in support of Atos's other claims in the PAC.  Under the civil conspiracy heading, Atos alleges that "AT&T and the mole entered into an agreement whereby the mole would covertly disseminate to AT&T sensitive confidential business information of Atos and simultaneously repeat to Atos representatives select information, a skewed factual narrative, and knowingly false or

misleading assertions of AT&T about the scope, nature, and pricing of the services to be provided under the [ ] Addendum."  (PAC at 89 ¶ 204.)  Though there are differences in the wording, the allegations are the same as those underlying Atos's claims for aiding and abetting breach of fiduciary duty and tortious interference with contract.  (*See* PAC at 85 ¶¶ 178-83; 88 ¶¶ 198-202.)

Because Atos may not "reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim," the proposed civil conspiracy claim is futile.  *Aetna Casualty & Surety Co. v. Aniero Concrete Co.*, 404 F.3d 566, 591 (2d Cir. 2005) (dismissing a claim for conspiracy as duplicative of fraudulent inducement claim); *see also Durante Brothers & Sons, Inc. v. Flushing National Bank,* 755 F.2d 239, 251 (2d Cir. 1985) ("Count 7 added no new allegations to those of counts 1-6 except to reiterate that [defendants] had conspired to commit the acts heretofore described ... [and therefore] Count 7 was properly dismissed ... as duplicative ... ").

## B.   Bad Faith

Having found that several of Atos's proposed amended counterclaims are not futile, the Court next turns to whether Atos brought its motion in bad faith.  Bad faith exists where counsel conveyed a misleading impression that claims were fixed or where the earlier decision not to plead additional allegations "was a tactical one."  *City of Birmingham Firemen's & Policemen's Supplemental Pension System v. Ryanair Holdings PLC,* No. 18-CV-10330, 2022 WL 4377898, at *2 (S.D.N.Y. Sept. 22, 2022) (citing *State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990)). Neither is the case here.

AT&T argues that "it defies credulity to suggest that, with depositions looming and document discovery nearly completed, Atos 'suddenly' uncovered documents to support seven new counterclaims."  (Pl. Mem. at 24.)  Atos does not claim to have "suddenly" discovered all of its proposed claims and falls back instead on the accumulation of evidence over time.  While Atos should have been more diligent, there is no indicia of bad faith.  Nor is there anything to suggest that Atos sought to hide its intention to plead many of the facts underlying Atos's proposed counterclaims.  As AT&T itself points out, Atos described in general terms the factual allegations underlying its fraud claims as early as early as October 25, 2021 at conference before the Court.  (*See* Pl. Mem. at 9.)  And, while Atos could and should have communicated earlier about its intention to file for leave to amend, its actions do not constitute gamesmanship meriting denial of leave to amend.  *Cf. In re Interest Rate Swaps Antitrust Litigation,* No. 16-MC-2704, 2018 WL 2332069, at *27 (S.D.N.Y. May 23, 2018) (plaintiff's counsel "engaged in unacceptable gamesmanship" where counsel mislead both the Court and opposing counsel by concealing the possibility of a momentous amendment until "virtually the last possible minute," feigning that the claims to be litigated were fixed, and causing opposing counsel to incur substantial costs and expenses on work that the amended complaint stood to overtake).

AT&T further points to the fact that Atos's "counsel has confirmed that the Atos Employee it has unceremoniously designated a 'mole,' and accuses of breaching his fiduciary duty to Atos and expropriating trade secrets is not only still employed by Atos, heis jointly represented by Atos' counsel in this Action."  (Pl. Mem. at 25 (citing 5/12/2023 Pressment Decl. ¶ 26).)  While this fact may not do Atos any favors regarding credibility,

it does not demonstrate bad faith.[21]   The Court finds no bad faith to warrant denying

amendment.

## C.     Prejudice

Finally, the Court turns to whether amendment would be prejudicial to AT&T.  The

Second Circuit has stated that prejudice to the opposing party resulting from a proposed

amendment is among the "most important" reasons to deny leave to amend.  *AEP Energy*

*Services Gas Holding Co. v. Bank of America, N.A.*, 626 F.3d 699, 725 (2d Cir. 2010).

"Prejudice to the nonmoving party may arise when the proposed amendment causes the

nonmoving party to 'expend significant additional resources to conduct discovery and

prepare for trial,' or when the proposed amendment causes significant delay to the

disposition of the original claim or claims."  *Maoli,* 2018 WL 4278352, at *5 (quoting *Block,*

988 F.2d at 350).

"The degree of potential prejudice a motion to amend may cause is evaluated

against the overall progress of the litigation:  the closer to the end of discovery or the

closer to trial a motion to amend is filed, the more likely that it will cause prejudice and

delay to the nonmoving party."  *Maoli*, 2018 WL 4278352, at *5 (citing *GEM Global Yield*

*Fund,* 2006 WL 2389345, at *11).  Courts thus are particularly likely to find prejudice

where the parties have already completed discovery and moved for summary judgment.

*See, e.g., AEP Energy Services Gas Holding*, 626 F.3d at 726-27 (affirming denial of

leave to amend where plaintiffs filed their motion for leave several months after cross-

---

[21] At oral argument, Atos's counsel asserted there were "various reasons" the mole could still be employed by Atos and argued it was not relevant to the instant motion.  (Hrg. Tr. at 66.)

motions for summary judgment were filed); *Ansam Associates, Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir. 1985) (affirming denial of motion to amend as "especially prejudicial given the fact that discovery had been completed and [the defendant] had already filed a motion for summary judgment"); *Baez v. Delta Airlines, Inc.*, No. 12-CV-3672, 2013 WL 5272935, at *7-8 (S.D.N.Y. Sept. 18, 2013) (denying motion to amend where discovery was completed and amendment would require redeposition of witnesses).  However, as most amendments entail additional discovery and some delay, those factors alone do not give rise to prejudice.  *See Bridgeport Music, Inc. v. Universal Music Group, Inc.*, 248 F.R.D. 408, 414 (S.D.N.Y. 2008) ("Even assuming that additional discovery would impose costs on ... the current defendants, allegations that an amendment will require the expenditure of some additional time, effort, or money do not constitute undue prejudice") (internal quotation marks and brackets omitted).

AT&T argues that the addition of new counterclaims will delay progress and require AT&T to expend additional resources on obtaining new discovery and filing motions to dismiss the new counterclaims.  (Pl. Mem. at 25.)  AT&T overstates its case.  The parties have not taken depositions, exchanged expert reports, or filed motions for summary judgment.  Indeed, based on the parties' most recent joint proposal, fact discovery is scheduled to close six months from the latest of the issuance of an order on the motion currently before the Court or the filing of a responsive pleading should the Court grant Atos's instant motion.  (Dkt. 82.)  Further, at oral argument, Atos disavowed the need for any substantial additional discovery that would be required by the amendments, and, apart from making a general statement that allowing amendment would open up the case to further discovery, AT&T did not identify any discovery in particular that it would seek.

(*See* Hrg. Tr. at 64-65.)  The Court finds that amendment of Atos's counterclaims will pose no undue prejudice to AT&T.

## CONCLUSION

For the foregoing reasons, Atos's motion for leave to amend is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED with respect to Atos's claims for fraudulent concealment (on the theory AT&T concealed its alleged collusion with the mole), aiding and abetting breach of fiduciary duty, DTSA, unfair competition, and tortious interference.  The motion is DENIED with respect to Atos's claims for fraudulent inducement, fraudulent concealment (on the theory AT&T concealed its knowledge of the pricing/scope requirements), and civil conspiracy.  To the extent not discussed above, the Court has considered the parties' arguments and finds them to be without merit.

Within seven days of entry of this Decision and Order, Atos shall file its Second Amended Complaint.  Within 14 days of entry of this Decision and Order, the parties shall meet and confer and file a joint proposed schedule for completing fact and expert discovery.

So Ordered.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:  December 11, 2023
        New York, New York